Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
Angelina Alioto-Grace (SBN 206899)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

Mary Katherine Arcell, Keith Dean Bradt, Jose Brito, Jan-Marie Brown, Rosemary D'Augusta, Brenda Davis, Pamela Faust, Carolyn Fjord, Donald C. Freeland, Donald Frye, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Valarie Jolly, Michael Malaney, Lenard Marazzo, Lisa McCarthy, Timothy Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, June Stansbury, Clyde Duane Stensrud, Gary Talewsky, Diana Lynn Ultican, Pamela Ward, and Christine M Whalen,

                           Plaintiffs,

vs.

Google LLC, Alphabet, Inc., XXVI Holdings, Inc., Apple, Inc., Tim Cook, Sundar Pichai, and Eric Schmidt,

                           Defendants.

Case No:

**COMPLAINT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT**
**(15 U.S.C. §§ 1 AND 2)**

**DEMAND FOR JURY TRIAL**

1.      This is a private antitrust suit brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. 15, 26) for actual and potential damages and injunctive relief caused

by reason of and made necessary by the Defendants' past, present and substantially threatened continued violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. 1, 2).

2.     The Defendants Apple and Google agreed that Apple would not compete in the search business in competition with Google.

3.     In exchange for Apple's commitment not to compete in the search business in competition with Google, Google agreed to share its profits from the search business with Apple and, in addition, to pay Apple extra billions of dollars.

4.     Apple agreed to assist Google in building its search business for their mutual benefit.

5.     For Google to be able to generate sufficient billions of dollars to pay to Apple, Apple agreed that Google would be the only search engine automatically included in all of Apple's devices.

6.     Apple's agreement to include Google as the initial search engine on all of Apple's devices gives Google a substantial and unfair anticompetitive advantage over other search providers, actual and potential, including Yahoo!, DuckDuckGo, Bing, and others.

7.     Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and non-Google favored advertisers.

8.     These agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Officers and Chairmen of Apple and Google.

9.     The architects of the combination during the early 2000's were Steve Jobs, the CEO and Chairman of Apple, and Eric Schmidt, the CEO and Chairman of Google.

10.     More recently, the continued combination to eliminate competition between Apple and Google for the search business has been re-affirmed by Tim Cook, the CEO of Apple, and Sundar Pichai, CEO and Chairman of Google.

11.     The meetings between the CEOs and Chairmen of Apple and Google were clandestine so that they could fraudulently conceal the agreement not to compete in the search business.

12.     The Plaintiffs do not know when the agreement between Apple and Google was originally formed but allege that it began with Messrs. Jobs and Schmidt and that it has continued in force under Messrs. Cook and Pichai.

13.     Some of the secret meetings have been photographed and taped by bystanders who chanced to notice the conspirators meeting together.

14.     These meetings were undertaken to promote the shared vision that Apple and Google would act, in effect, as one company that had been merged without merging.  Apple and Google invented and used the word "co-opetitive" to describe their unlawful combination and conspiracy.

15.     These CEOs and Chairmen knew and understood that their agreements were illegal under the antitrust laws of the United States.  The CEOs and Chairmen had been advised that their agreement to divide the market would violate the antitrust laws.

16.     Notwithstanding the advice of their counsel, the CEOs and Chairmen of Apple and Google insisted on going forward with their agreement in contumacious disregard of the law, thereby waiving any privilege that otherwise would attach to communications with their counsel.

17.     The overall purpose of the Defendants' agreement was to eliminate the potential competition of Apple entering the search business.

18.     In furtherance of the unlawful agreement, the Defendants engaged in the following acts and means, among others, to ensure the success of the agreement:

     a.     secret meetings between the CEOs;

     b.     profit-pooling;

     c.     payment of billions of dollars every year by Google to Apple;

     d.     automatic inclusion of Google search on Apple devices, to the exclusion of other search companies and non-Google favored advertisers;

     e.     agreement that Apple would not compete;

     f.     the recognition and agreement that the more money that Google made the more money that Apple would make; and

     g.     elimination of Apple as a potential competitor in the search business.

19.     More than half (50%) of Google's search business was conducted through the use of Apple devices.

20.     Because more than half of Google's search business was conducted through Apple devices, Apple was a major potential threat to Google, and that threat was designated by Google as "Code Red."

21.     Google viewed Apple as a potential competitor.

22.     If Apple became a competitor in the search business, Google would have lost half of its business.

23.     As a result, Google paid billions of dollars to Apple and agreed to share its profits with Apple in order to eliminate the threat and fear of Apple as a competitor.

24.     Google, as of September 2020, controlled 94% of the U.S. mobile search engine market.

25.     Google, as of September 2020, controlled 82% of the U.S. computer search engine market.

26.     For the last 10 years, from 2009 to 2019, Google increased its control of the U.S. search engine market share from 80% to 88%.

27.     Google charges higher prices to advertisers than would otherwise be the case in the absence of the Google-Apple agreement.

28.     By reason of the agreement between Apple and Google, the prices, the production, the innovation, and the quality of the search business has been substantially, adversely, and anticompetitively affected.

29.     In addition to the potential and actual damages suffered by reason of the conspiracy, the Plaintiffs charge under Section 16 of the Clayton Act that all the illegal payments made by Google to Apple, all the illegal profit sharing, and all the payments by Google to Apple made in furtherance of their agreement must be disgorged under principles of equity on the grounds that these wrongdoers cannot be allowed or permitted to profit from their own wrongdoing.   Plaintiffs request that the Court require Google and Apple to disgorge the payments made by Google to Apple in consideration of Apple's agreement not to compete against Google, in consideration of their agreement to pool or share profits, and in consideration of Apple's agreement to provide exclusive out-of-the-box access to Google on Apple's devices, which payments are being used to fund or promote the illegal conduct alleged.  In addition, this Court must effect a forward-looking divestiture of the anticompetitive structures that Google and Apple have erected to commit their violations, for the benefit of the public as a whole, by dividing Google into separate and independent companies and dividing Apple into separate and independent companies to establish competition in search in the future.

30.     Because of the fraudulent nature of the clandestine meetings of these CEOs and Chairmen of Apple and Google, and because of the secrecy of their agreements, the exact amounts and times of the payments, rebates, and profit sharing that Google made to Apple are alleged on information and belief.

31.     In any one year, Google paid Apple more than $1 billion.

32.     In any one year, Google paid Apple more than $3 billion.

33.     In any one year, Google paid Apple more than $6 billion.

34.     In any one year, Google paid Apple more than $9 billion.

35.     In any one year, Google paid Apple more than $10 billion.

36.     In any one year, Google paid Apple more than $12 billion.

37.     In any one year, Google paid Apple more than $12 billion.

38.     In any one year, Google paid Apple more than $15 billion.

39.     From 2005 up to and including the time of the filing of this complaint, Google paid Apple more than $50 billion not to compete in the search business.

40.     Google paid Apple to stay out of the search business.

41.     Apple accepted the payments from Google and stayed out of the search business.

42.     Apple promoted Google in the search business over other search providers and non-favored advertisers.

43.      Apple and Google have the motive, the opportunity by their meetings, and the ability to control the search business, to share in its profits, and to eliminate the potential competition of Apple.

44.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

45.     The Court has personal jurisdiction over the Defendants because all Defendants are domiciled and are found within the United States, and venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Defendants transact business and are found within this District.

46.     Defendants Google and Apple have engaged in, and their activities have substantially affected, the interstate and foreign trade and commerce of the United States. Google and Apple provide a range of products and services that are intentionally marketed, distributed, sold, and offered to users of search throughout the fifty states and across state lines and in foreign countries.  The restraints alleged in this Complaint affect, and are a burden on, the free and open trade between and among the States of the United States and the trade and commerce between and among the United States and foreign nations.

47.     Each of the following Plaintiffs named below is an individual and a citizen of the state listed as the address for each such Plaintiff, and in the four years prior to the filing of this action, each Plaintiff was a user of search services on the internet:

> Mary Katherine Arcell, New Orleans, LA
> Keith Dean Bradt, Reno, NV
> Jose Brito, Reno, NV
> Jan-Marie Brown, Reno, NV
> Rosemary D'Augusta, San Francisco, CA
> Brenda Davis, Dallas, TX
> Pamela Faust, Cincinnati, OH
> Carolyn Fjord, Sacramento, CA
> Donald C. Freeland, Cincinnati, OH
> Donald Frye, Colorado Springs, CO
> Gabriel Garavanian, Boston, MA
> Harry Garavanian, Boston, MA
> Yvonne Jocelyn Gardner, Colorado Springs, CO
> Valarie Jolly, Dallas, TX
> Michael Malaney, Grand Rapids, MI
> Lenard Marazzo, Reno, NV
> Lisa McCarthy, Naples, FL
> Timothy Nieboer, Kalamazoo, MI
> Deborah Pulfer, Sidney, OH
> Bill Rubinsohn, Philadelphia, PA

Sondra Russell, Waco, TX
June Stansbury, Reno, NV
Clyde Duane Stensrud, Seattle, WA
Gary Talewsky, Boston, MA
Diana Lynn Ultican, Seattle, WA
Pamela Ward, Holmes Beach, FL
Christine M Whalen, New Orleans, LA

48.     Because Plaintiffs are users of the services provided by internet search engines, and because they have used Google search on an almost daily basis, they are threatened with harm and damage in that they have been deprived of the quality, service and privacy that they otherwise would have enjoyed but for Google's anticompetitive conduct. They have also been forced to withstand prejudicial steering by Google, as well as the annoying and damaging distortion of search results from Google in favor of Google's preferred advertisers.  In addition, Plaintiffs have been damaged and continue to be threatened with damage because they have used Google search in their businesses and have, as a result, been forced to bear the added expense that results from distorted and steered search results.  Further, Google has stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model.

49.     By restricting competition in general search services, Google's conduct has harmed users by reducing the quality of general search services (as related to privacy, data protection, and use of consumer data), by lessening choice in general search services, and by impeding innovation.

50.     Defendant Google, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Mountain View, California. Google is a subsidiary of Defendant XXVI Holdings Inc., which is a subsidiary of Defendant Alphabet Inc. Defendant Alphabet Inc. is a publicly traded company that is incorporated and

existing under the laws of the State of Delaware.  Its principal executive offices are in Mountain View, California. (Unless separately noted, Defendants Google, XXVI Holdings Inc. and Alphabet will hereinafter and above be collectively referred to as "Google".)

51.     Defendant Apple, Inc. (hereinafter and above referred to as "Apple") is a corporation organized and existing under the laws of the State of Delaware.  It is headquartered in Cupertino, California.

52.     Defendant Tim Cook is the current CEO of Apple, Inc.  Defendant Cook personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Defendant Pichai of Google. Defendant Cook's acts were authorized and ratified by Apple, and Defendant Cook was paid bonuses for the anticompetitive success of the agreements with Google.  The board of directors of both Google and Apple knew of these agreements and understood their purpose, intent, and motive, and approved and ratified them.

53.     Defendant Sundar Pichai is the current CEO of Defendant Alphabet Inc. and of Defendant Google LLC.  Defendant Pichai personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Defendant Cook of Apple. Defendant Pichai's acts were authorized and ratified by Google, and Defendant Pichai was paid bonuses for the anticompetitive success of the agreements with Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent, and motive, and approved and ratified them.

54.     Defendant Eric Schmidt is the former CEO and Chairman of Google. Defendant Schmidt personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those

agreements at secret meetings with his counterparts Steve Jobs and Defendant Cook of Apple. Defendant Schmidt's acts were authorized and ratified by Google, and Defendant Schmidt was paid bonuses for the anticompetitive success of the agreements with Apple.  Defendant Schmidt served on the Board of Directors of both Google and Apple.  The board of directors of both companies knew of these agreements and understood their purpose, intent, and motive, and approved of and ratified them.

55.     Various persons, partnerships, firms, and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.

56.     Apple and Google have achieved their size by multiple acquisitions of competitors and potential competitors, all of which have violated Section 7 of the Clayton Antitrust Act (15 U.S.C. §18).

57.     Since 2000, Apple has acquired more than 120 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.  *FTC vs. Procter & Gamble Co.*, 386 U.S. 568 (1967).

58.     Since 2000, Google has acquired more than 247 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.

59.     Apple and Google are two of the largest companies in the world.

60.     Apple and Google have abused their size by agreeing not to compete, by their profit sharing, by their preferential search settings, by their exclusion of non-favored Google advertisers and by their suppression of actual and potential search providers.

61.     Apple and Google have abused their size by engaging in anticompetitive conduct, some of which has resulted in fines in the billions of dollars.

62.     Although "Mere size * * * is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly * * * size carries with it the opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift*, 286 U.S. 106 (1932).  Also see *United States v. Aluminum Co. of American*,  148 F.2d 416, at 430 (2d Cir 1945), Opinion of Judge Learned Hand sitting by certification of the Supreme Court and *United States v. Paramount Pictures*, 334 U.S. 141, 174 (1948).

63.     Both Apple and Google have abused and have utilized their size in the past for unlawful purposes, using unlawful means to achieve unlawful objectives.

64.     Both Apple and Google have abused their size by engaging in unlawful acquisitions under Section 7 of the Clayton Antitrust Act and have been found to have engaged in anticompetitive conduct.  Indeed, Google has been fined billions of dollars for having abused its size by engaging in anticompetitive conduct.

65.     The current CEO of Defendant Alphabet Inc. is Sundar Pichai, who is also the CEO of Google LLC.  The current CEO of Defendant Apple Inc. is Tim Cook.

66.     Defendant Google is one of the wealthiest companies in the world, with a market value of over $1 trillion and annual revenue exceeding $180 billion.

67.     As of November 30, 2021, Google shareholder equity is $244.57 billion, and its market cap is $1.892 trillion.

68.     Google's revenue for 2021 through September is $239.21 billion and its net income is $70.62 billion.

69.     Google's CEO Sundar Pichai was awarded a $242 million pay package after

taking control of Alphabet in 2019. Pichai has earned nearly $1 billion in stock grants over the last five years.

70.     Google has achieved pre-eminent power in search. When asked to name Google's biggest strength in search, Google's former CEO explained: "Scale is the key. We just have so much scale in terms of the data we can bring to bear." By using profit sharing agreements to lock up scale for itself and deny it to others, Google has unlawfully built and maintains its search monopoly, so long as Apple abides by its agreement not to compete against Google.

71.     Apple is an American technology company that specializes in consumer electronics, software and online services.

72.     Apple was founded in 1976 and is now the largest information technology company by revenue in the United States, totaling $274.5 billion in 2020.

73.     Since January 2021, Apple has been the world's most valuable company. As of November 30, 2021, Apple shareholder equity is $63.09 billion, and its market cap is $2.712 trillion.

74.     Apple's revenue so far in 2021 through September is $365.82 billion and its net income is $94.68 billion.

75.      In 2020, Apple CEO Tim Cook was paid a $14.8 million salary and had $281 million worth of stock options that vested; in 2021 Cook was given 5 million Apple shares worth about $750 million.

76.     Apple devices account for roughly 60 percent of mobile device usage in the United States.

77.     Apple's Mac OS (operating system) accounts for approximately 25 percent of total computer usage in the United States.

78.     Apple and Google are currently worth more than $4.5 trillion combined.

79.     Apple and Google believe they are one company: "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo". Apple's general counsel described the reality of their combination as "co-opetition."

80.     Google's primary source of income is advertising revenue generated from its Google search engine.

81.     Google uses consumer search and consumer information to sell advertising.

82.     When a consumer uses Google, the user provides personal information and attention to the delivered searched page in exchange for search results. Google monetizes the user's information and attention by selling ads.

83.     As of September 2020, Google controlled 94 percent of the mobile search engine U.S. market share. As of September 2020, Google controlled 82 percent of the computer search engine U.S. market share.



84.     Google's next closest competitor in 2020 commanded less than 2% of the mobile search market. All the competitors, Yahoo!, Bing, DuckDuckGo, and others have less than 7% of the market compared to Google's almost 94%.



85.     In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

86.     Scale is of critical importance to competition among general search engines for users and search advertisers. Google has long recognized that its competitors will not be able to compete without adequate scale.  The agreement between Apple and Google suppresses the ability of Google's competitors to achieve any scale of significance to be able to compete against Google. That economic prohibition would be eliminated if the agreement between Apple and Google were dissolved.

87.     The most effective way for Google to achieve scale is for its general search engine to be the preset search engine on mobile devices, computers, and other devices; and to agree with Apple not to compete.

88.     In 2005, Apple began using Google as the automatic, preset, out-of-the-box general search engine for Apple's Safari browser.

89.    In return, Google began to pay Apple a significant percentage of Google's yearly general search advertising revenue in the profit-sharing agreement.

90.    In 2007, Google extended this profit-sharing agreement to cover Apple's iPhones.

91.    In 2016, the agreement expanded further to include additional search access points — Siri (Apple's voice-activated assistant) and Spotlight (Apple's system-wide search feature) — making Google the automatic, preset, general search engine for all of Apple's devices.

92.    Currently, Google's profit-sharing agreements with Apple give Google an exclusive, preset position on all significant search access points on Apple computers and mobile devices.

93.    In exchange, since 2005, Google has agreed to share billions of dollars of advertising revenue with Apple each year in consideration for Apple's commitment not to compete in the search market.

94.    Since 2005, Google has become the primary, out-of-the-box exclusive search engine on Apple's Safari browser on its Mac computer, and, since 2007, on Apple's iPhone.

95.    Apple has been paid for the profits it would have made if it had competed with Google without having the expense of doing so.

96.    By reason of the profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has contributed to Google's dominant position in the search market because the more money Google makes in search, the more money Apple makes under the agreements.

97.     The non-compete agreement, the profit-sharing agreement, and the out-of-the-box preference agreement remove any incentive on the part of Apple to compete against Google in the search business.

98.     Google's CEO, Eric Schmidt, served on Apple's board of directors until 2009. In 2007 while serving as both an Apple Director and as Google CEO he stood onstage at the formal unveiling of the Apple iPhone with Steve Jobs, the founder of Apple, and blustered that, with Google search on the iPhone, "you can actually merge without merging" and "If we just sort of merged the two companies, we could just call them AppleGoo."

99.     Apple told Google: "Our vision is that we work as if we are one company."

100.     In 2008, Jobs met at Google's headquarters near Palo Alto with Larry Page and Sergei Brin, the two founders of Google, and with Andy Rubin, the head of Android development for Google, to discuss Google's recent purchase of the Android operating system.  Brin and Page considered Jobs a mentor.

101.     Jobs agreed to continue to give Google access to the exclusive, out-of-the-box search position on the iPhone, as long as there were "good relations" between the two companies.  According to Jobs:  "I said we would, if we had good relations, guarantee Google access to the iPhone and guarantee it one or two icons on the home screen."

102.     Jobs continued to meet with Google executives until his death in October 2011. In mid 2010, he met with Eric Schmidt who was then still CEO of Google, at a café at the Stanford Shopping Center.  In mid 2011 he met again with Larry Page in Job's living room.

103.     At each of these meetings these top executives solidified their agreement that they would cooperate rather than compete against each other.

104.     On information and belief, Google has paid Apple between $8 and 15 billion a year – an amount which is pure profit to Apple.

105. Google makes approximately $25 billion a year in ad revenue from its searches on Apple's devices, iPhones, iPads, and Macs.

106. Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

107. In the past, Apple had actively worked on developing its own general search engine as a potential competitor to Google. As a result, Apple is seen by Google as a potential competitor that potentially threatens Google's dominance in internet search.

109. Apple could make it difficult for its iPhone users to get to Google – and Google knew it.

110. It has been estimated that if Apple were to launch its own search engine in competition with Google, at least $15 billion a year of Google revenue would go to Apple. This is equal to the estimated Google payment to Apple in 2021.

111. But Apple has agreed with Google that it will neither develop nor offer a general search engine in competition with Google.

112. Google has locked in Apple's agreement not to compete by paying Apple billions of dollars from the revenues it derives from advertisers each year.

113. The profits Google shares with Apple make up approximately 15 - 20 percent of Apple's worldwide net income.

114. By paying billions of dollars to Apple each year, Google has locked in Apple's commitment not to compete with Google in search.

115. By paying Apple billions of dollars each year to preserve its position as the initial, out-of-the-box exclusive search provider on Apple devices, Google and Apple have shared monopoly control and have shared the power to set prices and exclude competition in search.

116.   Users will rarely change the search provider on their devices after the devices have been purchased.

117.   By eliminating potential competition from Apple, and by becoming Apple's exclusive search engine, Google can charge higher fees for search advertising and can steer users to its own proprietary apps.

118.   Google's own documents admit that Apple's "Safari default is a significant revenue channel" and that losing that exclusivity with Apple would substantially harm Google's bottom line.

119.   Google viewed the prospect of Apple's competition in the search business as a "Code Red" emergency.

120.   One of the meetings between the CEOs of Google and Apple took place at a dinner on March 10, 2017, between Sundar Pichai, CEO of Google and its parent Alphabet, Inc., and Tim Cook, CEO of Apple, during which they discussed their agreements and the search business.

121.   Tim Cook had actively promoted the profit-sharing arrangement from the very beginning in exchange for Apple's commitment not to compete in the search business.  Cook knew, as Google observed in a 2018 strategy document, that "People are much less likely to change [the] default search engine on mobile."

122.   Google's deal with Apple "prevents the pre-installation of other search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user."

123.   After the meeting, Apple announced that Google would be the search vehicle for Siri, and Google announced that it had increased its payments in its sharing agreements for search traffic.



124.    The photo above was taken by a bystander who discovered a clandestine meeting between Tim Cook of Apple and Sundar Pichai of Google.  As can be seen from the photograph, the dinner was over and Mr. Pichai's left arm rested on a manila folder with documents.



125.    The photo above was taken by a bystander from outside the restaurant where the CEOs of Google and Apple were at dinner.

126.    The profit-sharing agreements between Apple and Google have in fact resulted in Apple pushing more search traffic to Google and denying traffic to Google's competitors.

127.    It was reported that as late as 2014 Apple had been working on its own search engine.  However, Apple opted to receive the payment of billions of dollars from Google instead of competing.

128.    Google's annual payments to Apple – estimated to be $8 billion to $15 billion a year – up from $1 billion a year in 2014, account for 14 to 21 percent of Apple's annual profits.

129.    In 2018, Apple's CEO Tim Cook and Google's CEO Sundar Pichai met again to discuss how Apple could further drive search advertising revenue to Google and increase the amount of Apple's share of the profit-sharing agreement.

130.    After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

131.    Apple's general counsel from 2009 to 2017, Bruce Sewell, described the relationship as one of "co-opetition."

132.    The Google-Apple agreement not to compete and to share in the profits substantially forecloses Google's search competitors from a substantial market.

133.    In 2019, almost 50 percent of Google's search traffic originated on Apple devices.

134.    By agreeing with Apple to pay Apple a substantial portion of the inflated income extracted from its advertisers, Google has locked in Apple's agreement not to compete for search advertising, and by sharing it profits from search revenues from search advertisers with Apple, it has incentivized and ensured that Apple will faithfully maintain its agreement not to compete in the search advertising market.

## VIOLATIONS ALLEGED

*First Claim for Relief*
*An Agreement Not to Compete in the Search Business*

135.    Plaintiffs incorporate the allegations of paragraphs 1 through 134 above and 136-163 below.

136.    Defendants Google and Apple made an agreement that Apple would not compete with Google in the search business. In exchange for that agreement, Google paid Apple billions of dollars;  the Defendants engaged in profit-pooling of the advertising revenues from Google's search business; and Google was granted an exclusive position on

*Complaint for Violation of the Sherman Act*

Apple's platforms to increase the revenues that would be shared.

137. The Defendants' CEOs met privately and secretly to discuss and confirm this agreement and personally understood that that their agreement was a violation of the antitrust laws.

138. The effect of this agreement is to eliminate competition for advertisers and to suppress competition from other smaller search competitors such as Bing, Yahoo!, and DuckDuckGo.

139. Because of Google's and Apple's agreement not to compete and to divide the market, prices have been higher, production has been lower, innovation has been suppressed, quality has been less, and user choice has been eliminated.

140. On the other hand, in the absence of the anti-competitive agreements, and if Apple were to compete against Google in search as it previously intended to do, prices would be lower, production would be higher, the incentives for companies to develop and distribute innovative search products would be restored, quality would be higher, and user choice would be preserved and enhanced.

141. Google's and Apple's agreement not to compete for search advertising is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142. Google's and Apple's agreement to share profits is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

143. Google and Apple's agreement to grant preferential treatment to Google on all Apple devices excludes and forecloses competitors from a substantial market and increases prices to advertisers and is therefore a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

144.    Google's and Apple's anticompetitive agreements have stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model;

145.    Apple has voluntarily participated in and profited by Google's by agreeing not to compete with Google and by sharing the profits from Google's monopoly on search advertising.

146.    By restricting competition in general search services, Google's and Apple's conduct has harmed users by reducing the quality of general search services, by lessening choice in general search services, and by impeding innovation.  Google's anticompetitive acts have had harmful effects on both competition and consumers.

147.    Absent Google's and Apple's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased user choice, and a more beneficial user experience. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and higher consumer welfare overall.

*Second Claim for Relief*

*Conspiracy to Monopolize in Violation of Sherman Act § 2*

148.    Plaintiffs incorporate the allegations of paragraphs 1 through 147 above and 145-163 below.

149.    Defendants have entered into a combination to suppress and eliminate actual and potential competition in the search business and to fix high, arbitrary prices.  The combination of Apple and Google to achieve "Our vision . . . that we work as if we are one company"  has resulted in higher prices, lower quality and the suppression of actual and potential competitors, including DuckDuckGo, Yahoo!, and Bing.

150.    Google controls 94% of the search market and all the actual and potential competitors have the remaining 6%.

151.    Google and Apple have combined to monopolize the search business by agreeing that Apple would not compete with Google on search.

152.    In furtherance of that agreement, Google agreed that it would share its profits with Apple, and Apple agreed to include Google as the only search engine on all of Apple's devices.

153.    Google and Apple further agreed that the CEOs of each of the companies would meet secretly from time to time to confirm and enforce both the agreement and the means used to further the agreement.

154.    As a combination in fulfillment of their vision, Apple and Google have the size and the economic power to fix prices and exclude competition, and in fact do so.

155.    As they themselves admitted:  "Our vision is that we work as if we are one company"; "you can actually merge without merging"; "If we just sort of merged the two companies, we could just call them AppleGoo".  Apple's general counsel's own description of their relationship was one of "co-opetition."

156.    Google's and Apple's anticompetitive practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

157.    Google's and Apple's anticompetitive acts have had harmful effects on competition and users.

## **FRAUDULENT CONCEALMENT**

158.    As a result of the private and secret meetings by the CEOs of Google and Apple since at least 2005 until shortly before the filing of this complaint, Plaintiffs had no knowledge that Defendants were violating the antitrust laws as alleged herein and had no

knowledge of facts that might have led to their discovery.  In addition, the Defendants took affirmative steps to conceal their conspiracy in private and clandestine meetings between their CEOs.

159.    Plaintiffs could not have discovered Defendants' violations at any time prior to this date by the exercise of due diligence because of the fraudulent and active concealment of the conspiracy by Defendants through various means and methods designed to avoid detection.

160.    Defendants secretly conducted meetings and made agreements in furtherance of the conspiracy, confined such information concerning the conspiracy to key officials and engaged in conduct creating an estoppel to assert the statute of limitations.

### **REQUEST FOR RELIEF**

161.    To remedy these illegal acts, Plaintiffs request that the Court:

a.      Adjudge and decree that the alleged contract, combination and conspiracy between Google and Apple to divide the search market are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

b.      Adjudge and decree that the contract, combination and conspiracy between Google and Apple to share profits of the search business are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

c.      Adjudge and decree that the alleged contract, combination and conspiracy between Google and Apple to give preferential search position to Google in all Apple devices are illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

d.      Adjudge and decree that the alleged contract, combination and conspiracy between Google and Apple to divide the search market, to share profits of the

search business, and to give preferential search position to Google in all Apple devices are, taken together, illegal combinations and conspiracies in violation of Section 1 of the Sherman Act;

e.      Adjudge and decree that the alleged contract, combination and conspiracy between Google and Apple (1) that Apple not compete with Google in the search market; (2) that Apple and Google share the profits of Google's search business;  (3) that Apple give Google preferential search position in all of Apple devices; and (4) that Google and Apple maintain control of 94% of the search market, with the power to fix prices and exclude competition, and in fact do so, are illegal combinations and conspiracies to monopolize in violation of Section 2 of the Sherman Act; and

f.      Enter judgment in favor of Plaintiffs against Defendants and award Plaintiffs threefold the damages sustained by them according to law and award Plaintiffs their reasonable attorneys' fees and costs, and any pre-judgment and post-judgment interest as permitted by law.

162.    In addition, Plaintiffs seek public injunctive relief prohibiting future unlawful acts for the benefit of the general public as a whole which is separate and apart from any private injunctive relief for the Plaintiffs themselves.

163.    For the benefit of the general public as a whole, Plaintiffs request that the Court:

a.      Require Google and Apple to disgorge the payments, plus interest from the first payment, made by Google to Apple in consideration of Apple's agreement not to compete against Google, that are being used to fund or promote the illegal conduct or that constitute capital available for that purpose, into a charitable trust to restore and provide

education about competition for the benefit of the public as a whole, as may be approved by the Court.

b.      Require Google and Apple to disgorge the payments, plus interest from the first payment, made by Google to Apple in consideration of Apple's agreement to provide exclusive out-of-the-box access to Google on Apple's devices that are being used to fund or promote the illegal conduct or that constitute capital available for that purpose, into a charitable trust to restore and provide education about competition for the benefit of the public as a whole, as may be approved by the Court.

c.      Require Google and Apple to disgorge the payments, plus interest from the first payment, made by Google to Apple in consideration of their agreement to pool or share profits, that are being used to fund or promote the illegal conduct or that constitute capital available for that purpose, into a charitable trust to restore and provide education about competition for the benefit of the public as a whole,  as may be approved by the Court.

d.      It is not sufficient that Google and Apple disgorge their payments and profits and dissolve their illegal agreement; rather, the law and this Court must, for the benefit of the public as a whole, effect a forward-looking divestiture of the anticompetitive structures that Google and Apple abused to commit their violations by dividing Google into separate and independent companies and by dividing Apple into separate and independent companies to re-establish competition in search in the future, just as was necessary to reestablish competition in *U.S. v. Standard Oil* when Standard Oil was divided by the Court into the following separate and independent companies: Standard Oil of Ohio, Standard Oil of Indiana, Standard Oil of New York, Standard Oil of New Jersey, Standard Oil of California, Standard Oil of Kentucky, Standard Oil of Iowa, Standard Oil of Minnesota, Standard Oil of Illinois, Standard

Oil of Kansas, Standard Oil of Missouri, Standard Oil of Nebraska, Standard Oil of Louisiana—a.k.a Exxon, Mobile, Chevron, Amoco, Sohio, Conoco *et cetera.*

        e.      Enter any other public injunctive relief necessary and appropriate for the benefit of the public as a whole to restore competitive conditions in the future in the markets affected by Google and Apple's unlawful conduct.

        f.      Enter any other public injunctive relief for the future that the Court may find just and proper for the benefit of the public as a whole.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

DATED:  April 22, 2022      By: /s/ Joseph M. Alioto
                               Joseph M. Alioto, Esq. (SBN 42680)
                               Tatiana V. Wallace, Esq. (SBN 233939)
                               Angelina Alioto-Grace (SBN 206899)
                               ALIOTO LAW FIRM
                               One Sansome Street, Suite 3500
                               San Francisco, CA 94104
                               Telephone: (415) 434-8900
                               Email: jmalioto@aliotolaw.com

Lawrence G. Papale (SBN 67068)      Robert J. Bonsignore, Esq.
LAW OFFICES OF LAWRENCE G.    BONSIGNORE TRIAL LAWYERS, PLLC
PAPALE                            23 Forest Street
1308 Main Street, Suite 117         Medford, MA 02155
St. Helena, CA 94574               Phone: 781-856-7650
Telephone: (707) 963-1704        Email: rbonsignore@classactions.us
Email: lgpapale@papale.com

Josephine Alioto (SBN 282989)     Christopher A. Nedeau (SBN 81297)
THE VEEN FIRM                 NEDEAU LAW PC
20 Haight Street                154 Baker Street
San Francisco, CA 94102       San Francisco, CA 94117-2111
Telephone: (415) 673-4800       Telephone: (415) 516-4010
Email: j.alioto@veenfirm.com      Email: cnedeau@nedeaulaw.net

Theresa Moore
LAW OFFICES OF THERESA D.
MOORE
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmore@aliotolaw.com

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H.
WINTERS
388 Market St. Suite 1300
San Francisco, California 94111
Telephone: (415) 398-2941
Email: sawmill2@aol.com

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

*Attorneys for Plaintiffs*