UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY KATHERINE ARCELL, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC, et al.,<br><br>        Defendants. | Case No. 22-cv-02499-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 97 |

      In this antitrust case, Plaintiffs are twenty-six consumers who use Google and other search engines. Plaintiffs allege that Defendants Google LLC, Alphabet Inc., XXVI Holdings Inc., Google CEO Sundar Pichai, and former Google CEO Eric Schmidt (collectively, "Google") have unlawfully foreclosed competition in the U.S. general search services market through an exclusive dealing arrangement with Apple. Under those contracts, Google is allegedly preset as the exclusive default search engine across all Apple devices. According to Plaintiffs, Google has used these default contracts to exclude competitors and monopolize the search market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Google moves to dismiss, principally on the basis that Plaintiffs lack antitrust standing to pursue their claims. Unlike the United States government, which may sue anyone who violates the federal antitrust laws, a private plaintiff must show standing to sue. To allege antitrust standing, among other things, Plaintiffs must show that they have suffered a plausible, non-speculative antitrust injury because of Google's alleged anticompetitive conduct.

      Google argues that, even if it has engaged in anticompetitive conduct, Plaintiffs fail to sufficiently allege that, absent the default agreements, search engines would have emerged that

1

are more innovative, more privacy protective, or less clogged with ads. Google contends that it would be virtually impossible to allege antitrust injury involving a free product like its search engine. In Google's view, Plaintiffs would need to construct an alternate universe demonstrating what the market would have produced for consumers absent the alleged anticompetitive conduct, and this endeavor would be inherently speculative. While Google is correct that the Second Amended Complaint does not allege sufficient facts from which antitrust injury could plausibly be inferred, the Court rejects the view that such an endeavor is inherently speculative. Indeed, in a case repeatedly cited in the Second Amended Complaint, another court recently found after a bench trial that competitors have been stymied in their efforts to provide high-quality search products to consumers that are more privacy protective or do not serve ads, due to the anticompetitive effects of Google's default agreements with Apple and other companies. *See United States v. Google LLC*, No. 20-CV-3010 (APM), 2024 WL 3647498, at *16, *23–24, *26, *56, *58, *76, *79, *97, *109–14 (D.D.C. Aug. 5, 2024). Google's motion to dismiss is therefore granted, but because amendment does not appear futile, dismissal is with leave to amend.

## I. THE SECOND AMENDED COMPLAINT'S ALLEGATIONS

The following is a recitation of the allegations of the Second Amended Complaint, which the Court is required to take as true at this stage of the proceedings.

Google operates the largest online general search engine in the United States. (Dkt. No. 95 ("SAC") ¶¶ 7, 43.) General search engines are used to search the Internet using queries, and work by providing results in response to those queries. (*Id.* ¶¶ 150–52.) Everything from "find[ing] answers to questions" and "specific websites" to "mak[ing] purchases" can be done on a search engine. (*Id.* ¶ 151.) Google dominates this market, and its market share has grown with time. (*Id.* ¶ 16.) In 2007, Google's share of the U.S. market for general search services was 68 percent. (*Id.*) By 2023, Google possessed a market share of approximately 90 percent, with its

closest rival, Microsoft's Bing, holding only about 6 percent. (*Id.* at 26; *see also id.* ¶ 239.)[1]

Google has allegedly grown and maintained this dominance through the use of exclusive default agreements. (*Id.* ¶¶ 43, 79, 160.) Plaintiffs allege that since 2005, Apple has agreed to make Google the exclusive and preloaded default search engine on its devices. (*Id.* ¶¶ 14, 24, 48, 95, 98.) Beginning with Apple's Safari web browser on its computers, the default contracts have expanded to now cover all Apple devices and other search access points, including Siri, a voice-activated virtual assistant, and Spotlight, a system-wide search feature. (*Id.* ¶¶ 95–98, 166.) In exchange, Google purportedly pays Apple a share of its advertising revenue generated from search queries, amounting to billions of dollars. (*Id.* ¶¶ 96, 100, 118.) Plaintiffs further allege that Google has entered into similar default contracts with other companies, including mobile device manufacturers like LG, Motorola, and Samsung; wireless carriers like AT&T, T-Mobile, and Verizon; and browser developers such as Mozilla, Opera, and UCWeb. (*Id.* ¶ 105.)

These default contracts allegedly give Google an anticompetitive advantage over its rivals. (*Id.* ¶ 25.) Because consumers rarely change the default search engines on their devices, Plaintiffs allege that Google's default status allows it to control the most effective channels of distribution to reach users. (*Id.* ¶¶ 94, 127, 132, 218, 238.) Its default contracts with Apple, for instance, are alleged to cover about 36 percent of all general search queries in the United States. (*Id.* ¶ 169.) Additionally, default status is allegedly the most effective way to amass user data, or scale. (*Id.* ¶¶ 79, 94.) Google has recognized that its rivals cannot compete without adequate scale, and the default contracts allegedly deprive them of the scale needed to compete effectively. (*Id.* ¶¶ 93–94, 162, 170.) With rivals like Bing and DuckDuckGo left unable to compete, Plaintiffs allege that Google's default contracts have substantially foreclosed the search market. (*Id.* ¶¶ 140, 154, 208–09, 211, 219–20, 222–24, 239.)

The market foreclosure created by Google's default contracts has allegedly harmed Plaintiffs as consumers who use Google and other search engines. (*Id.* ¶¶ 53–54.) They claim

---

[1] Citations to page numbers refer to the ECF pagination.

that, by excluding competition in the search market, Google's default contracts have lessened choice, impeded innovation, and reduced quality in search products. (*Id.* ¶¶ 54–55, 156, 214.) Absent these default contracts, more choices, innovations, and quality improvements would have allegedly emerged in the search market. (*Id.* ¶¶ 54, 159, 205.) In addition, the default contracts have purportedly deprived Plaintiffs of search offerings that would protect user privacy and personal data. (*Id.* ¶¶ 54–55, 156.) Plaintiffs maintain that Google, by thwarting competition, is able to collect users' search data, monetize that data by using it to sell ads to third-party advertisers without compensation to users, and "bombard[]" them with ads. (*Id.* ¶¶ 88, 156, 159, 201, 229–33, 256–57, 272.) The default contracts have thus allegedly stifled the development of search engines that offer greater privacy protections or compensate users for their search data. (*Id.*)

Based on the above allegations, the Second Amended Complaint brings two claims for monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. (*Id.* at 1, 53, 60.) Plaintiffs seek damages, as well as equitable remedies of injunctive relief, disgorgement, and divestment. (*Id.* ¶ 279.)

## II.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." *Somers v. Apple, Inc.*, 729 F.3d 953, 959–60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the

complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." (citation omitted)).

### III.    DISCUSSION

Based on the allegations that Google has foreclosed competition in the U.S. general search services market through its use of default contracts, Plaintiffs assert two causes of action for monopolization and attempted monopolization under Section 2 of the Sherman Act.[2]  Google moves to dismiss the Second Amended Complaint in its entirety on the grounds that Plaintiffs lack antitrust standing to bring their Sherman Act claims, a threshold requirement for private plaintiffs.  *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 145 (9th Cir. 1989) ("If [antitrust] standing is not found, an essential element of the plaintiff's case is missing and the plaintiff's case fails."); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 & n.10 (9th Cir. 2021).  As explained below, because Plaintiffs have failed to plausibly allege antitrust injury, a required element of antitrust standing, dismissal is warranted on this ground alone.

---

[2] Plaintiffs also embed passing references to a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under their Section 2 claim for attempted monopolization. (*See* SAC ¶¶ 246–48.)  Insofar as Plaintiffs attempt to plead a *per se* Section 1 violation based on allegations of a secret horizontal agreement between Google and Apple, under which Apple agreed not to compete in the search market (*see id.* ¶¶ 246–47), this claim was previously dismissed with prejudice because Plaintiffs had multiple opportunities to provide facts supporting those allegations but failed to do so.  *See Arcell v. Google LLC*, No. 22-CV-02499-RFL, 2024 WL 1090009, at *1–3 (N.D. Cal. Feb. 5, 2024).  To the extent that Plaintiffs bring a Section 1 claim predicated on the anticompetitive effects of allegedly exclusionary vertical agreements set forth in the default contracts, it would fail for the same reasons as their Section 2 claims, because antitrust standing and antitrust injury are likewise required to state a violation under Section 1.  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455–56 & n.10 (9th Cir. 2021).

### A.     Antitrust Injury

Among the various factors for establishing antitrust standing, antitrust injury is "mandatory." *City of Oakland*, 20 F.4th at 456; *see also Somers*, 729 F.3d at 964 n.5 ("[A]ntitrust injury is also the threshold requirement for antitrust standing."). "[C]ausal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." *Somers*, 729 F.3d at 963. This is so whether the relief sought is legal or equitable. *See Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999); *City of Oakland*, 20 F.4th at 455 n.10.

Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *City of Oakland*, 20 F.4th at 456. At the motion to dismiss stage, a plaintiff must allege sufficient facts showing a "credible" and "plausible antitrust injury." *Somers*, 729 F.3d at 963 (cleaned up). "Under the plausibility standard, [the plaintiff] must allege specific facts that raise an antitrust claim above the speculative level." *Id.* at 965.

In attempting to satisfy this requirement, Plaintiffs claim that they suffered antitrust injury as a result of Google's use of its default contracts. By thwarting competition in the search market, the default contracts allegedly caused Plaintiffs to suffer injury in the form of lost consumer choice, innovation, and search quality. (*See, e.g.*, SAC ¶¶ 45, 55, 273.) But as this Court previously held in dismissing the original complaint, bare assertions that "innovation is suppressed, quality is less (in terms of privacy, data protection, and use of consumer data), user choice is reduced, and search results are distorted or steered" are too "vague and conclusory" to plead a plausible antitrust injury. *Arcell v. Google LLC*, No. 5:22-CV-02499-EJD, 2023 WL 5336865, at *5 (N.D. Cal. Aug. 18, 2023). Although Plaintiffs add more words to their recitation of potential harms to consumer choice, innovation, and search quality, they do not add the necessary factual allegations. They do not identify exactly what kind of choices, innovations, or quality improvements Plaintiffs expect would have occurred. Nor do they identify what facts would lead to a plausible inference that those choices, innovations, or quality improvements

would have emerged absent the default contracts.  For example, Plaintiffs do not allege any specific facts that competitors who had adopted such improvements, or potential entrants who sought to compete on these axes, abandoned their attempts to compete in the search market due to the default contracts.  Though Plaintiffs allege that competitors such as Microsoft or DuckDuckGo were hampered in their ability to penetrate the consumer market, Plaintiffs do not say what improvements those competitors would have brought or how Plaintiffs were prevented from accessing those improvements due to the default agreements.

To the extent the Second Amended Complaint relies on these generalized allegations of harm, they remain "devoid of further factual enhancement" and are insufficient to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (cleaned up); *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028–29 (N.D. Cal. 2015) ("allegations of hypothetical loss of consumer choice and innovation" in search market caused by Google's default search contracts with cell phone manufacturers were "entirely too conclusory and speculative" absent facts that consumers were "prevented . . . from freely choosing among search products or prevented competitors from innovating"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) (allegations of "reduced innovation and quality of service" are "wholly conclusory and simply constitute[] threadbare recitals of the elements of antitrust injury insufficient to state a claim" (cleaned up)).

The Second Amended Complaint does contain more specific allegations concerning Plaintiffs' theory of injury in the form of less protections for user privacy and loss of personal data.  The thrust of this theory is that, insulated from competition, Google is able to collect users' search data, monetize that data by selling it to advertisers without compensation to users, and limit user privacy.  (*See* Dkt. No. 101 ("Opp'n") at 12–14; SAC ¶¶ 156, 159, 201, 230–33, 256–57.)  Thus, Plaintiffs theorize that in a competitive search market unrestrained by Google's default contracts, Google or other firms would compete by compensating users for their search data or protecting user privacy.  (*See id.*)

At the outset, the Court rejects Google's sweeping claim that a damages-seeking plaintiff can never suffer antitrust injury from the use of products, like Google's search engine, that do

not charge a fee.  (*See* Dkt. No. 97 at 10–12.)  The problem with that argument is that, as Plaintiffs allege, Google is not free:  its users "pay a price" by "trading personal data for the search results and by making themselves subject to targeted advertising that will follow them wherever they travel on the internet through Google."  (SAC ¶ 231.)  Google allegedly profits from this financially valuable data by using it to sell ads to third parties, and because Google lacks competition, it need not pay users for their data that is collected and sold.  (*Id.* ¶¶ 230–33.)  Contrary to Google's position, a private plaintiff could conceivably state an antitrust injury from anticompetitive conduct that blocks the development of competitive high-quality search offerings that offer greater privacy protections or compensate users for their collected data.  *Cf. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–601 (9th Cir. 2020) (in Article III standing context, plaintiffs using free social media platform sufficiently alleged suffering injury-in-fact where their browsing histories were alleged to "carry financial value," and Facebook profited by selling that data to advertisers).  Such an injury would have to be shown by factual allegations supporting a plausible inference that in a competitive market, viable search alternatives would have emerged that either paid users for the data that Google now acquires without compensation or limited the user data collected through enhanced privacy features.

Nevertheless, "mere conceivability or possibility" does not suffice at the pleading stage, and Plaintiffs have failed to allege sufficient factual content to nudge their "claim of antitrust injury 'across the line from conceivable to plausible.'"  *Somers*, 729 F.3d at 966 (quoting *Twombly*, 550 U.S. at 570).  Beyond conclusory assertions, Plaintiffs offer no facts to make plausible their claim that if Google had not foreclosed competition, an alternative market would have materialized in which search engines offer more privacy protections or compensate users for their search data.  Plaintiffs do not allege, for example, what the search market looked like before the default contracts purportedly thwarted competition, such as whether firms competed on privacy or user data; nor do Plaintiffs allege a picture of the market after Google's use of the default contracts, like whether those bases of competition were diminished or eliminated.  *Cf.* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*

8

*Their Application* ¶ 392 (5th ed. 2021) ("Areeda & Hovenkamp") (damages in antitrust cases can be shown by the use of a "before-and-after model," in which "the plaintiff uses its experience prior to and after the antitrust violation to infer what its experience would have been but for the antitrust violation"); *Somers*, 729 F.3d at 964 (finding implausible an antitrust injury based on a theory that anticompetitive conduct affected prices where the defendant "charged the same price . . . irrespective of the absence or presence of a competitor").  Thus, nothing in the Second Amended Complaint provides any factual basis for plausibly inferring that Google or other firms would offer more privacy protections, or that users would be compensated for their search data, in a search market unrestrained by the default contracts.  Without such facts, and limited to the four corners of the complaint, *see Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001), the Court is "only left to speculate" whether a competitive search market would be as Plaintiffs posit, *see Somers*, 729 F.3d at 965.

In another attempt to show what an alternative market could look like in the absence of the default contracts, Plaintiffs' opposition brief points to the web browser market.  In that market, Plaintiffs assert that Google "piloted a program where it pays users $3.00 a day for their browsing history."[3]  (Opp'n at 12.)  In contrast to the browser market, the theory seems to go, Google does not pay for users' search data because "competition for this data ha[s] been eliminated" by the default contracts.  (*See id.* (citing SAC ¶¶ 232, 257).)

Drawing such a comparison to an analogous market is a conceivable way to plausibly allege the effects of Google's default contracts on the search market.  *Cf. Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) (damages in antitrust cases can be measured by the use of a "yardstick," which involves "comparing [a] business to a comparable business not affected by the anticompetitive conduct at issue"); *In re Nat'l Football*

---

[3] While this assertion is not pleaded in the Second Amended Complaint, such an allegation would still be unavailing to plausibly allege antitrust injury for the reasons explained.  *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) ("Facts raised for the first time in plaintiff's opposition papers should be considered by the court in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice.").

*League's Sunday Ticket Antitrust Litig.*, No. ML152668, 2023 WL 1813530, at *8 n.3 (C.D. Cal. Feb. 7, 2023) ("The 'yardstick' methodology compares the outcome of interest in the affected market to the same outcome in an unaffected benchmark market."). Allegations that firms in the browser market compete on privacy or offer compensation for user data, for instance, could raise a plausible inference that competition on these dimensions would be present in a competitive search market, and that firms would provide more privacy-protected search engines or pay for search data as Plaintiffs claim.

Here, however, the Second Amended Complaint is devoid of any factual basis for plausibly inferring that the browser market is sufficiently comparable to the search market. *Cf. Tawfilis v. Allergan, Inc.*, No. 815CV00307, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) ("[P]roduct, firm, and market comparability are all relevant factors in the selection of a proper yardstick." (cleaned up)); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851 (5th Cir. 2015). Without any explanation why the markets are similar, Plaintiffs provide no facts to support a plausible inference that Google or other competitors would pay for search data, as Google did for browsing data, absent the default contracts. Nor do Plaintiffs allege whether firms in the browser market even compete on privacy, such that it would be plausible to infer that Google or other firms would provide better privacy protections in a search market unrestricted by the default contracts. Courts are required to assess complaints based on the allegations in the four corners of the document, not the judge's own experiences from using search engines or outside knowledge from news media or advertisements. *See Lee*, 250 F.3d at 688. Because the Second Amended Complaint lacks these factual allegations, the Court is left only to speculate on what a market free of Google's default contracts would look like. *See Somers*, 729 F.3d at 965. Ultimately, Plaintiffs' comparison to the web browser market does not make their asserted injury in the search market any less speculative.

Finally, Plaintiffs' repeated insistence on the need for discovery to adequately plead their claims is misplaced. (*See, e.g.*, Dkt. No. 73 at 30; Opp'n at 5 n.3.) For one, discovery is not required for Plaintiffs to plausibly allege antitrust injury. Possible facts to support inferences

10

about a hypothetical competitive search market are not "peculiarly within [Google's] knowledge," and would be available to Plaintiffs through expert analysis or other market information without discovery. *See* Areeda & Hovenkamp ¶ 307b. It is incumbent on the plaintiff to "make a more sophisticated effort at the front end to develop a plausible factual basis in support of" their claims. *Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988, 991 (N.D. Cal. 2021). Plaintiffs have simply "not yet done this legwork." *Id.* And in any event, the possibility that Plaintiffs "'might later establish some set of undisclosed facts' supporting antitrust injury . . . is not enough to permit the SAC to survive a Rule 12(b)(6) motion to dismiss." *Somers*, 729 F.3d at 966 (quoting *Twombly*, 550 U.S. at 561). "As the Supreme Court has emphasized, its insistence on specificity of facts is warranted before permitting a case to proceed into costly and protracted discovery in an antitrust case, especially where, as here, the potential expense of discovery is obviously great." *Id.*; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983) (observing in an antitrust case that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

In sum, the allegations of the Second Amended Complaint are too conclusory, and its proffered inferences too speculative, to plausibly support the asserted theories of antitrust injury. Because Plaintiffs have failed to adequately allege that the default contracts threatened to cause, let alone caused, antitrust injury, Plaintiffs lack antitrust standing to pursue damages or equitable relief for their Sherman Act claims. *See City of Oakland*, 20 F.4th at 455 n.10. Google's alternative bases for dismissal therefore need not be reached.

### B. Leave to Amend

Federal Rule of Civil Procedure 15 provides that a court "should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Petersen v. Boeing Co.*, 715 F.3d 276, 282 (9th Cir. 2013) ("[L]eave to amend should be granted with extreme liberality." (cleaned up)). The Court recognizes that Plaintiffs have twice amended their complaint already. Plaintiffs' original complaint maintained that Google's anticompetitive conduct, including its

default contracts, reduced competition at the expense of the "quality of general search services (as related to privacy, data protection, and use of consumer data)." (Dkt. No. 1 ¶ 49; *see also id.* ¶¶ 136–37, 143, 152.) Those allegations were already once found conclusory and implausible for the reasons similar to those explained above. *See Arcell*, 2023 WL 5336865, at *5. Nonetheless, the Second Amended Complaint is the first time that Plaintiffs have articulated how the default contracts have allegedly foreclosed competition in the search market in violation of Section 2 of the Sherman Act. This is therefore Plaintiffs' first opportunity to amend with the benefit of the Court's analysis of antitrust injury based on that theory.

Moreover, the court's findings of fact following the bench trial in *United States v. Google* suggest that amendment may not be futile. *See* No. 20-CV-3010 (APM), 2024 WL 3647498 (D.D.C. Aug. 5, 2024). Plaintiffs rely heavily on evidence from that trial in their Second Amended Complaint. (*See, e.g.*, SAC ¶¶ 210–18.) The court's recent opinion in that case found that Google's use of exclusive default agreements prevented specific competitors from providing consumers high-quality search products that were more privacy protective and ad-free. *Google*, 2024 WL 3647498, at *16, *23–24, *26, *56, *58, *76, *79, *97, *113–14. Based on the evidence from the trial, that opinion concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted in network effects that made it difficult for competitors to gain the volume of users, and consequently of user data, that would allow the development of high-quality search products. *Id.* at *79, *109, *111–14. The opinion identifies Neeva as a competitor that sought to create a subscription-based model for search that did not serve ads. *Id.* at *7. According to the opinion, Neeva had to rely on Bing for about 40 percent of its search results due to its inability to develop enough of a user base to have sufficient user data, and was ultimately driven out of the search market due to Google's default contracts. *Id.* at *16, *79, *97, *113–14. The opinion also identifies DuckDuckGo, a privacy-focused search engine, as a market participant that offers more privacy protections than Google (such as anonymizing click data, not tracking users across sessions, and not logging IP addresses), but cannot compete effectively because of the default search agreements and the lack of access to

sufficient user data.  *Id.* at *23–24, *26, *56, *58, *76, *79, *97, *113–14.  These findings suggest that, due to Google's allegedly anticompetitive use of default agreements, competitors offering better privacy or an ad-free alternative were unable to offer the same high quality of search as Google, due to their lack of access to a large volume of user data.  Although these findings were made in another litigation involving different issues, they indicate that Plaintiffs may be able to plausibly allege facts about consumer harm from the alleged anticompetitive effects of Google's default agreements.  Accordingly, the Court cannot conclude at this time that amendment would be futile.  *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

At the same time, because Plaintiffs have repeatedly failed to provide sufficient allegations of antitrust injury in prior rounds of amendment, the Court cautions Plaintiffs that this will likely be their last opportunity to amend to satisfy that requirement.

## IV.     CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED WITH LEAVE TO AMEND**.  If Plaintiffs wish to file a third amended complaint correcting the deficiencies identified in this order, they shall do so by **September 9, 2024**.  Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.  If a third amended complaint is not filed by the deadline, the Second Amended Complaint will remain dismissed, judgment will be entered in favor of Defendants, and the case will be closed.

**IT IS SO ORDERED.**

Dated: August 9, 2024

RITA F. LIN
United States District Judge