Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Email: jmalioto@aliotolaw.com

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H. WINTERS
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
Telephone : (510) 845-5914
Email: sawmill2@aol.com

[Additional Counsel Listed on Last Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Mary Katherine Arcell, Keith Dean Bradt, Jose Brito, Jan-Marie Brown, Rosemary D'Augusta, Brenda Davis, Pamela Faust, Carolyn Fjord, Donald C. Freeland, Donald Frye, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Valarie Jolly, Michael Malaney, Lenard Marazzo, Lisa McCarthy, Timothy Nieboer, Deborah Pulfer, Bill Rubinsohn, Sondra Russell, Clyde Duane Stensrud, Gary Talewsky, Diana Lynn Ultican, Pamela Ward, and Christine M Whalen,

Plaintiffs,

vs.

Google LLC, Alphabet, Inc., XXVI Holdings, Inc., and Eric Schmidt,

Defendants.

Case No. 3:22-cv-02499-RFL

**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 2)**

**DEMAND FOR JURY TRIAL**

INTRODUCTION

1. This private antitrust action is brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. 15, 26) for actual and potential damages and injunctive relief caused by reason of and made necessary by the Defendant's past, present and substantially threatened continued violations of Section 2 of the Sherman Antitrust Act (15 U.S.C. 2). This Court has subject matter jurisdiction under 28 U.S.C. § 1331 in that the issue presented is a federal question. In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1337 in that this civil action arises out of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

2. The Court has personal jurisdiction over the Defendants because the Defendants are domiciled and are found within the United States, and venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Google transacts business and is found within this District.

3. Defendant Google has engaged in, and its activities have substantially affected, the interstate and foreign trade and commerce of the United States. Google provides a range of products and services that are intentionally marketed, distributed, sold, and offered to Consumer End-Users of search, such as Plaintiffs, throughout the fifty states and across state lines and in foreign countries. The restraints alleged in this Complaint affect, and are a burden on, the free and open trade between and among the States of the United States and the trade and commerce between and among the United States and foreign nations.

4. Google uses End User search inquiries and consumer information derived from End Users of its search engines without compensation to End Users in order to sell advertising to advertisers, who pay at least $50 billion annually in the United States to place advertising on Google's search engine results page ("SERP"), which is subject to the Google-Apple agreements under which Google annually makes payments of billions of dollars of its search advertising revenues to Apple in return for Apple's agreement, inter alia, pursuant to the Joint

Cooperation Agreement ("JCA") (Exhibit A), the Information Services Agreements, and the Amendment to the Information Services Agreement between Google and Apple ("ISA") (Exhibit B), and other agreements among Defendants and Apple, which secure exclusionary default status for Google's general search engine on Apple's mobile devices, smartphones, tablets, desktop computers and laptop computers to the exclusion of Google's competitors.

## SUMMARY OF THE COMPLAINT

5. In 2023 Apple was the largest company in the world with a value of $2.746 Trillion and Alphabet (Google) was the fourth largest company in the world in 2023 with a value of $1.34 Trillion.

6. The revenue in the general search market as of 2022 was $225 billion per year.

7. Google has a monopoly of 90% of the general search services market in the United States and 60% of the search business is conducted over Apple devices.

8. The terms and conditions of the default agreement with Apple are that Google will pay Apple billions of dollars per year and share its revenues from the general search services market and general text advertising market with Apple in exchange for privileged default access to Apple's massive consumer base.

9. Google pays Apple billions of dollars in advertising revenue each year, with estimates ranging between $8–12 billion.

10. The revenues Google shares with Apple make up approximately 15–20 percent of Apple's worldwide net income.

11. Apple in return has made Google the automatic default search engine on all of its devices.

12. This agreement covers roughly 36 percent of all general search queries in the United States, including mobile devices and computers. Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

13. Over the years since implementation of Google's exclusive default and revenue sharing agreements with Apple and other distributors, including computer and mobile-device manufacturers, cell phone carriers and browser developers, Google has increased its dominant market share in the markets for general search services and general search text advertising. In July 2007, Google estimated its general search services market share at 68 percent. By June 2013, Google estimated that its market share in the United States had already increased to 77 percent on computers. By April 2018, Google estimated that its share was 79 percent on computers and 93.5 percent on mobile. More recently, Google has accounted for almost 90 percent of all general search engine queries in the United States, and almost 95 percent of queries on mobile devices. This measure of market share advantage is directly attributable to Google's restrictive and exclusionary default agreements with Apple and other distributors of its search engine.

14. The terms and conditions of the default and other exclusive and revenue sharing agreements between Google and its distributors, and the ISA and the JAC between Google and Apple, exclude competition and competitors from a substantial portion of the general search services and general search text advertising markets.

## FACTS

15. Apple agreed to assist Google in building its search business for their mutual benefit.

16. For Google to be able to generate sufficient billions of dollars to pay Apple, Apple agreed that Google would be the only search engine automatically included out-of-the-box in all of Apple's devices.

17. Apple's agreement to include Google as the initial search engine on all of Apple's devices gives Google a substantial and unfair anticompetitive advantage over other search providers, actual and potential, including Yahoo!, DuckDuckGo, Bing, and others.

18. Apple and Google agreed to suppress, eliminate, and/or foreclose other search providers and/or potential search providers, and also agreed to foreclose non-Google favored advertisers.

19. These agreements were formed, confirmed, reconfirmed, and re-negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Officers and Chairmen of Apple and Google, including Steve Jobs and Co-conspirator Tim Cook, Defendant Sundar Pichai, and Defendant Eric Schmidt.

20. The architects of the combination during the early 2000's were Steve Jobs, the CEO and Chairman of Apple, and Eric Schmidt, the CEO and Chairman of Google who also served on Apple's Board of Directors.

21. The regular meetings between Google and Apple were designed to cement the parties' combination to eliminate competition between Apple and Google on general search services and general search text advertising.

22. The agreements negotiated between Apple and Google by Messrs. Jobs and Schmidt have continued in force since then and have been continuously renewed under Messrs. Cook and Pichai. In addition, Plaintiffs allege that Messrs. Jobs and Schmidt negotiated the written agreements presently in place that make Google the default search engine on all Apple's devices and further allege that those written agreements have continued to be negotiated and renewed by Messrs. Cook and Pichai to date.

23. Some of the secret meetings at which these agreements have been negotiated have been photographed and taped by bystanders who chanced to notice the executives meeting together.

24. These meetings were undertaken to promote the shared vision that Apple and Google would act, in effect, as one company that had been "merged without merging" (Eric Schmidt).

25. Apple and Google invented and used the word "co-opetitive" to describe their unity of interest.

26. The overall purpose of these agreements has been to direct all search though Google.

27. A Google expert testified in late 2023 at the trial of the government's case against Google in *U.S. v Google,* that as part of the deal between Apple and Google, Google was paying Apple *36 percent* of the search advertising revenue generated through Apple as payment for the advantage of being the default search engine on Apple's devices. This percentage has been argued to be substantially higher than the percentage that Google has paid to other distributors of its search engine, such as Samsung. (See questioning of Google CEO Pichai in the trial of *Epic v. Google*, ND Cal. 2023).

28. In furtherance of these agreements, Google has engaged in the following acts and means, among others, to ensure the success of these agreements:

a. secret meetings between the CEOs of Apple and Google;

b. profit-pooling and profit sharing;

c. payment of billions of dollars every year to Apple;

d. automatic inclusion of Google search on Apple devices, to the exclusion of other search companies and non-Google favored advertisers;

e. the recognition and agreement that the more money that Google makes, the more money that Apple will make; and

29. Sixty percent (60%) of Google's search business was conducted through Apple devices.

30. Over 10 years, from 2009 to 2019, Google increased its control of the U.S. search engine market share from 80% to 88%. As of September 2020, supported by its exclusionary agreements to be the default search engine on Apple and other manufacturers' devices, Google controlled 94% of the U.S. mobile search engine market and 90% of the U.S. general search services market.

31. Because of its dominance in mobile and computer search, Google is able to charge higher prices to advertisers than would otherwise be the case in the absence of the Google-Apple agreement and in the absence of its agreements with other computer and iPhone manufacturers.

32. By reason of its agreement with Apple and other computer manufacturers, the prices, the production, the innovation, and the quality of the search business has been substantially, adversely, and anticompetitively affected.

33. In addition, this Court must effect a forward-looking divestiture of the anticompetitive structures that Google has erected to commit its violations by dividing Google into separate and independent companies to establish competition in search in the future.

34. From 2005 up to and including the time of the filing of this complaint, Google paid Apple more than $50 billion under their agreements to make Google the exclusive and exclusionary default search engine on Apple devices and to stay out of the general search services and general search text advertising markets in furtherance of their agreements not to compete in the search business.

35. Apple accepted the payments from Google and promoted Google over other search providers and non-favored advertisers.

36. Google has the motive, the opportunity, and the ability to control the general search services and general search text advertising markets, to share its profits, and to eliminate the potential competition of other actual and potential search engines.

## Plaintiffs

37. Plaintiffs are End Users domiciled in the State of California and in other states, who have used Google's general search services from which Google collects search inquiries and information derived from End Users of its search engines for no compensation to End Users, which End User inquiries and information Google then sells to advertisers who collectively pay billions annually to Google in the United States.

38. Each of the following Plaintiffs named below is an individual and a citizen of the state listed as the address for each such Plaintiff, and in the four years prior to the filing of this action, each Plaintiff was a user of Google and other search services on the internet:

Mary Katherine Arcell, New Orleans, LA
Keith Dean Bradt, Reno, NV
Jose Brito, Reno, NV
Jan-Marie Brown, Reno, NV
Rosemary D'Augusta, San Francisco, CA
Brenda Davis, Dallas, TX
Pamela Faust, Cincinnati, OH
Carolyn Fjord, Sacramento, CA
Donald C. Freeland, Cincinnati, OH
Donald Fry, Colorado Springs, CO
Gabriel Garavanian, Boston, MA
Harry Garavanian, Boston, MA
Yvonne Jocelyn Gardner, Colorado Springs, CO
Valarie Jolly, Dallas, TX
Michael Malaney, Grand Rapids, MI
Lenard Marazzo, Reno, NV
Lisa McCarthy, Naples, FL
Timothy Nieboer, Kalamazoo, MI
Deborah Pulfer, Sidney, OH
Bill Rubinsohn, Philadelphia, PA
Sondra Russell, Waco, TX
Clyde Duane Stensrud, Seattle, WA
Gary Talewsky, Boston, MA
Diana Lynn Ultican, Seattle, WA
Pamela Ward, Holmes Beach, FL
Christine M Whalen, New Orleans, LA

39. Because Plaintiffs are users of the services provided by internet search engines, and because they have used Google search on an almost daily basis, they have been harmed

and continue to be threatened with harm and damage in that they have been deprived of the quality, service and privacy that they otherwise would have enjoyed but for Google's anticompetitive conduct. They have also been forced to withstand prejudicial steering by Google based upon the annoying and damaging distortion of search results from Google in favor of Google's preferred advertisers. In addition, Plaintiffs have been damaged and continue to be threatened with damage because they have used Google search in their businesses and have, as a result, been forced to bear the added expense that results from distorted and steered search results. Further, Google has stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model. And Plaintiffs have been deprived of the income to which they otherwise would be entitled from the appropriation by Google of their personal consumer data and personal information and search habits which are sold by Google to advertisers and others.

40. By restricting competition in general search services, Google's conduct has also harmed users by reducing the quality of general search services related to privacy, data protection, and the use of consumer data, and by lessening choice in general search services, and by impeding innovation.

Defendants

41. Defendant Google, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Mountain View, California. Google is a subsidiary of Defendant XXVI Holdings Inc. (roman numerals signifying the number of letters in the alphabet), which is a subsidiary of Defendant Alphabet Inc. Defendant Alphabet Inc. is a publicly traded company that is incorporated and existing under the laws of the State of Delaware. Its principal executive offices are in Mountain View, California. (Unless separately noted, Defendants Google, XXVI Holdings Inc. and Alphabet will hereinafter and above be collectively referred to as "Google".)

42. Defendant Sundar Pichai is the current CEO of Defendant Alphabet Inc. and of Defendant Google LLC. Defendant Pichai is named as a defendant because he personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterpart Cook of Apple. Defendant Pichai's acts were authorized and ratified by Google, and Pichai was paid bonuses for the anticompetitive success of the agreements with Apple. The board of directors of both companies knew of these agreements and understood their purpose, intent, and motive, and approved and ratified them.

43. Defendant Eric Schmidt is the former CEO and Chairman of Google. Defendant Schmidt is named as a defendant because he personally negotiated the contracts, combinations, and conspiracies alleged in this Complaint, and continuously confirmed, re-confirmed, and amended those agreements at secret meetings with his counterparts Steve Jobs and Co-conspirator Cook of Apple. Defendant Schmidt's acts were authorized and ratified by Google, and Schmidt was paid bonuses for the anticompetitive success of the agreements with Apple. Defendant Schmidt served on the Board of Directors of *both* Google and Apple. The board of directors of *both* companies knew of these agreements and understood their purpose, intent, and motive, and approved of and ratified them.

44. Various persons, individuals, partnerships, firms, and corporations not named as Defendants or Co-conspirators in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.

45. Apple and Google have achieved their size by multiple acquisitions of competitors and potential competitors, all of which acquisition have violated Section 7 of the Clayton Antitrust Act (15 U.S.C. §18).

46. Since 2000, Apple has acquired more than 120 competitors, potential competitors, or "product-extension merger" companies for billions of dollars. *FTC vs. Procter & Gamble Co.*, 386 U.S. 568 (1967).

47. Since 2000, Google has acquired more than 247 competitors, potential competitors, or "product-extension merger" companies for billions of dollars.

48. Apple and Google are two of the largest companies in the world.

49. Apple and Google have abused their size by their agreement for preferential treatment in their default search settings that automatically exclude competitors, by their exclusion of non-favored Google advertisers and by their suppression of actual and potential search providers.

50. Both Apple and Google have abused their size and have utilized their size in the past for unlawful purposes, using unlawful means to achieve unlawful objectives, and have been found to have engaged in anticompetitive conduct.

51. Apple has been found to have engaged in a *per se* illegal conspiracy with book publishers to fix the price of ebooks. *United States v. Apple, Inc.,* 791 F.3d 290 (2d Cir 2015).

52. Google has been fined billions of dollars for having abused its size by engaging in anticompetitive conduct.

53. The United States has alleged that Google has engaged in monopolizing the AdTech Market involving AdTech tools (software) that link publishers and advertisers. In this regard it has purchased Double Click, ADMob, Invite Media, and Ad Meld in order to manipulate advertising auctions. *United States v. Google, LLC*, Case 1:23-cv-00108, USDC, ED Virginia.

54. The European Commission has recently fined Google 2.42 billion Euro for breaching EU antitrust proscriptions by abusing its market dominance in search to provide an illegal advantage to other Google products, including its comparison-shopping service.

55. In *United States v. Google,* 20-cv-3010, (D. D.C. Aug.5, 2024), after a plenary trial on the merits, Judge Mehta concluded "that Google has violated Section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising—through its exclusive distribution agreements" with Apple and others. Judge Mehta further described Apple's agreement to make Google its default search engine and its agreement to provide Google the right of first refusal over any advertising that Apple may offer through its own search engines.

56. Judge Mehta's Memorandum Opinion is both collateral estoppel against Defendant Google and also constitutes *prima facie* evidence in favor of Plaintiff and against Google under Section 5(a) of the Clayton Act.

57. Google has achieved pre-eminent power in search. When asked to name Google's biggest strength in search, Google's former CEO explained: "Scale is the key. We just have so much scale in terms of the data we can bring to bear." By using profit sharing agreements to lock up scale for itself and denying it to others, Google has unlawfully built and maintains its search monopoly.

58. Apple is an American technology company that specializes in consumer electronics, software and online services.

59. In the United States, Apple iOS devices—those running on Apple's proprietary mobile operating system—account for roughly 60 percent of mobile-device usage and Apple's Mac OS (operating system) accounts for approximately 25 percent of total computer usage in the United States.

60. Apple and Google believe and act as though they are one company. They have admitted that "Our vision is that we work as if we are one company"; and Defendant Eric Schmidt has said that "you can actually merge without merging"; and that "If we just sort of merged the two companies, we could just call them AppleGoo". Apple's Bruce Sewell,

General Counsel from 2009-2017, described the reality of their combination as "co-opetition": "We have this sort of strange term in Silicon Valley: co-opetition . . . You have brutal competition but at the same time, you have necessary cooperation."

61. Google's primary source of income is the advertising revenue generated from its Google search engine.

62. Google uses consumer search queries and consumer information to sell advertising.

63. When a consumer uses Google, the user provides personal information and attention to the delivered search page. Google monetizes the user's information and attention by selling ads but does not reimburse the consumer for the use of this information.

64. The following Chart shows Google's U.S. Market Share from 2009 through 2019.




65. Scale is of critical importance to competition among general search engines for

users and search advertisers. Google has long recognized that its competitors will not be able to compete without adequate scale. The agreement between Apple and Google to make Google Apple's default search engine suppresses the ability of Google's competitors to achieve any scale of significance in order to be able to compete against Google. That economic barrier would be eliminated if the agreement between Apple and Google were dissolved.

66. The most effective way for Google to achieve scale is for its general search engine to be the preset search engine on mobile devices, computers, and other devices.

67. In 2005, Apple began using Google as the automatic, preset, out-of-the-box general search engine for Apple's Safari browser on Apple's computers.

68. In return, Google began to pay Apple a significant percentage of Google's yearly general search advertising revenue that was derived from the search queries logged on Apple devices pursuant to the profit-sharing agreement.

69. In 2007, Google extended this profit-sharing agreement to cover Apple's iPhones.

70. In 2016, the agreement expanded further to include additional search access points — Siri (Apple's voice-activated assistant) and Spotlight (Apple's system-wide search feature) — making Google the automatic, preset, general search engine for all of Apple's devices.

71. Currently, Google's profit-sharing agreements and default agreements with Apple give Google an exclusive, preset position on all significant search access points on Apple computers and mobile devices.

72. In exchange, since 2005, Google has agreed to share billions of dollars of advertising revenue with Apple each year .

73. Since 2005, Google has become the primary, out-of-the-box exclusive search engine on Apple's Safari browser on its Mac computer, and, since 2007, on Apple's iPhone.

74. In effect, Apple has been paid and is being paid and now enjoys the profits it would have made if it had competed with Google without having the expense of doing so.

75. By reason of this profit-sharing and the discriminatory treatment in favor of Google on its devices, Apple has aided and abetted Google to achieve Google's dominant position in the general search services and general search text advertising markets because the more money Google makes in search, the more money Apple makes under these agreements. As was found by Judge Mehta, these agreements remove any incentive on the part of Apple to compete against Google in the search business:

> "The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so." Mehta Memorandum, at p. 242.

76. Google's CEO, Defendant Eric Schmidt, served on Apple's board of directors until 2009. In 2007 while serving as both an Apple Director and as Google CEO he stood onstage at the formal unveiling of the Apple iPhone with Steve Jobs, the founder of Apple, and admitted that, with Google search on the iPhone, "you can actually merge without merging" and "If we just sort of merged the two companies, we could just call them AppleGoo."

77. Apple told Google: "Our vision is that we work as if we are one company."

78. In 2008, Jobs met at Google's headquarters near Palo Alto with Larry Page and Sergei Brin, the two founders of Google, and with Andy Rubin, the head of Android development for Google, to discuss Google's recent purchase of the Android operating system. Brin and Page considered Jobs their mentor.

79. Jobs agreed to continue to give Google access to the exclusive, out-of-the-box search position on the iPhone, as long as there were "good relations" between the two companies. According to Jobs: "I said we would, if we had good relations, guarantee Google access to the iPhone and guarantee it one or two icons on the home screen."

80. Jobs continued to meet with Google executives until his death in October, 2011. In mid 2010, he met with Eric Schmidt who was then still CEO of Google, at a café at the Stanford Shopping Center. In mid 2011 he met again with Larry Page in Job's living room.

81. At each of these meetings these top executives negotiated and solidified their agreement that they would cooperate to make Google the default search engine on Apple devices. See JCA, Exhibit A.

82. On information and belief, Google has paid Apple between $8 and 15 billion a year – an amount which is pure profit to Apple.

83. Google makes approximately $25 billion a year in ad revenue from its searches on Apple's devices, iPhones, iPads, and Macs.

84. Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

85. It has been estimated that if Apple were to launch its own search engine in competition with Google, at least $15 billion a year of Google revenue would go to Apple. This is equal to the estimated Google payment to Apple in 2021.

86. Google's annual payments to Apple – now estimated to be $8 billion to $12 billion a year and more – up from $1 billion a year in 2014, account for 15 to 20 percent of Apple's annual profits.

87. By paying Apple billions of dollars each year to preserve its position as the initial, out-of-the-box exclusive search provider on Apple devices, Google and Apple have

shared monopoly control and have shared the power to set prices and exclude competition in the markets for general search services and general search text advertising.

88. By becoming Apple's exclusive default search engine, Google can charge higher fees for search advertising and can steer users to its own proprietary apps.

89. Google's own documents admit that Apple's "Safari default is a significant revenue channel" and that losing that exclusivity with Apple would substantially harm Google's bottom line.

90. In 2016 Eddy Cue, senior vice-president of Apple, met with Sunder Pichai, CEO of Google and its parent Alphabet, Inc., to renegotiate a higher percentage payout to Apple under their revenue sharing agreement. Another meeting between the CEOs of Google and Apple took place at a dinner on March 10, 2017, between Defendant Sundar Pichai and Tim Cook, CEO of Apple, during which they continued to discuss their agreements with regard to the search business.

91. Cook knew, as Google observed in a 2018 strategy document, that "People are much less likely to change [the] default search engine on mobile." In fact, it is well recognized by the experts that users will rarely change the default search provider on their mobile or desktop devices after the devices have been purchased.

92. Google's deal with Apple "prevents the pre-installation of other search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user."

93. After the March 10, 2017, meeting, Apple announced that Google would be the search vehicle for Siri, and Google announced that it had increased its payments in its sharing agreements for search traffic.



94. The photo above was taken by a bystander who discovered a clandestine meeting between Tim Cook of Apple and Sundar Pichai of Google.

95. The profit-sharing agreements between Apple and Google have in fact resulted in Apple steering more search traffic to Google and denying traffic to Google's competitors.

96. Later, in 2018, Apple's CEO Tim Cook and Google's CEO Sundar Pichai met again to discuss how Apple could further drive search advertising revenue to Google and increase the amount of Apple's share of the profit-sharing agreement.

97. The Google-Apple agreement to share in the profits substantially forecloses Google's search competitors from a substantial market.

98. As a direct result of these exclusionary agreements, Google has dominated the general search services market and the general search text advertising market both globally and in the United States. See charts following:

**GLOBAL SEARCH ENGINE MARKET SHARE 2023**




From https://www.oberlo.com/statistics/search-engine-market-share

**U.S. SEARCH ENGINE MARKET SHARE 2023**




From https://www.oberlo.com/statistics/search-engine-market-share#:~:text=US%20search%20engine%20market%20share,%2C%20compared%20to%2093.37%25%20worldwide.

99. Google's dominance in the global and U.S. general search services market is even more impressive when it comes to search queries on mobile phones, with 95.12% of all mobile search queries handled by Google.[1]

100. In 2021, Google accounted for an estimated 28.6 percent of the total digital advertising revenue generated in the United States and was the largest digital ad publisher in the country.[2]

101. Apple has agreed to assist Google in building its general search services business and its general search text advertising business because Apple will by agreement share in Google's monopoly profits.

EVIDENCE OF MONOPOLY POWER

102. The newly discovered Joint Cooperation Agreement ("JCA") (Exhibit A) and the Amendment to the Information Services Agreement between Google and Apple ("ISA") (Exhibit B) each set forth in detail and in writing the nature and scope of Defendant Google and Apple's exclusionary agreements that have led to Google's monopoly power in the general search services and general search text advertising markets. In addition, the testimony of Google and Apple witnesses at the trial in *United States v. Google,* 20-cv-3010, firmly establishes Defendant's culpability for monopolization through its anticompetitive exclusivity agreements with Apple, and others. The JCA and ISA agreements between Apple and Google, together with the additional trial testimony of witnesses, corroborate and provide plausibility for the allegations in this Complaint.

103. In particular, the newly discovered evidence proves the following:

---

[1] https://www.oberlo.com/statistics/search-engine-market-share#:~:text=US%20search%20engine%20market%20share,%2C%20compared%20to%2093.37%25%20worldwide.

[2] https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/

1) the CEOs of Apple and Google met at least once a year to confirm their agreements, and to police each other's observance and compliance with their exclusivity agreement; and

2) Google and Apple agreed to share Google's search revenue, not just the profits.

A. The Google-Apple ISA Is An Agreement Between Apple and Google To Meet to Discuss, Enforce and Police the Implementation of Their Exclusionary Agreement

104. Section 5 of the ISA between Google and Apple provides for an Annual CEO "Check-In" for their CEOs to meet and discuss the performance of the ISA Agreement and to confirm each party's compliance with the terms of the ISA Agreement.

> "5. CEO Check-Ins
> *Agreement Purpose*
> Both parties agree they are entering into this Agreement for the following purposes (collectively, the "Agreement Purpose '): (1) to create tangible and intangible value for each party, (2) to increase the revenue performance of each party, and (3) to improve the search experience and performance of the Services, the Spotlight Services and the Siri Services for End Users on Apple products.
>
> *"Annual CEO Check-In*
> At the end of each contract year, or earlier if reasonably requested by a party, Chief Executive Officers from each party will meet to review and discuss in good faith the performance of the ISA Agreement vis-a-vis the Agreement Purpose, and, upon request, to confirm each party's compliance with the terms of the ISA Agreement ("Annual CEO Check-In"). The parties mutually agree to address and resolve in good faith any issues identified during the Annual CEO Check-In that are interfering or have interfered with the Agreement Purpose. If a particular issue is under the reasonable control of Apple, then Apple wil1 have primary responsibility for addressing and resolving such issue in good faith, with input from Google. If a particular issue is under the reasonable control of Google, then Google will have primary responsibility for addressing and resolving in good faith such issue, with input from Apple. The parties will have joint responsibility for addressing and resolving in good faith any other issues identified during the Annual CEO Check-Ins that are not under the reasonable control of one party."

105. As a result, the Google and Apple executives were intimately involved in enforcing the exclusionary agreements which set out the parameters of their revenue sharing for the purpose of making Google the exclusive default search engine on Apple devices. The

JCA (Exhibit A) is significant because it is signed by Tim Cook CEO of Apple and Larry Page CEO of Google. The Amendment to the ISA (Exhibit B) specifically requires the CEOs of the two companies to meet each year "to review and discuss in good faith the performance of the ISA Agreement . . . and . . . to confirm each party's compliance with the terms of the ISA Agreement."

106. In addition to setting out the exclusive nature of the agreement itself, this document also establishes the continuing high-level participation of the CEOs in the negotiation, confirmation and execution of the agreements that are the subject of this lawsuit, and it directs the CEOs to enforce these agreements and to monitor the compliance of the other party to the agreements. -

107. Furthermore, under this agreement, the CEOs, and the CEOs alone, are to address and resolve any issues that interfere with or have interfered with the purpose of the agreements. And the CEOs are charged with the responsibility not only to identify any "interfering" issues, but to fix them in accordance with their stated purpose to "increase the revenue performance of each party."

1. The Joint Cooperation Agreement (Exhibit A)

108. The highly redacted Joint Cooperation Agreement (JCA) (Exhibit A) which was signed by Larry Page (Google) and Time Cook (Apple)[3] on May 15, 2014, purports to amend the "Information Services Agreement (ISA) between the parties dated December 20, 2002," and provides on page one that "Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015 to be co-terminus with this JCA." It further provides that "1. Rev share will become [redacted][4] effective July 31, 2015", and that "2. . . . Google shall "remain the default search engine in all Geo's."

[3] Tim Cook, CEO of Apple, and Larry Page, CEO of Google.
[4] Kevin M. Murphy, Google's Defense Witness, testified at trial that when Google was

2. The Amendment to the Information Services Agreement (Exhibit B)

109. This highly redacted document is the Amendment to the Information Services Agreement (ISA) (Exhibit B). It is dated September 30, 2016 and is signed by Eddy Cue (Apple) and Daniel Alegre (Google)[5]. It requires Apple to provide Google with the right of first refusal before it may sell advertising on its in-house search engines. Thus, if Apple includes ads or paid listings in Siri or Spotlight (or successor versions), Apple must first offer Google the opportunity to supply those ads or paid listings under the terms of the ISA Agreement and Apple will be paid a percentage of the revenue generated by Google from those ads.[6]

B. The Agreement For Google Search To Be The Pre-Set Default On Apple Devices Substantially Forecloses Rivals From Competing In Violation Of Section 2 Of The Sherman Act

110. The newly discovered Apple-Google agreements are evidence of Google's violation of Section 2 of the Sherman Act since these agreements with Apple and others serve to - substantially foreclose competition from other actual and potential search engines. Section 1 of the Google-Apple Amendment to the Information Services Agreement provides that Google's general search services shall be the pre-set default search service on Apple operating systems as well as on Microsoft Windows operating systems:

"1. Use and Implementation of Google Services in Apple Software"

(a) Safari Web Browser Software

"Apple will pre-set and use the [Google search] Services as the Default search service for Search Queries in Apple's web browser software (e.g., Safari or successor

---

"negotiating with Apple, they agreed to a rev share of 36. . ." (Google Trial Tr. 9785:14-15)

[5] Eddy Cue, Senior VP of Apple Inc., and Daniel Alegre, President of Google Inc.

[6] This 2016 Amendment to the Information Services Agreement (ISA) (Exhibit B) extended the dates and the existing terms of the original ISA agreement dating from December 20, 2002, and these terms remain operative to date. Although Google and Apple amended the ISA in 2016 and again in 2021, the 2021 amendment, according to Eddy Cue, Apple Senior VP, was "just an extension of the dates" and all the terms remained operative. Trial testimony of Eddy Cue, Google Trial Tr. 2453:12-2454:5.)

> versions)" designed for use on (i) one or more of the Apple operating systems: iOS, watch OS, tvOS, macOS, or any other operating system software made generally available by Apple during the Term, or (ii) the Microsoft Windows operating system (such web browser software, the Web Browser Software)".

111. In Judge Mehta's Memorandum Opinion re summary judgment, Dkt. No. 626, in *United States v. Google,* 20-cv-3010, (D. D.C.), the Court concluded:

> "The *Browser Agreements do lock in Google as the default search engine for years at a time.* In the case of Apple products, that means Google is a purchaser's out-of-the-box search engine. *That is arguably a form of exclusivity*—rivals are prevented from occupying default position in the browser's integrated search bar at time of purchase. *Cf. Microsoft,* 253. F.3d at 68." (Memorandum Opinion at p. 34).

112. Google's rivals (such as Bing, owned by Microsoft, and DuckDuckGo) are substantially foreclosed from competing with Google's general search services and search advertising services by reason of Google's exclusionary default agreements with Apple and others.

113. Satya Nadella, Microsoft's CEO, testified at the Google trial in *U.S. v. Google* that if Bing had succeeding in getting the Safari traffic from Apple, "that would have made us more competitive as a search product that end users would have liked and advertisers and publishers would have benefited from as well." (Trial Tr. 3508:15-18 (Nadella).)

114. In addition, the *Google* trial testimony of Satya Nadella shows that even a competitor as strong as Microsoft, the largest company in the world, which was willing to spend billions to enter the market, could not break into the general search services market against Google, because of the exclusionary effect of the pre-set default. (Tr. 3500:9-3505:23; Tr. 3510:16-23 (Nadella)) This testimony is in itself proof that the default provision and the exclusionary agreements between Apple and Google substantially foreclose even extremely powerful rivals from competing in the general search services market in violation of Section 2 of the Sherman Act.

115. The Joint Cooperation Agreement ("JCA") and the Amendment to the Information Services Agreement between Google and Apple ("ISA") taken together show that Google has pursued exclusionary contracts and agreements to monopolize the general search services and general search text advertising markets in violation of Section 2 of the Sherman Act.

D. Judge Mehta's Opinion After Trial Confirms the Plausibility of Plaintiffs' Allegations

1. Judge Mehta's Findings of Fact

116. In his Trial Memorandum Opinion dated August 5, 2024, (U.S. v. *Google*, at page 4), which is reported at ECF 1033 in Case No. 20-cv-3010-APM (D.D.C.), Judge Mehta holds as follows:

> "After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.
>
> "Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supra competitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

117. The touchstones to the Court's opinion are the written agreements between Google and Apple, including the Joint Cooperation Agreement ("JCA") and the Amendment to the Information Services Agreement ("ISA") between Google and Apple:

> "Google's browser agreements are exclusive insofar as they establish Google as the out-of- the-box default search engine. The Apple ISA requires that Google be preloaded as the exclusive default search engine on all Safari search access points in exchange for [redacted]% revenue share. … . The resulting query volume is substantial. About 65% of queries on all Apple devices (mobile and desktop), and 61.8% on iOS devices (mobile), flow through the Safari default, demonstrating that default placement is a 'primary channel[] for distribution of' search. . . ." (ECF 1033, p 204-205).

* * *

> "Two provisions of the ISA were at the heart of the parties' dispute: (1) default and revenue sharing and (2) restrictions on Apple's product development." (ECF 1033, Para. 293).

118. The ISA makes clear that Google will be the exclusive default search engine on Apple devices and, for that, Google will share its revenues from search advertising with Apple. If Apple wishes to display ads in its own Siri or Spotlight search vehicles, , Apple must first provide Google the right to supply those advertisements and receive the revenue from them. The ISA further specifically requires the CEOs of the two companies to meet each year ". . . to confirm each party's compliance with the terms of the ISA Agreement", thereby confirming the regular meetings of the CEO's as alleged by Plaintiff.

119. Judge Mehta noted:

> "The trial evidence firmly established that Google's monopoly power, maintained by the exclusive distribution agreements, *has enabled Google to increase text ads prices without any meaningful competitive constraint*." (ECF 1033, p. 259).
>
> * * *
>
> "In 2022, Google's revenue share payment to Apple was an estimated $20 billion. This is nearly double the payment made in 2020, which was then equivalent to 17.5% of Apple's operating profit." (ECF 1033, Para. 299).

RELEVANT MARKETS

A. General Search Services in the United States Is a Relevant Product Market

120. General search services in the United States is a relevant antitrust market. General search services allow consumers to find responsive information on the internet by entering keyword queries in a search engine such as Google, Bing, or DuckDuckGo.

121. General search services are unique because they offer consumers the convenience of access to an extremely large volume of information across the internet. Consumers use general search services to find specific websites, to find answers to questions, and to make purchases.

122. Other search tools and sources of information are not reasonable substitutes for general search services. Books, publisher websites, social media platforms, and even

specialized search providers such as Amazon, Expedia, or Yelp, do not offer consumers the scope of information or convenience that is provided by a general search engine. These other resources do not respond to all types of consumer queries. Few consumers would find alternative sources a suitable substitute for general search services. As a result, there are no reasonable substitutes for general search services, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

123. Specifically, Judge Mehta found in *U.S. v. Google* that there are relevant product markets for general search services and general search text ads.

B. United States is a Relevant Geographic Market

124. The United States is a relevant geographic market for general search services. Google's services are optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes for general search services offered in the United States. Google analyzes search market shares by country, including the United States. Therefore, the United States is a relevant geographic market.

GOOGLE'S ANTICOMPETITIVE CONDUCT

A. Google's Anticompetitive Conduct Includes Revenue Sharing and Exclusionary Pre-Installation Default Agreements

125. Google is a monopolist in the general search services and general search text advertising markets markets. Google aggressively uses its monopoly positions, and the money that flows from them, to continuously foreclose rivals and to protect its monopolies.

126. Google, aided and abetted by Apple, has maintained unlawful monopolies in the general search services and general search text advertising markets through exclusionary agreements, revenue sharing and by other conduct that have separately and collectively harmed competition by substantially foreclosing competition in general search services and insulating search queries in the United States against any meaningful competition.

127. By restricting competition in general search services and general search text advertising markets, Google's conduct has harmed consumers of search services by reducing the quality of general search, lessening choice in general search services, impeding innovation, and collecting and reselling valuable user/consumer data without reimbursing its users.

128. Google's exclusionary conduct has also substantially foreclosed competition in the general search text advertising market and has harmed advertisers. By suppressing competition in order to be able to charge advertisers more than it could in a competitive market, Google can also reduce the quality of the services it provides to advertisers.

129. Google's conduct has also harmed competition by impeding the distribution of innovative search apps that offer search features that would otherwise challenge Google, by raising rivals' costs and foreclosing them from effective distribution channels, and by preventing Google's rivals from meaningfully challenging Google's monopoly the general search services and general search text advertising markets.

130. Absent Google's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased consumer choice, and a more beneficial user experience. Consumer data would not be harvested from users without compensation. In addition, more competitive general search services and general search text advertising markets would allow advertisers to purchase ads at more attractive rates, with better quality and service. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and greater consumer welfare overall.

130. The anticompetitive effects flowing from Google's agreements, particularly when considered collectively, have allowed Google to develop and maintain monopolies in the markets for general search services and general search text advertising. These anticompetitive effects outweigh any benefits from those agreements.

131. Particularly when taken together, Google's exclusionary agreements have denied rivals access to the most important distribution channels for general search services and general search text advertising. In fact, Google's exclusionary contracts cover almost 60 percent of U.S. search queries. Almost half the remaining searches are funneled through properties owned and operated directly by Google. As a result, the large majority of searches are covered by Google's exclusionary contracts and by its own proprietary devices, operating systems and browsers, leaving only a small fraction of search distribution points for competitors.

132. Google's continued use of the exclusionary agreements over many years, long after there was any real competition in general search services and general search text advertising, has denied its rivals access to the scale that would allow rivals to increase quality. By depriving them of scale, Google also hinders its rivals' ability to secure distribution going forward, insulating Google from competition.

133. Google's exclusionary motives influence its negotiations with distributors of its search engine. Some of these exclusionary agreements have been described by Google as an "[i]nsurance policy that preserves our search and assistant usage." To preserve its dominance, Google has developed economic models to measure the "defensive value" of foreclosing search rivals from effective distribution. Google recognized it could pay search distributors to "protect [its] market share from erosion."

1. Google's Agreements Lock Up Mobile Distribution of Search

134. Google's strategy to ward off competition for mobile search distribution had two parts. First, Google expanded its existing search deal with Apple to cover mobile. Second, for other mobile distributors, Google offered its Android operating system for "free" but with a series of interlocking distribution agreements to ensure it search-engine dominance in the Android system.

135. As a result, Google has almost completely shut out its competitors from mobile distribution. As one executive for a competing search product recognized: "Google essentially [has] locked up ALL DISTRIBUTION" with its Apple deal and restrictive Android licensing terms, leaving the competitor's product with "no mobile volume."

a. Google Search Distribution on Apple iOS Devices

136. Apple does not currently offer its own general search engine. Under the current agreement between Apple and Google, which has a multi-year term, Apple must make Google's search engine the default for Safari and use Google for Siri and Spotlight in response to general search queries. In exchange for this privileged access to Apple's massive consumer base, Google pays Apple billions of dollars in advertising revenue each year, with public estimates ranging around $8–12 billion. The revenues Google shares with Apple make up approximately 15–20 percent of Apple's worldwide net income.

137. Although it is possible to change the search default on Safari from Google to a competing general search engine, few people do, making Google the *de facto* exclusive general search engine. That is why Google pays Apple billions on a yearly basis for default status. Indeed, Google's documents recognize that the "Safari default is a significant revenue channel" and that losing the deal would fundamentally harm Google's bottom line. Thus, Google views the prospect of losing default status on Apple devices as a "Code Red" scenario. In short, Google pays Apple billions to be the default search provider, in part, because Google knows the agreement increases the company's valuable scale and simultaneously denies that scale to rivals.

138. Apple's revenue sharing agreement with Google incentivizes Apple to push more and more search traffic to Google and to accommodate Google's strategy of denying scale to rivals. In 2018, Apple's and Google's CEOs met to discuss how the companies could work together to drive search revenue growth. After the 2018 meeting, a senior Apple

employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

139. The current version of the Google–Apple default agreement substantially forecloses Google's search rivals from an important distribution channel for a significant, multi-year term. *This agreement covers roughly 36 percent of all general search queries in the United States, including mobile devices and computers.* Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

140. When considered with Google's other exclusionary distribution agreements with other distributors of its search engine, Google's hold on Apple's distribution channel is self-reinforcing and successfully impairs rival general search engines' ability to offer competitive products thereby making Google's monopolies impenetrable to competitive discipline. By paying Apple a portion of the monopoly rents extracted from advertisers, Google has aligned Apple's financial incentives with its own and set the price of bidding for general search distribution extraordinarily high—in the billions. And, even if a rival was willing to make no money from a distribution relationship or could afford to lose money indefinitely, the rival would likely still fall short because the existing distribution agreements have, for more than a decade, denied rivals the benefits of scale, thus limiting (1) the quality of their general search and search advertising products, as well as (2) the audience to attract advertisers. As a result of the longtime deprivation of scale, no other search engine can offer Apple (or any other partner) the mix of quality, brand recognition, and economics that market-dominant Google can.

b. Google Search Distribution on Android Devices

141. Google controls the Android mobile distribution channel with its distributor agreements and owned-and-operated distribution properties.

142. Even though Android is open source, Google has used Android to protect Google's lucrative general search services and general search text advertising monopolies. Google sets the rules through "anti-forking" agreements, preinstallation default agreements, and revenue sharing agreements. Notably, each of these agreements builds on the others to preserve control. Thus, Google will not pay a revenue share or a financial incentive payment on a mobile device unless it is covered by (1) an anti-forking agreement insuring that Google's Android system is not significantly changed by the mobile device manufacturer, (2) a preinstallation agreement ensuring that Google's search access points are preinstalled and are given prominent placement, and (3) a revenue sharing or mobile incentive agreement that entitles Google to preset default status and, in most cases, prohibits preinstallation of search access points with rival general search providers.

143. Through these interlocking, anticompetitive agreements, Google insulates and protects its monopoly profits. One internal Google analysis of these restrictive agreements concluded that *only one percent of Google's worldwide Android search revenue was currently at risk to competitors*. This analysis noted that the growth in Google's search advertising revenue from Android distribution was "driven by increased platform protection efforts and agreements."

2. Preinstallation Agreements

144. Google uses preinstallation agreements—so-called MADAs—to ensure that its entire suite of search-related products is given premium placement on Android devices. Consumers naturally and regularly turn to these prominently placed search access points to conduct searches.

145. If a manufacturer wants even one of Google's key apps and application program interfaces (APIs), the device must be preloaded with a bundle of other Google apps selected by Google. The six "core" apps are Google Play, Chrome, Google's search app,

Gmail, Maps, and YouTube. Manufacturers must preinstall the core apps in a manner that *prevents the consumer from deleting them, regardless of whether the consumer wants them*. These preinstallation agreements cover almost all Android devices sold in the United States.

146. Google's preinstallation agreements condition the distribution of Google Play and GPS to the distribution of these other apps. This tie reinforces Google's monopolies. The preinstallation agreements provide Android device manufacturers an all-or-nothing choice: if a manufacturer wants Google Play or GPS, then the manufacturer must also preinstall, and in some cases give premium placement to, an entire suite of Google apps, including Google's search products. The forced preinstallation of Google's apps deters manufacturers from preinstalling those of competitors. This forecloses distribution opportunities to rival general search engines, protecting Google's monopolies.

147. Once the manufacturer adopts the necessary suite of Google apps, the search access points of those apps are preset to default to Google's search engine. The preinstalled version of Chrome is preset to default to Google search. A senior executive at Google referred to changing Chrome's preset search default as "totally off the table" and insisted that if a manufacturer "values their MADA, they cannot modify Chrome's settings." The result is that Google locks up the access points to general search on Android phones.

148. The preinstallation agreements are even more pernicious than basic ties because these agreements force distributors to configure the appearance of their phones to Google's specifications. They require manufacturers to put the Google search widget on the device's default home screen. Google considers the search widget "an essential part of the Google brand" and rejects requests by manufacturers to waive the preinstallation agreement's search-widget requirement. This locks up another search access point, as it would be impractical for a manufacturer to preinstall two search widgets on the same home screen.

149. Google's preinstallation agreements also impose voice-search preferencing. In addition to requiring the preinstallation of Google Assistant, preinstallation agreements require manufacturers to (1) implement a Google hot word, which activates Google Assistant, and (2) ensure certain touch actions on the device's home button directly access Google Assistant or Google. Google's agreements with most manufacturers also set Google Assistant as the default assistant app.

150. Rivals to Google Assistant are deprived of the same opportunities. Most of Google's preinstallation agreements prevent rival assistants from being the preset default or using a home button. Google also handicaps rival assistants by limiting the program interfaces (APIs) that non-Google apps can use, ensuring that the useful features, such as "always on" microphone access that would enable the use of a hot word or the initiation of phone calls, are available only to Google Assistant. Even Google Assistant's chief rival—Amazon's Alexa—is unable to navigate these disincentives to get significant preinstallation or functional integration on Android devices.

151. Voice search is an important, emerging access point. Internal Google documents have recognized that the "[v]oice platform will become the future of search" and financial projections for the assistant category recognize "search defensive value."

152. Partners that depart from the preinstallation agreements risk discipline from Google. In 2015, Google was concerned that a major United States carrier would ask manufacturers to install a search widget powered by the carrier's own in-house search engine. Google's Vice President of Partnerships wrote to a colleague that Google needed to make clear to manufacturers that "[these] customization requests will not go far" and replacing the Google search widget with a different search box would violate the preinstallation agreement. Termination of this default agreement would, in turn, prohibit access to the entire GMS suite, including Google Play and GPS, *and forfeit any potential cut of Google's search advertising*

*revenue under a revenue sharing agreement*. In short, as the above examples illustrate, Google's own documents show its efforts to discipline its counterparties, including major electronics companies and carriers.

3. Revenue Sharing Agreements

153. In exchange for a substantial portion of Google's search advertising revenues, Android distributors agree to make Google the preset default general search engine for all significant search access points on the device. In addition, these agreements typically contain an *exclusivity* provision prohibiting the preinstallation of a competing general search service.

154. Google has required for some time that its revenue sharing agreements with Android device manufacturers and carriers shall provide exclusivity for its general search service on those devices. As stated explicitly in a draft 2014 Google strategy deck in the Charts set out below, Google's revenue sharing arrangements with Android manufacturers or OEMs "provide exclusivity of Search" and its deals with carriers similarly "prevent[] the pre-installation of other Search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user."

**CHART: ANDROID MANUFACTURERS**



## CHART: ANDROID CARRIERS




155. Similarly, one Google executive acknowledged that exclusivity is "the general philosophy of the RSA [revenue sharing agreement] or one of the tenets of the value exchanged in the RSA." Another Google executive noted, "our philosophy is that we are paying revenue share *in return for* exclusivity." These agreements are, as that executive further explained, "really important" because "otherwise Bing or Yahoo can come and steal away our Android search distribution at any time."

156. As Google's documents recognize, the preinstallation agreements and revenue sharing agreements work together to drive searches to Google (and therefore away from competitors) on Android devices. As one Google executive explained in 2017, Google uses revenue sharing agreements "as a lever for motivating partner behavior that is consistent with our goals for Google and the ecosystem," and to "drive incremental revenue (securing search defaults not covered by MADA)." By using its monopoly profits, Google is able to secure even "more stringent requirements" on manufacturers and carriers to obtain the preset default position on search access points not covered by the preinstallation agreements. The combined result of Google's preinstallation and revenue sharing agreements is to lock up all the main

pathways through which consumers access search on Android devices, thus foreclosing rivals and protecting Google's monopoly positions.

157. The size of Google's payments to Android distributors demonstrates the enormous value of default status and exclusivity provided by the agreements. In recent years, Google paid major U.S. carriers, collectively, more than a billion dollars a year.

158. Other channels of distribution left for competitors are far inferior to those paid for by Google and protected by its agreements. For example, a consumer can in theory download a competing search app on his or her own. But as one of Google's executives bluntly put it, "most users just use what comes on the device" and do not attempt to download or use other general search services. Most users do not change the default settings.

159. Google's revenue-sharing partners turn down opportunities to preinstall or otherwise enable innovative, search-related apps because those new partnerships could violate Google's demand for exclusivity.

160. Google also uses its agreements to ensure that new search access points are not available to competitors. For example, Google developed a smart keyboard—a mobile app that can be used as an alternative for the standard-issued keyboards on smart phones—with the recognition that such keyboards might be "the next big search access point." Google relies on its preinstallation and default restrictions in its revenue sharing agreements as a "strategic defense" against rival keyboards that might provide a "[b]ridge" to rival general search engines. Thus, search queries cannot leak out to Google's rivals even in niche areas.

161. Google likewise structures its agreements to penalize any search distributor or device manufacturer that might walk away, tying them to Google. The typical term of the carrier and manufacturer revenue sharing agreement is two to three years. If a carrier or manufacturer does not renew its revenue sharing agreement with Google, the distributor loses out on revenue share not only for new mobile devices but also for the phones and tablets

previously sold and in the hands of consumers. This provision is punitive to the carrier or manufacturer and helps to ensure that carriers and manufacturers will not stray from Google.

162. As a result, to be attractive to a carrier or manufacturer, a rival search provider's offer for preset default status would need to cover not only the revenue the carrier or manufacturer would have earned from Google for new devices, but also the revenue that the carrier or manufacturer would have earned on all the devices that are currently in the hands of consumers. Google will continue to benefit from those devices with defaults previously set to Google. A rival search provider is left with no practical way to ensure that it will generate revenues from those devices, regardless of how competitive its general search service might otherwise be.

163. In roughly a decade, no other general search provider has secured preset default search status on any preinstalled search access point on Android devices. As with the Apple distribution agreements, the Android distribution agreements—taken together—are self-reinforcing, depriving rivals of the quality, audience, and financial benefits of scale that would allow them to mount an effective challenge to Google.

164. Particularly for newer entrants, the revenue sharing agreements present a substantial barrier to entry. These entrants cannot pay the billions of dollars that Google does for the most effective forms of distribution—premium placement and default status. Instead, they are relegated to inferior forms of distribution that do not allow them to build scale, gain brand recognition, and generate momentum to challenge Google.

4. Google Agreements Lock Up Browser Distribution

165. Beyond its agreements locking up distribution on Android and Apple devices, Google also has entered into exclusive revenue sharing agreements with browsers. Google has recognized it is "crucial to retain web browser partnerships." Google's agreements with

browsers generally require the browsers to make Google the preset default general search engine for search access points in both the browser's computer and mobile versions.

166. In exchange for being the preset default general search engine, Google shares a portion of the advertising revenue it generates from these search access points with Google's browser rivals. Browser revenue sharing agreements typically last at least two years and are routinely extended.

167. Browsers are one of the most important distribution channels for general search services because they are the gateway to the internet for most consumers. Many search queries on mobile devices and computers are performed through the device's browser. Today, Google has revenue sharing agreements with the most widely used browsers in the United States, such as Apple's Safari browser and Mozilla's Firefox browser; Microsoft's browsers are the only notable exceptions. *Over 85 percent of all browser usage in the United States occurs on one of the browsers covered by these revenue sharing agreements or on Google's own Chrome browser.*

168. In a competitive market, rival search engines could compete to be the preset default general search engine on a browser. The general search services market has not, however, been competitive for many years. When considered with Google's other exclusionary agreements and its monopoly power, Google's conduct forecloses a critical avenue for search competitors to enter the market or increase distribution.

169. In the absence of these agreements, rival browsers would have the ability to consider making other general search engines the preset default for some or all search access points, spurring greater competition in the general search services market and offering additional choices to consumers. As a Google employee once noted, Google's browser agreements can be "a good way to keep [a browser] away from Bing [Microsoft's browser]."

## ANTICOMPETITIVE EFFECTS

170. Google has maintained unlawful monopolies in the general search services and general search text advertising markets through its many exclusionary agreements, revenue sharing agreements and other conduct that have separately and collectively harmed competition by:

a. Substantially foreclosing competition in general search services and protecting a large majority of search queries in the United States against any meaningful competition;

b. Excluding general search services rivals from effective distribution channels, thereby denying rivals the necessary scale to compete effectively in the general search services, search advertising, and general search text advertising markets;

c. Impeding other potential distribution paths for general search services rivals;

d. Increasing barriers to entry and excluding competition at emerging search access points from nascent competitors on both computers and mobile devices;

e. Stunting innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model; and

f. Insulating Google from significant competitive pressure to improve its general search and general search text advertising products and services.

171. Google has unlawfully acquired monopoly power through a set of exclusive contracts. These contracts require that Google be the pre-installed default search engine on the only pre-installed access point on computers and phones in exchange for a share of the advertising revenue generated by the searches run on Google. These exclusive and exclusionary agreements lock in Google as the default search engine for years at a time and

prevent rivals from occupying default positions on a browser's search bar at the time of purchase. These agreements provide Google with an immediate, heightened advantage that is difficult to overcome.

172. According to Antonio Rangel, a behavioral economist at Caltech, the use of defaults is an effective tactic and a powerful influence on consumer decisions that would bias a user toward choosing that search engine in a "sizeable and robust" way. Google has these contracts with web browser developers such as Apple and with telephone manufacturers such as Samsung and with wireless carriers. The fact that Google is the default search engine on these products constitutes the exclusionary and anticompetitive conduct that prevents rivals from competing in the relevant market.

173. In *United States v. Google,* 20-cv-3010 (D.D.C.) (August 5, 2024), Judge Mehta concluded that Google had monopolized the general search services and general search text advertising market through its exclusive distribute agreements.

174. The effect of Defendant's agreements is to suppress competition from other smaller search competitors such as Bing, Yahoo!, and DuckDuckGo. Because of Google's and Apple's agreements not to compete and to divide the market, prices have been higher, production has been lower, innovation has been suppressed, quality has been less, and user choice has been eliminated.

175. On the other hand, in the absence of the anti-competitive agreements, and if Apple were to compete against Google in search, as it previously intended to do, advertising expenses would be lower, the incentives for companies to develop and distribute innovative search products would be restored, the quality of search would be higher, and user choice would be preserved and enhanced.

176. Google's and Apple's anticompetitive agreements have stunted innovation in new products that could serve as alternative search access points or disruptors to the

traditional Google search model that would benefit the search users/consumers such as Plaintiffs, just as the break-up of ATT launched a renaissance in communications technology.

177. By restricting competition in general search services, Google's conduct has harmed consumers by reducing the quality of general search services relating to privacy, data protection, and use of consumer data, lessening choice in general search services, impeding innovation, and by the harvest and sale of user data to advertisers.

178. Google's exclusionary conduct also substantially forecloses competition in the general search text advertising markets, harming advertisers. By suppressing competition, Google has more power to manipulate the quantity of ad inventory and auction dynamics in ways that allow it to charge advertisers more than it could in a competitive market. Google can also reduce the quality of the services it provides to advertisers, including by restricting the information it offers to advertisers about their marketing campaigns.

179. Google's conduct also has harmed competition by impeding the distribution of innovative apps that offer search features that would otherwise challenge Google. Google has also harmed competition by raising rivals' costs and foreclosing them from effective distribution channels, such as distribution through voice assistant providers, preventing them from meaningfully challenging Google's monopoly in general search services and general search text advertising.

180. Google's monopoly in general search services and general search text advertising also has given the company extraordinary power as the gateway to the internet, which it uses to promote its own web content and increase its profits. Google originally prided itself as being the "turnstile" to the internet, sending users off its results pages through organic links designed to connect the user with a third-party website that would best "answer" a user query. Over time, however, Google has pushed the organic links further and further down the results page and featured more advertising results and Google's own specialized search

offerings. This has demoted organic links of third-party websites, pushing these links off the front results page (SERP) and requiring them to buy more search advertising from Google to remain relevant. This raises their costs, reduces their competitiveness, and limits their incentive and ability to invest in innovations that could be attractive to users.

181. Absent Google's exclusionary agreements and other conduct, dynamic competition for general search services and general search text advertising would lead to higher quality search, increased consumer choice, and a more beneficial user experience. In addition, more competitive search advertising and general search text advertising markets would allow advertisers to purchase ads at more attractive terms, with better quality and service. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in more options, better products, and higher consumer welfare overall.

182. The anticompetitive effects flowing from Google's distribution agreements, particularly when considered collectively, have allowed Google to develop and maintain monopolies in the markets for general search services and general search text advertising; these anticompetitive effects outweigh any benefits from those agreements, or those benefits could be accomplished by less restrictive means.

## PERCENTAGE OF MARKET FORECLOSED BY GOOGLE'S EXCLUSIONARY CONDUCT DEMONSTRATES MARKET POWER

183. In 2020, Google's share of the U.S. general search services market was nearly 90%, and even higher on mobile devices. The market share of Google's closest competitor, Bing, was roughly 6%.

184. Google has maintained monopoly power through anticompetitive "exclusionary conduct" as opposed to procompetitive means and Google's exclusionary conduct has harmed

the competitive process, foreclosed a substantial share of the relevant market, and thereby harmed consumers and Plaintiffs.

185. Google's use of exclusive contracts requiring Apple and other computer and phone manufacturers to use Google as the pre-installed, default search engine on their devices creates a *de facto* exclusivity that "ties-up" and forecloses a substantial share of the relevant general search services and general search text advertising markets in both mobile and desktop computers for years at a time. The foreclosure created by exclusive contracts is measured by the percentage of the market that is 'tied up' by the exclusive-dealing contract which translates to the percentage of the market that those exclusivity contracts cover. *The Google default/exclusivity agreement with Apple alone covers roughly 36 percent of all general search queries in the United States, including mobile devices and computers.*

186. In the government case in *United States v. Google*, 1:20-cv-03010-APM, the government's expert's analysis (Whinston, DOJ Pls.' Expert Initial Report, Pls. Ex. 22, ¶ 905) showed that *Google's exclusivity agreements with Apple together with the Android system users "cover almost 50% of all U.S. general search traffic."* This percentage easily supports a *prima facie* case of monopolization under *United States v. Microsoft Corp.*, 253 F.3d 34, 50, 58 (D.C. Cir. 2001) (decided per curiam).

187. Tellingly, the experts have concluded that competition would be restored but for the exclusionary effect of Google's default, pre-loaded search distribution contracts and revenue sharing agreements. Prof. Whinston explained in the *U.S. v. Google* litigation that although "it is difficult to know exactly what Google (and rivals) would have done if Google had not used its exclusionary search distribution contracts, . . . there are reasonable scenarios in which current or future rivals would achieve . . . positions on a device or browser." Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, ¶ 427; *accord* Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 329.

188. Prof. Whinston explained that absent Google's exclusionary contracts " . . . there are reasonable scenarios in which current or future rivals would achieve parity," such as a choice screen. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, ¶ 427.

189. Prof. Whinston provided extensive evidence on the "stickiness" of defaults. *E.g.*, Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, § VII.A. His analysis of defaults showed (among other things) that a choice (instead of default) screen "would, [even] in the short run, lead to a modest but still significant shift in shares toward Google's rivals." Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 926. The fall in share would be caused, at least in part, by users who prefer a non-Google search engine but are using Google because it is the default. *See* Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 926.

190. Prof. Whinston's Initial Report provides extensive evidence of the benefits to consumers if Google faces more competition. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 1173 (discusses how Google's "distribution contracts directly reduce the quality of the alternatives that consumers have" and how "these contracts reduce[] the incentives of firms in the general search services market, including Google, to make improvements in search quality").

191. Prof. Whinston further provides evidence that absent the distribution deals, Google's rivals would be more competitive. *E.g.*, Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 41.

192. Ultimately Professor Whinston testified at the trial of the *U.S. v. Google* case on October 6, 2023, that Google did in fact maintain the power to raise prices in advertising at will in both the general search text ads market and in the search ads market. (Transcript, October 6, 2023, at pp. 4796-4798.). He concluded that Google possessed and exercised monopoly power.

193. Judge Mehta found that Google possessed the power to raise prices.

194. Prof. Baker (State of Colorado Expert Witness) is also clear that the "pre-installation search default agreements exclude [Google's] actual and potential rivals . . . because they raise the cost of entry and expansion for all general search firms." Pls. Ex. 266, Baker (Colo. Pls.' Expert) Initial Report, ¶ 316. In other words, without the "pre-installation search default agreements," Prof. Baker's opinion is that the "cost of entry and expansion" would have been lower for all general search firms. Pls. Ex. 266, Baker (Colo. Pls.' Expert) Initial Report, ¶ 316.

195. "Google admits that Google Search is the default out-of-the-box search service for certain Google apps, including the Chrome app." (Defendant Google LLC's Answer And Affirmative Defenses To Plaintiffs' Amended Complaint (ECF #103), Jan. 29, 2021, at ¶ 137). Professor Whinston has written that users are highly unlikely to take the steps required to change the default. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 846–965

COMPETITION WAS EXCLUDED AND FORECLOSED

196. The following testimony from the *U.S. v. Google* trial in the District of Columbia shows that Google's default agreements substantially foreclosed competition.

197. Gabriel Weinberg CEO of DuckDuckGo testified in *U.S. v. Google* that he proposed to Apple to be the default on Safari for private browsing, as well as to Samsung, Mozilla and Opera, but that the default provisions of their contracts with Google prevented them from considering going forward with DuckDuckGo. Weinberg testified as follows:

> "So we did that for private browsing in all these different partners you mentioned, and we concluded that the common theme was the Google contract that each one of these companies had. That's ultimately why we stopped the objective as well." (Transcript Sept. 21, 2023 2047:13-2049:17).

198. Prof. Jonathan Baker also testified in *U. S. v. Google* about the effect of Google's exclusive default agreements:

> "Q. How do you describe the effects, if any, of the exclusive defaults on competition?

> "A. Well, they get more likely that the search users will stick with Google, and that makes it harder for the rivals to compete, and for the reason we just discussed, there isn't a substantial countervailing benefit to the buyers, and that makes it harder for the rivals also to work with other firms that would help them attract search users and search advertisers." (Transcript, Oct. 25, 2023 at 7094: 15-22)

199. Even powerful competitors such as Microsoft Corporation with its Bing search engine could not compete with Google because of Google's exclusivity agreements. Satya Nadella, current CEO of Microsoft Corporation, testified in the U.S. v. Google trial that the internet search market was dominated by Google and that Google's power in online search was so ubiquitous that even his company found it difficult to compete in general internet search. Microsoft could not overcome Google's use of multibillion-dollar deals to be the default search engine on smartphones and web browsers:

> "Just by share, revenue, margins. Whichever way you look at it today, you know, it's dominated by one player . . ." (Transcript, Oct. 2, 2023, morning session.)

200. Nadella testified that Google has the overwhelming market share for desktop computers running the Windows operating system. The internet is really the "Google web":

> "Q. Let me just finish up. So just to be clear, Google is getting the overwhelming majority of search queries on Windows PCs because users are actively going and downloading either Google Search or Google Chrome onto their Windows PC, correct?
>
> "A. That's correct." (Transcript, Oct. 2, 2023, morning session.)

201. Google's dominance is fed by its agreements requiring that it be the default search engine for general search on desktop and mobile devices. Nadella testified:

> "This entire notion that users have choice and they go from one website to one website or one search into one search . . . it's complete bogus. There's defaults. The only thing that matter[s] in terms of changing search behavior.
>
> "And at this point, in fact, it's even more true, right. I mean, there's -- you get up in the morning, you brush your teeth and you search on Google. And so therefore, with that . . . level of habit forming, the only way to change is by changing defaults."

* * *

"I mean, there's no question that users **can** switch. My only argument against that is users **don't switch**. And as I said, the best example is, again, take a look at what happened with Apple Maps. You know, the default was there, . . . there was a lot of press about how, you know, it's got quality issues, this, that, and the other. And I don't have the data, but I would say, my bet, that 90 percent of the users use Apple Maps.

"And so defaults, that's the biggest thing that I think the broader world sort of doesn't get is, you just . . . will not switch defaults.

202. Microsoft has tried to break into the Apple/Google default ecosystem:

"A. But right now, the search default is fundamentally synonymous with the browser entry point.

"Q. And has Microsoft tried to get default positions [on] devices?
"A. Yes, we have.
"Q. How has that gone?

"A. Not very well.
"Q. Why not?
"A. I mean, the one that we tried and continue to try, quite frankly, is the Apple default.

"I mean, if you think about it, if you step back in a second and say, what really are the defaults that truly, truly matter that are even available, you -- obviously, there's no availability of the default on Android because Google owns it. There is no way you're going to get a default on Chrome, which happens to be the dominant browser, even on Windows, so, therefore you're not going to get that.

"So you're left with really iOS as the only thing that you can truly contend for as sort of another player in search, which is needle-moving in a big way. So I focused every year of my sort of tenure as CEO to see if Apple would be open, and we've had, you know, a series of dialogues with them over the years on it."

(Transcript, Oct. 2, 2023, morning session.)

203. Google's default agreement with Apple is a "game-changer" and "king maker" in terms of providing market power to Google, for which Apple is paid. Nadella testified:

"Q. And just sort of following up on the discussions with Apple, . . . what would a deal to be the default in Safari, what would that do for Bing?

"A. It would be a big game-changer. If you think about it, my confidence, quite frankly, in all of that comes from what Apple was able to do with Apple Maps, which is, they just said, Apple Maps is the default, there was a period of turbulence, and now . . . everybody just uses . . . Apple Maps.

"And so to me, that's what the power of defaults is. In fact, that's I would say exhibit number one . . . [for] anybody who wants to . . . know anything about . . . the power of defaults, that case study is the best.

> "And so I basically look at that and say Apple, both because of the brand they have and the power they have of setting defaults on their operating system, that whomever they chose, they basically king make on it.
>
> "And so -- and then, of course, they have [an] economic interest in it; they get paid for that default setting. And so that's where the entire discussion is."
>
> * * *
>
> "Q. And you said that . . . the premise was that Apple would essentially receive the economic benefits of the profit-- what do you mean by that?
>
> "A. I mean, today, Apple makes, you know, a lot of profit and a lot of money because of the money they collect from Google for setting Google as the default . . .
>
> * * *
>
> "A. Then your question of why would Apple ever want to do this [i.e., use Bing instead of Google]. It would want to do this if they felt that economically in the long run for them having competition in search is helpful. And this is sort of an interesting question for them, right, [since] . . . there's this fantastic simple oligopolistic arrangement between number one and number two [Apple and Google], so why upset the apple cart, no pun intended."
>
> (Transcript, Oct. 2, 2023, morning session.)

204. Mr. Nadella also testified that he was worried that Google would strike deals for the exclusive use of online content to train it's A.I. tools in support of its own A.I. powered chatbot, Bard.

> "When I am meeting with publishers now, they are saying, 'Google's going to write this check to us, and it's going to be exclusive and you have to match it.'"
>
> (Transcript, Oct. 2, 2023, morning session.)

205. Other Microsoft executives such as Jonathan Tinter, a business development executive, and Mikhail Parakhin, an advertising executive, also testified about the search business. Mr. Tinter said that Google used its scale to make its search engine the default on Apple and Samsung phones, stifling competitors like Microsoft. (Testimony of Tinter and Parakhin at *U.S. v. Google* trial.)

STANDING

206. Plaintiffs have standing to bring this action under Section 2 of the Sherman Act. Plaintiffs are direct consumers of Google's services. Plaintiffs use the Google search engine on devices that are subject to the exclusionary Google agreements. Because of Google's monopoly power and because of the illegal and exclusionary written and oral agreements with Apple to stay out of the general search services and general search text advertising markets and to make Google the default search engine on Apple and other distributors' and manufacturers' devices and because of the Google agreements to share the profits of their search business, there are fewer viable, less expensive competitive alternatives available to Plaintiffs to conduct search inquiries and thereby to obtain the information required both in their daily lives and in their businesses.

207. The relevant markets in this case are the markets for general search services and general search text advertising in which Plaintiffs participate directly. Plaintiffs conduct their personal lives and operate their businesses using Google's general search services. In the general search text adverting market Plaintiffs are targeted with general search text advertising based upon the data that Google derives from Plaintiffs through its general search services.

208. Google in turn makes its money from adds placed on its search engine results page. Google's dominance in the search market gives it the power to control the price of search advertising that it will charge to advertisers seeking the eyes of the searchers (see trial testimony of Professor Whinston, *supra*), since these markets work "hand in glove". The revenue Google generates in its business comes from the advertising to which searchers are exposed while engaging in their search.

209. The Plaintiffs' injury is both particularized and concrete, personal and individual. Plaintiffs have themselves been injured as individuals and as consumers in the

market where the trade has been restrained and as customers who obtained services in the threatened market. Plaintiffs have further been injured by reason of Google's extraction of user data from them as users of Google's internet search engine. Google's monetization of the Plaintiffs' personal data by reselling that personal data to others, including to its own advertisers, has resulted in damage to Plaintiffs. The monetization of Plaintiffs' data by reselling this data to advertisers itself establishes the inherent value of the data and establishes that there is a market for the data with advertisers. Google's extraction of this data from users, without compensation to users, results in a direct, calculable and concrete monetary injury. Google is only able to extract this data from Plaintiffs and other users by virtue of its monopolistic position in which it has, as a practical matter, eliminated any choice for alternative search vehicles.

210. Plaintiffs and consumers are also directly injured because they have been deprived of alternative search engines that may be more responsive to Plaintiffs' demands for privacy and because Plaintiffs have been subjected to an inferior search experience. Plaintiffs are injured because Plaintiffs and consumers must relinquish their personal information to Google during their search and, as a result, suffer a loss in privacy, which is an invasion of a legal right, and which is a valuable commodity in and of itself. Google's service is clearly not free; Plaintiffs and consumers pay a price for using Google search by trading personal data for search results and by making themselves subject to targeted advertising that will follow them wherever they travel on the internet through Google. Here, Google's practices will cause harm or a material risk of harm to Plaintiffs' interests by controlling their personal information.

211. Plaintiffs and other users of Google's search engine are also injured by the taking of their valuable search data for no compensation and then by reason of the ineluctable subsequent bombardment of their email accounts with advertising by advertisers who have purchased the users' data from Google for no compensation to Plaintiffs. If it were not for

Google's monopoly, and if there were more competition among general search engines for consumer searches, Google would be forced to pay the consumer for the information it collects and for its monetization of that consumer's personal data. Ultimately, Plaintiffs and all consumers are directly injured in their business or property because Google does not pay them for the information that it collects. Plaintiffs are owed compensation for the valuable personal information that is secretly extracted from them and resold, which compensation can reasonably be calculated through the use of economic models by economic experts. This injury is ongoing and has been ongoing for years. It is not theoretical nor conjectural. It will not stop until it is terminated by the action of this court, and, for this, Plaintiffs seek the court's redress. The loss effected and for which Plaintiffs seek redress is much more than "the recreational or even the mere esthetic interests of the plaintiff." Rather, Plaintiffs seek money damages based upon the value of their personal data which is a valuable personal asset that has been harvested and sold by Google to advertisers and others for profits in the billions of dollars.

212. In addition, Plaintiffs are entitled to the profits Google has made from the monetization of Plaintiffs' personal data. Plaintiffs allege that their browsing histories carry financial value. Plaintiffs' browsing histories can be valued at a dollar amount per year, as will be proved at trial. Google profited from this valuable data by selling user data to advertisers in order to generate revenue. And Google's ad sales constituted a substantial portion of its overall revenue during the relevant period.

213. The loss and injury sustained by plaintiffs and other consumers and search users are readily traceable to Google's anticompetitive conduct. But for Google's exclusionary contracts requiring that Google be made the default search engine on Plaintiffs' and other consumers' devices, and but for the *de facto* exclusivity of Google's search engine on Plaintiffs' devices, Plaintiffs and others would be free to choose competitive search engines

that may be more user-friendly, more solicitous of Plaintiffs' privacy, more careful about the sale of Plaintiffs' personal information, even more up-to-date and innovative, and which may pay Plaintiffs for the use of their personal information.

214. Plaintiffs and End-Users have standing due to antitrust injury from Google's monopoly in the general search services market and general t4ext advertising market which incorporate the End-users' browsers' access points as integral components through Google's search code embedded on websites from which Google collects End-users' valuable data for no compensation and sells it to advertisers to target End-users' with text ads for profits in which End-users' retain a stake, and Google's exclusive default agreements prevented competitors Neeva and DuckDuckGo from providing quality search products to End-users that were more privacy protected and ad-free.

A. Plaintiffs And End-Users Have Standing Due To The Antitrust Injury From Google's Monopoly In Which Google Collects Their Valuable Data For No Compensation And Sells It To Advertisers To Target End-users With Text Ads For Profits In Which End-Users Retain A Stake

215. There are relevant product markets for general search services and general search text ads and Google has monopoly power in those markets. Google's distribution agreements with Apple and others are exclusive and have anticompetitive effects.

216. Google collects End-users' data while they are searching and making queries on Google's general search engine ("GSE") in the general search services market. End-Users disclose their data in the general search services and general search text ads markets ("search markets") thereby enabling Google to collect End-users' data, and Google then provides and sells End-users' data to advertisers and brokers for billions of dollars which enable the advertisers to target End-Users with general search text ads in the general search text ads market, focusing on End-users' interests as expressed in their data.

217. End-users have a property right in the data that Google collects from them and

Plaintiffs retain a stake in the unjustly earned profits that Google garners from selling or transmitting their data, including their personal browsing histories, all of which confers standing. See *In re Facebook, Inc. Internet Tracking Litig*., No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources . . ."); *Greenley v. Kochava*, Inc., No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, plaintiffs must only establish a stake in the profits garnered from their personal data and that it is unjust for the defendant to retain those profits.")

B. Google Requires Website Developers To Embed Google's Code Onto Their Websites So That End-users' Browsers Can Read Google's Code And Relay to Google The Data The End-users' Browser Communicated To the Website. Thus, Google's Embedded Code Incorporates The End-users' Browser As An Integral Part Of Google's General Search Services Market

218. In *Brown v. Google*, LLC, 4:20-cv-3664-YGR, Dkt. No. 969 at p.3; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909, the court stated:

> "Data Collection…When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, *the user's browser reads Google's code, which is embedded on the website.* (Id.) Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. (Id.) *This second transmission tells Google exactly what a user's browser communicated to the website.* (Id.)
>
> "Google's services are ubiquitous on the internet: over 70 percenta [sic] of websites use Google Analytics and Ad Manager. (4AC ¶¶ 67 and 78.) To use these services, <u>*Google requires website developers to embed Google's code onto their websites*</u> and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.) (Emphasis added).
>
> "According to plaintiffs, *Google then takes users' private browsing history and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing*

*so allows Google to offer better, more targeted, advertisements to users.* (Response to SUF 63; 4AC ⁋ 84.) This is at the core of Google's business: the bulk of Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ⁋ 89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ⁋ 138; PAF 27–28.) *The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them.* (PAF 28.)." (Emphasis added). *Brown v. Google*, LLC, 4:20-cv-3664-YGR, Dkt. No. 969 at p.3.

219. As recognized in *Brown v. Google LLC,* Google requires website developers to embed Google's code onto their websites so that Google's search engine can collect End-users' data directly from End-users' browsers making the End-users' browsers the gateway to Google's general search services market and general search text advertising market. Thus, Google's embedded code incorporates the End-users' browser as an integral part of Google's general search services system in which the End-user's browser is the gateway to Google's general search services market in Google's general search services and general search text advertising market.

220. Google's communications code that is embedded on websites is thus an extension of Google's search engine. Google then takes End-users' private browsing history that Google collected with Google's embedded code and associates it with End-users' preexisting user profiles already compiled by Google, which then allows Google to offer targeted advertisements to End-users and to build scale that far surpasses Google's competitors.

221. Plaintiffs in this case, as the Plaintiffs in the Brown case, allege that there is a market for their data—*Google itself has piloted a program where it pays users $3.00 a day for their browsing history.* Google itself has paid for users' search data, establishing that there is a market for user's search data and that user's search data has value. Plaintiffs' and End-users' data carries financial value and Google profits from their valuable data by selling or transferring it to advertisers. Plaintiffs and End-users retain a stake in their data and in the

profits garnered by Google from the disposition of Plaintiffs' and End-users' data. In *Rodriguez v. Google LLC,* 20-cv-04668 Dkt. No 352 at p. 13, Judge Seeborg stated: "In [*In re Facebook*], the Court held that Plaintiffs had adequately established standing because they alleged their data "carried financial value" and that the defendant "profited from this valuable data."

222. Google uses its general search services and general search text ads to compile End Users' searches on the web which information Google then sells to advertisers. When an End User uses Google, the End User provides personal information to Google in exchange for search results for no compensation to the End User which Google monetizes by selling the End User's information to advertisers and producing search advertising targeting the End User based on the End User's collected information. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023).

223. Plaintiffs' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in the billions that Google obtains by re-selling the End-users' data to advertisers. As further injury, Plaintiffs and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation, but, in addition, Google also harms consumers of general search services by reducing the quality of the general search experience, by lessening choices, and by impeding innovation.

224. Google and Apple have specifically targeted End Users in their written agreements. In the written ISA contract, which sets out the parties' agreement not to compete and to share revenue, the parties specifically recite that the stated "Agreement Purpose" is to improve the "performance of the Services, the Spotlight Services and the Siri Services *for End Users* on Apple products." (Exhibit B, p. 7) (Emphasis Added.) Having been expressly and

unambiguously targeted as End-Users by the Defendants within the context of a document which is anticompetitive on its face, the Plaintiffs meet the criteria for standing to bring this lawsuit.

### C. End-users' Data Is Collected By Google Through Apple's Safari Browser And Android and Chrome Browsers As Search Access Points, which Operate As Integral Components Of and Portals to Google's General Search Services Markets

225. End-users' data is collected by Google through Apple's Safari browser and Android and Chrome browsers as access points which operate as integral components of Google's general search services and general search text ads markets.

226. Google's general search services and general search text ads markets incorporate End-user's browsers as access points to Google's general search engine ("GSE").

227. In Finding of Fact 59 in the *United States v. Google* the court found that End-user's browsers interacted with Google's GSE through access points that were integrated into Google's general search services and general search text ads markets, stating:

> "The most efficient channel of GSE distribution is, by far, the placement as the preloaded out-of-the-box default GSE. That access point varies by device. On Apple products, it is the integrated search bar in the Safari browser…On Android devices, it is the search widget…and the search toolbar in the Chrome browser…Google is the default GSE on all of these access points except on Edge where the default GSE is Bing."

As search access points, End-users' browsers are integral to and incorporated in Google's GSE search system and in Google's general search services and general search text ads markets.

228. As the primary channel for distribution of search through Safari [and Firefox] access points, the Safari [and Firefox] browsers and access points are integral components of the general search services and general search text ads markets in which search queries are entered and distributed through Google's code embedded on websites.

229. Likewise, the court in *Brown v. Google, LLC,* 4:20-cv-3664-YGR; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909, described how the interaction of End-users' browsers with Google's GSE through the embedded Google code on developers' websites created an integrated search system.

230. When the End-user's browser reads Google's code embedded on the website, it operates as an extension of Google's general search engine in the general search services and general search text ad markets. End-users' data is collected by Google through access points in Apple's Safari browser, and through the Android and Chrome browsers, based on queries harvested through the Google code embedded on websites.

D. Google Profits from The Valuable End-Users' Data It Collects Through Apple's Safari Browser and Android Chrome Browser, As Access Points For Google's GSE, and Which Operate As Integral Components Of The General Search Services And General Search Text Ads Markets

231. Google, LLC, as one of the largest technology companies on earth, and its parent Alphabet Inc. have over 1.5 billion active users, and Alphabet Inc. boasts a net worth exceeding $1 trillion. Google's enormous financial success results from its tracking and collection of personal and sensitive user data (including Plaintiffs' and Class members' data) and selling and brokering that user data to advertisers to optimize advertisement services.

232. Google profits from the data it collects by charging its customers for advertisement-related services based on End-user data, by targeted advertisements to End-users, including Plaintiffs, and by using the results to improve Google's own algorithms and technology, such as Google's general search services and general search text ads.

233. The End-user data that Google collects contains personal viewing information, which Google analyzes and associates with End-users' prior viewing histories, to create a "profile" for each End-user that enables Google to charge its advertiser-customers for targeted

End-user data and enables Google to monetize End-users' data so that Google can profit from Google's ad-targeting services.

234. Google is paid high prices by third-party advertisers for these targeted End-user, data-based profiles for advertisements because Google uses End-user data that Google collected from End-users to select and display advertisements targeted at those specific profiles.

235. Google also benefits by using the End-user data it collects to improve and refine existing and new Google products, services, and algorithms.

236. Google's market power in general search services and general search text ads depends on Google's ability to track what consumers are doing. The trackers that Google has employed across the internet not only tell Google where consumers go after using Google, but also what websites are popular and how often they are visited. By surveying End-users' behavior across the web, Google is able to create a better and higher quality search product compared to its competitors.

237. Google includes far more than volunteered personal information like name, birth date, gender and email address since Google secretly plants numerous tracking mechanisms on End-users' computers and web-browsers, which enable Google to track users' browsing histories and correlate them with End-user browser IDs, effectively preventing End-users' from blocking access to their data.

238. Similarly, the value of End-user-correlated internet browsing history can be quantified because Google itself is willing to pay users for the exact type of communications that Google has been illegally intercepting from Plaintiffs and End-users during the Class Period. For example, as early as 2012, Google convened a panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

239. Upon becoming a panelist, internet users add an extension to their browser that shares with Google the sites they visit and how they use them. The panelists consent to Google tracking this information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

240. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at $5, demonstrate conclusively that internet industry participants understand that there is value in internet users' browsing habits. Google now pays Screenwise panelists up to $3 *per week* to be tracked.

241. In a study, web browsing histories were valued at $52.00 per year; web search histories were valued at $57; GPS records were valued at $55; and emails and text messages were valued at $59.

242. Thus, Google itself has recognized the value of End-user' data and has actually paid for End-users' search data.

1. The End-users' Data Collected By Google Is Highly Valuable

243. The data Google has collected from End-users is highly valuable to Google, to advertising companies, and to End-users. There was a growing consensus in the ecommerce industry that consumers' personal data was very valuable.[7] In 2004, Professor Paul M. Schwartz noted in the Harvard Law Review:

---

[7] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS No. 220 at 7 (Apr. 2, 2013), available at http://dx.doi.org/10.1787/5k486qtxldmq-en; Supporting Investment in Knowledge Capital, Growth and Innovation, OECD at 319 (Oct. 13, 2013), available at https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman & Nicolas Glady, What's the Value of Your Data? TECHCRUNCH (Oct. 13, 2015), available at https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Nov. 11, 2020) Paul Lewis & Paul Hilder, Former Cambridge Analytica Exec Says She Wants Lies to Stop, THE GUARDIAN (March 23, 2018), available at https://www.theguardian.com/uknews/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies (last visited Nov. 11, 2020); SHOSHANNA ZUBOFF, THE

"Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[8]

244. In 2011, Christopher Soghoian, formerly of the Open Society Institute and current technologist at the ACLU, wrote in The Wall Street Journal:

> "The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers."[9]

a. <u>End-users' Data Is Valuable to Class Members</u>

245. It is possible to quantify the cash value to Class members of the data collected and saved by Google through the Google tracking and advertising code.

246. In a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[10] Web browsing histories were valued

---

AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER at 166 (2019).

[8] Paul M. Schwartz, Property, Privacy and Personal Data, 117 HARV. L. REV. 2055, 2056–57 (2004).

[9] Julia Angwin, How Much Should People Worry About the Loss of Online Privacy?, THE WALL STREET JOURNAL (Nov. 15, 2011), available at https://www.wsj.com/articles/SB10001424052970204190704577024262567105738 (last visited Nov. 11, 2020).

[10] Tim Morey, What's Your Personal Data Worth?, DESIGN MIND (Jan. 18, 2011), available at:https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html (last visited Nov. 11, 2020).

at $52.00 per year, web search histories were valued at $57, emails and text messages were valued at $59.00, and GPS records were valued at $55.

b. End-users' Data Is Valuable to Google

247. In addition to quantifying the value of the collected data to End-users, it is also possible to quantify the value of this data to Google.

248. For example, it is possible to calculate the profits Google has earned from using End-users' data to enhance its "user profiles"; to sell targeted advertisements; and to develop and refine other Google products.

249. It is also possible to assess the value of the collected data to Google by reference to the money that Google has, on other occasions, paid to users for this kind of data. Google began paying users for their web browsing data in 2012.[11]

250. Google has also paid internet users to participate in a panel that Google calls "Google Screenwise Trends."

251. Upon becoming panelists for Google Screenwise Trends, these users add a browser extension that shares with Google the sites they visit and how they use them.

252. The panelists consent to Google tracking their information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google then pays panelists additional gift cards "for staying with" the panel.

253. These gift cards, mostly valued at $5, demonstrated that Google has assigned cash value to the data it obtained from internet users' communications with the websites they visited. Google now pays Screenwise panelists up to $3 per week.

---

[11] Jack Marshall, *Google Pays Users for Browsing Data*, DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/
K.N.C., *Questioning the searches*, The Economist (June 13, 2012), https://www.economist.com/schumpeter/2012/06/13/questioning-the-searchers

c. End-users' Data Is Valuable to Other Internet Firms Who In A Competitive Market Would Compete By Compensating End-Users' For Their Search Data

254. Unrestrained by Google's default contracts, Google or other firms would compete for user data by compensating End-users for their search data. Since Judge Mehta found that Microsoft was willing to pay even 100% of its Bing revenue for a default GSE with improved privacy in search, it is entirely plausible that Microsoft would have competed with Google by paying End-users for their data to achieve improved privacy in search. Once in a position to compete, Google's competitor, Microsoft/Bing, would offer to pay for End-user' data just as Microsoft/Bing offered to pay Apple for a default GSE with "improved private searching."

255. In *United States v. Google,* FOF 322-323, Judge Mehta found:

> "Microsoft made clear that it was 'willing to provide Apple with the majority of profits in a search partnership along with greater levels of flexibility and control over the product experience including user experience and branding,' with one example being improved private searching 'consistent with the broader Apple value proposition around respecting user privacy.' Microsoft understood that it 'would have to pay and even subsidize the transfer' for the period of the transition and was willing to do so for the long term. Tr. at 3502:21-3503:8 (Nadella)…Microsoft proposed sharing 100% of its Bing revenue with Apple to secure the default, or even selling Bing to Apple."

256. Since Judge Mehta found that Microsoft was willing to pay 100% of its Bing revenue for a default GSE with improved privacy in search, it is likely Microsoft would have paid users for data to accomplish improved privacy in search. DuckDuckGo (DDG) also attempted to obtain default status on Apple devices. Judge Mehta also found that DDG - because of its brand emphasis on privacy – has, on multiple occasions, attempted to convince Apple to switch to DDG as the default GSE for Safari's 'private browsing mode'. (FOF 330.)

257. Second, a number of platforms have appeared that permit consumers to monetize their data. For example:

a. Brave's web browser pays users to watch online targeted ads.[12]

b. Loginhood "lets individuals earn rewards for their data.[13]

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[14]

d. Killi is a new data exchange platform that allows a user to own and earn from the user's data.[15]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[16]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer,

---

[12] Brandan Hesse, Get Paid to Watch Ads in the Brave Web Browser, LIFEHACKER (Apr. 26, 2019), available at https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser1834332279#:~:text=Brave%2C%20a%20chromiumbased%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than %20we%E2%80%99re%20accustomed%20to (last visited Nov. 11, 2020) ("The model is entirely opt-in, meaning that ads will be disabled by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly")

[13] Privacy Drives Performance, LOGINHOOD, https://loginhood.io/ ; see also Chrome Browser Extension, LOGINHOOD, https://loginhood.io/product/chromeextension 2020) ("Start earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[14] *Your data – Your Property*, DATA DIVIDEND PROJECT, https://www.datadividendproject.com ("Get your Data Dividend…We'll send you $$ as we negotiate with companies to compensate you for using your personal data.").

[15] *Killi Paycheck*, KILLI, https:/killi.io/earn/

[16] FAQ, BIG TOKEN, https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits to earn points worth up to $50 per month.[17]

258. Even the California Civil Code recognizes that the End-users' personal data is a property right. Not only does the Civil Code prohibit covered businesses from discriminating against consumers that opt-out of data collection, the Civil Code also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The Code provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

259. End-users have a property right in the data that Google collects from them, a reasonable expectation of privacy and a stake in the unjustly earned profits that Google garnered from selling or transmitting their data, including their personal browsing histories, all of which confers Article III standing. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

260. Through its false representations and unlawful data collection, Google is unjustly enriching itself at the expense of End-user's choice, since the End-user would otherwise have the ability to choose how they would monetize their own data.

261. If not for Google's actions, End-users could have received monetary value for their data from other internet firms.

---

[17] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash*, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

d. <u>There Is Value to Class Members in Keeping Their Data Private</u>

262. In addition to the monetary value of selling their data, Class members also assign value to keeping their data private.

263. It is possible to quantify this privacy value, which is destroyed when Google tracking and advertising code surreptitiously transmit End-users' data to Google.

264. According to Google, more than 200 million End-users visit Google's "Privacy Checkup" website each year. Each day, nearly 20 million End-users check their Google privacy settings because they care about keeping their data private and preventing its disclosure to anyone else, including to Google.

265. Surveys of consumers indicate the importance that consumers assign to privacy. For example, in a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was "very important" to control this.

266. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits.

267. Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user choice. End-user consumers would prefer to choose how they would monetize their own data.

E. Plaintiffs And End-Users Have Standing Due To The Injury That Ensues When Google's Exclusive Default Agreements Prevent Competitors Such As Neeva and DuckDuckGo From Providing Quality Search Products To End-users That Would Be More Privacy Protected and Ad-free

268. In *United States v. Google,* the court found that Google's exclusive default agreements with Apple and others prevented competitors such as Neeva and DuckDuckGo from providing End-users with high quality search products that were more privacy protected and ad-free. In *United States v. Google,* the court also concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted in network effects that made it difficult for competitors to gain the volume of users and user data that would allow the development of high-quality search products.

269. The court further found that Neeva, as a competitor to Google, sought to create a subscription-based model for search that did not serve ads, but, due to Google's exclusive default contracts which prevented Neeva from developing sufficient user data, it was driven out of the search. Likewise, the court found that DuckDuckGo ("DDG"), another competitor of Google's, cannot compete effectively because of Google's exclusionary default search agreements and DDG's ensuing lack of access to sufficient user data. The *Google* court found that ". . . DDG and Neeva are the only two notable market entrants in the last 15 years. Each attempted to innovate—DDG on privacy and Neeva through a subscription-based model—but found only limited success (DDG) or left the market altogether (Neeva)."

270. Neeva and DuckDuckGo, competitors of Google that offered better privacy or ad-free alternatives to Google, were unable to offer the same high quality of search to End-users as Google as a result of their lack of access to large volumes of user data due to Google's anticompetitive use of exclusionary default agreements.

271. As a result of Google's use of anticompetitive exclusionary default agreements with Apple and others that foreclosed DDG's and Neeva's access to the large volume of user

data needed to offer the same high quality of search to End-users as Google, Plaintiffs and End-users have been injured because they are deprived of the better-quality privacy and ad-free searches from Google's competitors, DDG and Neeva, which those companies offered.

## FRAUDULENT CONCEALMENT

272. As a result of the private and secret meetings by the CEOs of Google and Apple since at least 2005 until shortly before the filing of this complaint, Plaintiffs had no knowledge that Defendants were violating the antitrust laws as alleged herein and had no knowledge of facts that might have led to their discovery. Plaintiffs as consumers, users and members of the general public had no knowledge of the default agreements, revenue sharing agreements between Google and Apple. Moreover, the Defendants took affirmative steps to conceal their conspiracy in private and clandestine meetings between their CEOs.

373. Plaintiffs could not have discovered Defendants' violations by the exercise of due diligence because of the fraudulent and active concealment of the exclusionary agreements by Defendants through various means and methods designed to avoid detection, such as Defendants' executives' secret meetings and the fact that Defendants have not publicly revealed even today the terms of their revenue sharing agreements and their default agreements.

374. Defendants secretly conducted meetings and made agreements in furtherance of the monopoly, confined such information to key executives and engaged in conduct to obfuscate internal communications creating an estoppel to assert the statute of limitations. For example, Google has destroyed evidence of its practices. In an MDL proceeding in the Northern District of California, *In Re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD, the Attorneys General of 38 states sought sanctions against Google for the destruction of evidence. The district court found that " . . . Google falsely assured the court . .

that it had 'taken appropriate steps to preserve all evidence relevant to the issues reasonably evident in this action' . . . but evidence at the hearing plainly established that this representation was not truthful." (*Id*. at Dkt. No. 386, p. 16).

## FEDERAL VIOLATIONS ALLEGED

*First Claim for Relief*

*Monopolization of General Search Services in Violation of Sherman Act § 2*

*(Defendants Google, Schmidt and Pichai)*

375. Plaintiffs re-allege and incorporate the allegations of paragraphs 1 through 374 above as though fully set forth herein.

376. General search services in the United States is a relevant antitrust market and Google has monopoly power in that market.

377. Google has willfully maintained and abused its monopoly power in general search services through anticompetitive and exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; require preinstallation and prominent placement of Google's apps; tie Google's search access points to Google Play and Google APIs; and other restrictions that drive queries to Google at the expense of search rivals.

378. Google's exclusionary conduct has foreclosed a substantial share of the general search services market.

379. Google's anticompetitive acts have had harmful effects on competition and consumers.

380. By restricting competition in general search services, Google's conduct has harmed users by reducing the quality of general search services, by lessening choice in general

search services, and by impeding innovation. Google's anticompetitive acts have had harmful effects on both competition and consumers.

381. Absent Google's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased user choice, and a more beneficial user experience. Finally, the incentives and abilities for companies to develop and distribute innovative search products would be restored, resulting in better products and more options for Plaintiffs and other users of internet search.

382. Plaintiffs in this case are users and consumers of search who have been injured in fact by Google's monopolization even though they do not pay to use Google. In addition to monetary injury, consumers have also been hurt in ways that cannot necessarily be quantified by price, since Plaintiffs who are consumers have been adversely affected by the lessened quality of their search results, as well as the Orwellian policies that Google has imposed upon them to extract their personal information. Google collects personal data from anyone who uses its services in order to target back advertisements to the users because that is how Google makes money. The reason Google is able to so aggressively collect the personal data of its users is because Google controls the search market and because, as a result, there few alternatives to Google if a consumer is concerned about privacy.

383. Google has in effect blotted out other companies that could provide the marketplace with products that would ultimately be better for Plaintiffs and for consumers in general. When there is fair competition on the merits, consumers will end up with more choice and better products. They end up paying less money for products because companies are incentivized to offer something better to consumers.

384. When a user searches on Google, Google keeps the information about the user's search forever. And Google trackers are everywhere. They track a user's cyber

footsteps and collect information about the user's internet activity so that a search for a particular topic will produce tailored advertisements.

385. In addition to the annoyance of the experience, Plaintiffs and consumers are injured because they have been deprived of alternatives for search engines and have been subjected to an inferior search experience. Plaintiffs are injured because Plaintiffs and consumers must relinquish their personal information to Google during their search. Google's service is not free; Plaintiffs and consumers pay for the Google search by trading personal data for the results of their search and by making themselves subject to targeted advertising that will follow them wherever they travel on the internet through Google.

386. Google monetizes personal data. Google extracts and collects information on the websites that consumers visit, using the information it collects about what consumers have searched for, and more. That information is then either used to produce ads that will follow the user or is sold to other companies to help them build a profile about the user's demographics. If the information that is collected is sold to another company, Google has monetized the user's search experience. If it were not for Google's monopoly, and if there were more competition for consumer searches, Google would be forced to pay the consumer for the money it collects upon monetizing the consumer's information. Ultimately, Plaintiffs and all consumers are injured in their business or property because Google does not pay for the information it collects from Plaintiffs. Plaintiffs are therefore owed compensation for the valuable personal information that is secretly extracted from them and resold.

387. The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in this market, or can be achieved through less restrictive means.

308. Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

*Second Claim for Relief*

*Monopolization of General Search Text Advertising in Violation of Sherman Act § 2*

*(Defendants Google, Schmidt and Pichai)*

388. Plaintiffs reallege and incorporate paragraphs 1 through 387 above as if set forth fully herein.

389. General search text advertising in the United States is a relevant antitrust market, and Google has monopoly power in that market.

390. As of September 2020, Google controlled 94 percent of the mobile search engine U.S. market share. As of September 2020, Google controlled 82 percent of the computer search engine U.S. market share. Additionally, default placements drive significant traffic to Google. Over 65% of searches on all Apple devices go through the Safari default. On Android, 80% of all queries flow through a search access point that defaults to Google.

391. Google has willfully maintained and abused its monopoly power in general search text advertising through anticompetitive and exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; require preinstallation and prominent placement of Google's apps; tie Google's search access points to Google Play and Google APIs; and other restrictions that benefit Google at the expense of general search text advertising rivals.

392. Google's exclusionary conduct has foreclosed a substantial share of the general search text advertising market.

393. Google's anticompetitive acts have had harmful effects on competition, advertisers, and consumers.

394. The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in this market, or can be achieved through less restrictive means.

395. Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

**REQUEST FOR RELIEF**

396. To remedy these illegal acts, Plaintiffs request that the Court:

a. Adjudge and decree that Google's attempted monopolization of the general search services and general search text advertising market, as orchestrated by Google's executives Pichai and Schmidt, violates Section 2 of the Sherman Act, and that its anticompetitive practices be permanently enjoined;

b. Adjudge and decree that Google's monopolization of the general search services and general search text advertising market, as orchestrated by Google's executives Pichai and Schmidt, violates Section 2 of the Sherman Act, and that its anticompetitive practices be permanently enjoined.

397. In addition, Plaintiffs seek injunctive relief prohibiting future unlawful acts.

398. Plaintiffs request that the Court:

a. Effect a forward-looking divestiture of the anticompetitive structures that Google has abused in committing its violations by dividing Google into separate and independent companies to re-establish competition in search for the future, just as was necessary to reestablish competition in *U.S. v. Standard Oil* when Standard Oil was divided by the Court into the following separate and independent companies: Standard Oil of Ohio, Standard Oil of Indiana, Standard Oil of New York, Standard Oil of New Jersey, Standard Oil of California, Standard Oil of Kentucky, Standard Oil of Iowa, Standard Oil of Minnesota, Standard Oil of Illinois, Standard Oil of Kansas Standard Oil of Missouri, Standard Oil of Nebraska, Standard Oil of Louisiana—a.k.a Exxon, Mobile, Chevron, Amoco, Sohio, Conoco *et cetera.*

b. Enter any other injunctive relief necessary and appropriate to restore competitive conditions in the future in the markets affected by Google's unlawful conduct.

c. Enter any other injunctive relief for the future that the Court may find just and proper.

d. Enter judgment in favor of Plaintiffs against Defendants and award Plaintiffs threefold the damages sustained by them according to law and award Plaintiffs their reasonable attorneys' fees and costs, and any pre-judgment and post-judgment interest as permitted by law.

DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

DATED: September 23, 2024 By: /s/ Joseph M. Alioto

Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 434-8900
Email: jmalioto@aliotolaw.com

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H. WINTERS
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
Telephone: (510) 845-5914
Email: sawmill2@aol.com

ADDITIONAL COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papale.com

Christopher A. Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Josephine Alioto (SBN 282989)
THE VEEN FIRM
20 Haight Street
San Francisco, CA 94102
Telephone: (415) 673-4800
Email: j.alioto@veenfirm.com

Robert J. Bonsignore, Esq.
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

Attorneys for Plaintiffs