Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Last Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Mary Katherine Arcell, *et al.*,

               Plaintiffs,

vs.

Google LLC, Alphabet, Inc., XXVI Holdings, Inc., Apple, Inc., Tim Cook, Sundar Pichai, and Eric Schmidt,

               Defendants.

Case No:  **3:22-cv-02499-RFL**

**Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ...............................2

        A.      The Government Antitrust Action ..............................................2

        B.      The Mehta Trial and Decision ...................................................2

        C.      This Private Action .....................................................................4

III.    LEGAL STANDARD...............................................................................4

        A.      Summary Judgment Standard .....................................................4

        B.      Collateral Estoppel (Issue Preclusion).......................................5

        C.      Section 5(a) of the Clayton Act – Prima Facie Evidence .......5

IV.     ARGUMENT..............................................................................................6

                GOOGLE'S VIOLATION OF SECTION 2 IS UNDISPUTED; JUDGE MEHTA'S FINDINGS ARE COLLATERAL ESTOPPEL AGAINST GOOGLE  ON LIABILITY AND INJURY...........................................6

        A.      All Elements of Collateral Estoppel Are Satisfied ..................6

                1.      The Issues in Both Proceedings Are Identical...........................7

                2.      The Issues Were Actually Litigated and Determined..................8

                3.      The Determinations Were Necessary to the Judgment...............9

                4.      Google Had a Full and Fair Opportunity to Litigate ..................9

                5.      The Prior Judgment Is Final.......................................................9

        B.      Offensive Collateral Estoppel Is Appropriate and Fair Under Parklane ...................................................................................10

                1.      Plaintiffs Could Not Easily Have Joined the Government Action ...................................................................................10

                2.      Google Had Overwhelming Incentive to Litigate.....................10

                3.      No Inconsistent Prior Judgments ..............................................11

                4.      No Procedural Opportunities Here That Were Unavailable There ...................................................................................11

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

5.    Judge Mehta's Equitable Determination Estoppels Google from Arguing Against Liability in Subsequent Actions at Law .........11

C.    Plaintiffs Have Alleged That Google Violated Section 2 of the Sherman Act....................................................................................................12

D.    Judge Mehta Found that Google Violated Section 2 .............................14

1.    Apple Was a Potential Competitor to Google ...........................16

2.     Google Possessed Monopoly Power........................................19

3.    Barriers to Entry and Scale .......................................................19

4.    The Effect on Competition and Innovation ..............................19

5.    Supracompetitive Pricing and Degraded Product Quality.........20

6.    Lack of Procompetitive Justifications.......................................20

V.    PLAINTIFFS ARE ENTITLED TO THE PRESUMPTION OF PRIMA FACIE EVIDENCE  UNDER SECTION 5(A) OF THE CLAYTON ACT ........... .....23

A.     Section 5(a) of the Clayton Act Makes the Government Judgment Prima Facie Evidence ............................................................................23

B.    Judge Mehta's Findings Are Prima Facie Evidence Of The Violation .23

C.    Scope Of Preclusion And Remaining Issues .......................................25

VI.    CONCLUSION............................................................................... .....25

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

**TABLE OF AUTHORITIES**

**CASES**

*American Tobacco Co. v. United States,* 328 U.S. 781. ................................................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 4

*Brown Shoe Co. v. United States,* 747 F. Supp. 3d 294 (1962) ................................... 8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 5

*Clark v. Bear Stearns & Co.*, 966 F.2d 1318  (9th Cir. 1992) .................................... 7

*Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558(1951), .................... 6, 23, 24, 25

*Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394 (1981) ................................... 10

*Howard v. City of Coos Bay*, 871 F.3d 1032 (9th Cir. 2017) ..................................... 5

*Hydranautics v. FilmTec Corp.*, 204 F.3d 880 (9th Cir. 2000) .................................. 7

*In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166 ............................................... 4, 19

*International Salt Co. v. United States,* 332 U.S.392. ............................................... 12

*Janjua v. Neufeld,* 933 F.3d 1061 (9th Cir. 2019) ..................................................... 7

*Katchen v. Landy,* 382 U.S. 323 (1966) ................................................................... 12

*Oyeniran v. Holder*, 672 F.3d 800 (9th Cir. 2012) ................................................... 5

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) .................................... 5, 10, 11, 12

*State of Colorado v. Google LLC*, 20-cv-3715-APM (D.D.C.) .................................... 2

*United States v. Aluminum Co. of America, et al.* 377 U.S. 271 (1964) .................... 12

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024)
    (the "Mehta Decision") .......................................................................... *passim*

*United States v. Google*, Final Judgment, 20-cv-03010 APM, ECF 1462
    December 5, 2025 ............................................................................... 1, 4, 9

*United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) .................................. 8

**STATUTES**

15 U.S.C. § 16 ............................................................................... 2, 4, 5, 6, 24

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

15 U.S.C. § 1-2 ................................................................................................ 4, 12, 14

**OTHER AUTHORITIES**

51 Cong. Rec. 1964................................................................................................ 23

51 Cong. Rec. 9270, 9490, 13851......................................................................... 24

H. R. Rep. No. 627, 63d Cong., 2d Sess. 14; S. Rep. No. 698, 63d Cong., 2d Sess. 45 ......... 24

AREEDA 651e2 ...................................................................................................... 21

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................ 6

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

I.    INTRODUCTION

"After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.

"Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supra competitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

These are the conclusions of Judge Mehta at pages 32-33 of his decision in *United States v. Google,* 747 F.Supp.3d 1 (D.D.C. 2024).

After a ten-week bench trial on the merits Judge Amit P. Mehta entered detailed findings of fact and conclusions of law holding that Google had violated Section 2 of the Sherman Act by unlawfully monopolizing the general search services market and the general search text ads market in the United States. *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024) (the "Mehta Decision"). Final judgment was entered on December 5, 2025. *United States. v. Google*, Final Judgment, 20-cv-03010 APM, ECF 1462, December 5, 2025.

The issues decided in the government action are identical to the core liability issues in this private antitrust action. Google had a full and fair opportunity to litigate these issues and

1

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

did so vigorously, with extensive discovery, expert testimony from leading economists, and comprehensive trial advocacy. The doctrine of collateral estoppel bars Google from relitigating questions of liability, market definition, monopoly power, exclusionary conduct, foreclosure, anticompetitive effects, the rejection of procompetitive justifications and impact on the users.

Independently, Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), makes the government's final judgment prima facie evidence in this subsequent private action as to all matters actually and necessarily decided.

Plaintiffs respectfully submit that Google's violation of Section 2 of the Sherman Act is now an undisputed fact as a matter of law, and this Court should grant partial summary judgment on liability and causation, leaving only the issue of the amount of damages for trial or further proceedings.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Government Antitrust Action

On October 20, 2020, the United States Department of Justice and eleven state attorneys general filed *United States v. Google LLC*, 20-cv-3010-APM (D.D.C.), alleging that Google violated Section 2 of the Sherman Act by unlawfully maintaining monopolies in the markets for general search services and search advertising through exclusive distribution agreements.

On December 17, 2020, thirty-eight additional states filed a consolidated action, *State of Colorado v. Google LLC*, 20-cv-3715-APM (D.D.C.), raising similar claims.

### B.   The Mehta Trial and Decision

Discovery in the government cases closed on February 23, 2023, after the exchange of

2

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

millions of pages of documents and extensive depositions of executives from Google, Apple, Microsoft, and other major technology companies.

Trial commenced on September 12, 2023, and concluded on November 16, 2023—a period of nine weeks. The court heard testimony from dozens of live witnesses, including:

- Sundar Pichai, CEO of Google and Alphabet

- Eddy Cue, Senior Vice President of Services at Apple

- John Giannandrea, Apple's Chief of Machine Learning and AI Strategy (formerly head of Google Search)

- Satya Nadella, CEO of Microsoft

- Multiple economic experts, including Dr. Michael Whinston for Plaintiffs and Dr. Kevin Murphy and Dr. Israel for Google

The parties entered thousands of pages of exhibits into evidence. Post-trial briefing exceeded thousands of pages. Closing arguments were held on May 2-3, 2024.

On August 5, 2024, Judge Mehta issued a comprehensive 286-page Memorandum Opinion holding as follows: "After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act. Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements.  Importantly, the court also finds that Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits." *U.S. v. Google*, 747 F. Supp. 3d at 33.

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

Final judgment was entered against Google on December 5, 2025. (*U.S. v. Google*, Final Judgment, 20-cv-03010 APM, ECF 1462 December 5, 2025.)

**C. This Private Action**

Plaintiffs filed their private antitrust complaint on April 22, 2022, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking treble damages and injunctive relief for injuries caused by Google's violations of Sections 1 and 2 of the Sherman Act.

Plaintiffs' Third Amended Complaint alleges that Google monopolized the general search services and general search text ads markets through exclusionary agreements with Apple—the identical conduct that was adjudicated in *United States v. Google*.

Plaintiffs seek a determination that Google has violated Section 2 of the Sherman Act and that Plaintiffs as user/consumers of Google search have been impacted or damaged. This determination is warranted by Judge Mehta's findings that Google monopolized the general search services market and that consumers such as Plaintiffs were the targets of that monopolization. Plaintiffs' use of Google search over the last years is not in dispute.

**III.   LEGAL STANDARD**

**A. Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court may grant a motion for summary judgment "if the record 'construed in the light most favorable to the party opposing summary judgment,' reveals no genuine issue of material fact." *In re: Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 117 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 n. 2 (1986)). "The party seeking summary judgment must first make a preliminary showing that

there are no issues worthy of trial." *In re: Relafen Antitrust Litig.*, 360 F. Supp. 2d at 177 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 300 (1986)).

### B. Collateral Estoppel (Issue Preclusion)

Collateral estoppel bars a party from relitigating issues decided against it in a prior case where "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012); *see also Howard v. City of Coos Bay*, 871 F.3d 1032, 1039-41 (9th Cir. 2017). Collateral estoppel does not require mutuality of parties and may be applied offensively against a defendant based on a final decision in a prior lawsuit brought by a different plaintiff. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

### C. Section 5(a) of the Clayton Act – Prima Facie Evidence

Section 5(a) of the Clayton Act provides:

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto..." 15 U.S.C. § 16(a) (emphasis added). This presumption extends to all issues of fact and law that were necessary to reach the underlying judgment.

This provision was intended by Congress to expedite and facilitate the bringing of private treble damage actions based on conduct that had been held to violate the antitrust laws:

"By its terms, however, § 5 makes a prior final judgment or decree in favor of the United States available to a private suitor as prima facie evidence of "all matters

5

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

respecting which" the judgment "would be an estoppel" between the defendants and the United States. We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit.

*Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951).

## IV.    ARGUMENT

### GOOGLE'S VIOLATION OF SECTION 2 IS UNDISPUTED; JUDGE MEHTA'S FINDINGS ARE COLLATERAL ESTOPPEL AGAINST GOOGLE ON LIABILITY AND INJURY

This motion presents a straightforward legal question: should this court declare that the judgment in the case of *U.S. v. Google LLC*, is collateral estoppel on the Defendant in this case such that judgment should be entered against the Google here on liability and causation? This question matters greatly to these plaintiffs and to millions of users of Google search who have spent years using Google as their primary search engine. First, Judge Mehta in *U.S. v. Google* found that Google was a monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. Section 2). As a result, there are no factual issues left to be decided regarding liability in this case. Second, Judge Mehta further found that users of general search had been injured by Google's monopoly. Likewise, there are now no factual issues remaining on the issue of causation. And third, public policy requires that the Court apply both collateral estoppel and Section 5 of the Clayton Act in favor of Plaintiffs in this case.

**A. All Elements of Collateral Estoppel Are Satisfied**

The core elements of collateral estoppel in this circuit are: First, the issue must be identical. Second, the issue must have been actually litigated, that is, the issue must have been raised, contested, submitted for decision, and decided. Third, the issue must have been decided as a necessary part of the prior judgment. Fourth, the party to be estopped must have had a full

6

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

and fair opportunity to litigate.  And fifth, the earlier decision must be final and on the merits. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000); *Janjua v. Neufeld,* 933 F.3d 1061, 1065 (9th Cir. 2019); *Clark v. Bear Stearns & Co.*, 966 F.2d 1318 , 1320 (9th Cir. 1992).

1. The Issues in Both Proceedings Are Identical

The issues in *United States v. Google* are identical to the core liability issues in this case. Both cases address:  1) Relevant market definition: General search services in the United States; 2) Monopoly power: Google's dominant and durable market share (89.2% overall, 94.9% on mobile), high barriers to entry, and ability to control prices; 3) Exclusionary conduct: Google's exclusive default distribution agreements with Apple (the ISA), Android OEMs (MADAs), carriers (RSAs), and browser providers; 4) Substantial foreclosure: The agreements foreclose 50% of the general search services market by query volume; 5) Anticompetitive effects: Denial of scale to rivals, reduced innovation, supracompetitive pricing, and degraded quality; 6) Lack of procompetitive justifications: Google's asserted justifications were unsupported or achievable through less restrictive means; and 7) Section 2 liability: Google unlawfully maintained monopoly power in violation of the Sherman Act.

There can be no dispute that the Court's decision in the DOJ case decided the identical issue in this case: whether Google's anticompetitive conduct violated Section 2 of the Sherman Act.  That is the issue decided in the DOJ Mehta Decision, and it is the claim in Plaintiffs' TAC in this case. ECF 124, ¶¶ 5-14.  There can also be no dispute that this identical issue – whether Google violated Section 2 – was litigated in the DOJ Case.  Judge Mehta's 286-page decision in the DOJ case came after ten weeks of trial on the merits filled with evidence that included testimony from top executives at Google, Microsoft and Apple,

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

hundreds of pages of trial briefing, and included detailed factual findings and conclusions of law on which the decision was based.

These are the identical elements that Plaintiffs must prove for monopolization under Section 2. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (Section 2 requires proof of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power").

2. The Issues Were Actually Litigated and Determined

The Mehta Decision followed extensive discovery and a nine-week bench trial with detailed findings of fact and conclusions of law resolving each element of Section 2 liability against Google.

The court's analysis directly adjudicated: 1) Market definition using the *Brown Shoe* factors (747 F. Supp. 3d at 108-117); 2) Monopoly power through both direct and indirect evidence (*id.* at 117-124); 3) The exclusionary nature of Google's distribution agreements (*id.* at 146-152); 4) Substantial market foreclosure and denial of scale to rivals (*id.* at 152-165); 5) Anticompetitive effects including supracompetitive pricing and quality degradation (*id.* at 177-181); and 6) Rejection of Google's procompetitive justifications (*id.* at 171-177).

Judge Mehta expressly found as follows:

"The trial evidence firmly established that Google's monopoly power, maintained by the exclusive distribution agreements, has enabled Google to increase text ads prices without any meaningful competitive constraint." 747 F. Supp. 3d at 178.

"The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market? The answer is yes." *Id.* at 153.

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

3. The Determinations Were Necessary to the Judgment

Each finding was essential to the judgment. The court could not have found a Section 2 violation without necessarily deciding the relevant market (747 F. Supp. 3d at 109-117); Google's monopoly power within that market (*id.* at 117-124); the exclusive and anticompetitive nature of the distribution agreements with Apple, Samsung and others (*id.* at 146-77); and the lack of valid procompetitive justifications (*id.* at 171-77).

These determinations were not alternative holdings or dicta, but rather they were the necessary predicates to liability.

4. Google Had a Full and Fair Opportunity to Litigate

Google had every incentive and opportunity to litigate vigorously in the government action since the case involved Google's core business model, with potential structural and equitable relief.  Extensive discovery was conducted. Millions of pages of documents, petabytes of data, and dozens of depositions.  Expert testimony was received by the Court. Google presented multiple economic experts, including Dr. Kevin Murphy and Dr. Israel. Google was represented by elite counsel from Williams & Connolly LLP during nine weeks of witness testimony, cross-examination, and evidentiary presentations and through thorough briefing consisting of thousands of pages of pre-trial, post-trial, and closing argument briefs.

As a result, Google cannot credibly claim it lacked either the incentive or opportunity to defend.

5. The Prior Judgment Is Final

Judge Mehta entered final judgment on liability after trial. Final judgment was entered against Google on December 5, 2025.  (*U.S. v. Google*, Final Judgment, 20-cv-03010 APM, ECF 1462 December 5, 2025.)    This judgment is sufficiently firm and final to support

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

preclusion. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398-99 (1981) where the court concluded that a final judgment is not subject to collateral attack.

**B. Offensive Collateral Estoppel Is Appropriate and Fair Under Parklane**

In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), the Supreme Court set out the various elements that should be met before a plaintiff may use offensive collateral estoppel for issue preclusion and the case provides the main federal framework for nonmutual offensive collateral estoppel. In *Parklane*, as here, private plaintiffs were seeking to use findings from an earlier government action against the same defendants. The Supreme Court approved offensive use in principle, but subject to fairness limits, including whether the later plaintiff could have joined the first action, whether the defendant had sufficient incentive to litigate the first case vigorously, whether the prior judgment conflicts with others favoring the defendant, and whether the second action offers materially different procedural opportunities.

The Parklane fairness factors strongly favor applying offensive collateral estoppel here.

1. Plaintiffs Could Not Easily Have Joined the Government Action

Private plaintiffs seeking damages would not have been permitted to join the government's equitable enforcement action since the procedural postures are fundamentally different.  Joinder would have been neither available nor practical.

2. Google Had Overwhelming Incentive to Litigate

Google faced the same or greater stakes in the government action as in this private action.  Both cases allege Section 2 violations based on the same conduct. The government action threatened structural relief (e.g., divestiture) and injunctive relief potentially more severe than monetary damages.  This is not a case where "the defendant in the first action is

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

sued for small or nominal damages" and so has "little incentive to defend vigorously. . ."
*Parklane*, 439 U.S. at 330.

### 3. No Inconsistent Prior Judgments

There are no prior judgments favorable to Google on these issues. The Mehta Decision is the authoritative resolution after full trial.

### 4. No Procedural Opportunities Here That Were Unavailable There

This case does not afford Google "procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane*, 439 U.S. at 331. The government bench trial afforded expansive discovery and presentation of evidence and Google had every opportunity to present its defenses, including expert economic testimony.  Moreover, the issues presented in the government case were legal and economic, not strictly dependent on jury dynamics.

### 5. Judge Mehta's Equitable Determination Estops Google from Arguing Against Liability in Subsequent Actions at Law

Nor can defendants argue that because the Mehta case involved injunctive relief that they are insulated from the application of collateral estoppel because this case is at law.  Prior injunctive relief antitrust cases have been held to confer collateral estoppel effect on subsequent plaintiffs' cases for damages.

In *Parklane* the Court upheld the principle that a party may be precluded from relitigating facts resolved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel even though the prior action was in equity. The Court held that a litigant who was not a party to a prior judgment in an SEC proceeding may nevertheless use that judgment offensively to prevent a defendant from relitigating issues

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

resolved in the earlier SEC proceeding since the application of offensive collateral-estoppel was not fundamentally unfair in a situation where the plaintiff could not have joined in the injunctive action brought by the SEC even had he so desired.  Relying upon *Katchen v. Landy,* 382 U.S. 323 (1966) the Court in *Parklane Hosiery* concluded that a prior equitable determination can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment.  *Parklane Hosiery, supra* at 323, 331-332.

**C.      Plaintiffs Have Alleged That Google Violated Section 2 of the Sherman Act.**

In their TAC Plaintiffs have alleged that Google, both individually and in concert with Apple through the exclusionary default agreements, has the market power to exclude competition, and in fact has exercised that power through its agreements with Apple, in violation of Section 2 of the Sherman Act. In *United States v. Griffith*, 334 U.S. 100, at 107 (1948) the Supreme Court stated held:

> ". . . the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 811, 814. It is indeed 'unreasonable, per se, to foreclose competitors from any substantial market.' *International Salt Co. v. United States,* 332 U.S.392, 396. The anti-trust laws are as much violated by the prevention of competition as by its destruction. *United States v. Aluminum Co. of America, supra.* It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."

Specifically, Plaintiffs alleged as follows at paragraphs 5 - 14 of their TAC:

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

"5.     In 2023 Apple was the largest company in the world with a value of $2.746 Trillion and Alphabet (Google) was the fourth largest company in the world in 2023 with a value of $1.34 Trillion.

"6.     The revenue in the general search market as of 2022 was $225 billion per year.

"7.     Google has a monopoly of 90% of the general search services market in the  United States and 60% of the search business is conducted over Apple devices.

"8.     The terms and conditions of the default agreement with Apple are that Google  will pay Apple billions of dollars per year and share its revenues from the general search services market and general text advertising market with Apple in exchange for privileged default access to Apple's massive consumer base.

" 9.     Google pays Apple billions of dollars in advertising revenue each year, with  estimates ranging between $8 - 12 billion.

"10.     The revenues Google shares with Apple make up approximately 15–20 percent  of Apple's worldwide net income.

"11.     Apple in return has made Google the automatic default search engine on all of its devices.

"12.     This agreement covers roughly 36 percent of all general search queries in the  United States, including mobile devices and computers. Google estimates that, in 2019, almost 50 percent of its search traffic originated on Apple devices.

"13.     Over the years since implementation of Google's exclusive default and revenue sharing agreements with Apple and other distributors, including computer and mobile-device manufacturers, cell phone carriers and browser developers, Google has increased its dominant market share in the markets for general search services and

13

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

general search text advertising. In July 2007, Google estimated its general search services market share at 68 percent. By June 2013, Google estimated that its market share in the United States had already increased to 77 percent on computers. By April 2018, Google estimated that its share was 79 percent on computers and 93.5 percent on mobile. More recently, Google has accounted for almost 90 percent of all general search engine queries in the United States, and almost 95 percent of queries on mobile devices. This measure of market share advantage is directly attributable to Google's restrictive and exclusionary default agreements with Apple and other distributors of its search engine.

"14.    The terms and conditions of the default and other exclusive and revenue sharing agreements between Google and its distributors, and the ISA and the JAC between Google and Apple, exclude competition and competitors from a substantial portion of the general search services and general search text advertising markets." (ECF 124, ¶¶ 5-14.)

**D.    Judge Mehta Found that Google Violated Section 2**

In his Memorandum Opinion (*U.S. v. Google, supra* at 32-33), Judge Mehta held as follows:

"After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.

"Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have

14

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supra competitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

The touchstones to the Court's opinion are the written agreements between Google and Apple, including the Joint Cooperation Agreement ("JCA") and the Amendment to the Information Services Agreement ("ISA") between Google and Apple, both of which were made exhibits in the trial:

> "Google's browser agreements are exclusive insofar as they establish Google as the out-of- the-box default search engine. The Apple ISA requires that Google be preloaded as the exclusive default search engine on all Safari search access points in exchange for [redacted]% revenue share. … . The resulting query volume is substantial. About 65% of queries on all Apple devices (mobile and desktop), and 61.8% on iOS devices (mobile), flow through the Safari default, demonstrating that default placement is a 'primary channel[] for distribution of' search. . . ." *U.S. v. Google, supra* at 146-47.

> "Two provisions of the ISA were at the heart of the parties' dispute: (1) default and revenue sharing and (2) restrictions on Apple's product development." *U.S. v. Google, supra* at 89-90.

The ISA makes clear that Google will be the exclusive default search engine on Apple devices and for that Google will share its revenues from search advertising with Apple. If Apple wishes to display ads in its own Siri or Spotlight search vehicles, however, Apple must first provide Google the right to supply those advertisements and receive the revenue from them. *See U.S. v. Google, supra* at 92, ¶ 309).

15

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

The ISA further specifically requires the CEOs of the two companies to meet each year ". . . to confirm each party's compliance with the terms of the ISA Agreement", thereby confirming the regular meetings of the CEO's as alleged by Plaintiff.  (Exhibit B, Papale Decl.)

Judge Mehta held:

"The trial evidence firmly established that Google's monopoly power, maintained by the exclusive distribution agreements, has enabled Google to increase text ads prices without any meaningful competitive constraint."  *U.S. v. Google, supra* at 177-78.

"In 2022, Google's revenue share payment to Apple was an estimated $20 billion. This is nearly double the payment made in 2020, which was then equivalent to 17.5% of Apple's operating profit." (*U.S. v. Google, supra* at 90.)

1.  Apple Was a Potential Competitor to Google

With respect to whether Apple was, or considered being, a competitor to Google, Judge Mehta specifically addressed the issue:

"Plaintiffs offer other examples of how the distribution agreements disincentivize investment and innovation in general search:  . . (2) Apple, a fierce potential competitor, remains on the sidelines due to the large revenue share payments it receives from Google . . . (*U.S. v. Google, supra* at 165.)

The Court went on to find that Apple was a potential competitor who was sidelined and disincentivized by Google's payments under the revenue sharing agreements:

"Still, the ultimate question is whether the ISA reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly. . . . The revenue share payments unquestionably

16

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

have that effect. The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple —disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so." (*U.S. v. Google*, supra at 167-168.)

In addition, with regard to Apple's potential competition, the Court found:

"Apple has taken steps to grow its capacity in search. In 2018, it hired the former head of Google Search, John Giannandrea. . . Under his leadership, Apple has made a significant commitment to developing certain foundational elements of a GSE [General Search Engine], including crawling and indexing the web and creating a knowledge graph. . . It also has integrated machine learning into its development efforts. . . . Apple has invested [redacted] of dollars and committed [redacted] employees to search development." (*U.S. v. Google, supra* at 90, at ¶ 301).

* * *

"*Entering Search*. Apple has the financial, technological, and human resources to develop or acquire a competing GSE. In 2018, Apple hired the former head of Google Search, John Giannandrea. . . . Since then, Apple has been 'investing quite a lot in' search by 'building all of the technology [it] would need to build a general-purpose search engine.' *Id.* at 2245:2-6 (Giannandrea); *id.* at 2247:14-16 (Giannandrea); FOF ¶ 301 (describing dollars and manpower dedicated to search at Apple). Both Apple and Google understand that Apple could develop its own GSE to replace Google as the default in Safari. FOF ¶¶ 300-301. Apple has decided not to do so thus far. FOF ¶ 302." (*U.S. v. Google, supra* at 167.)

"Though it has not launched a full-blown GSE, Apple has introduced and integrated search functionality into its devices. . . . In practice, this means that Apple

17

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

can effectively divert certain queries away from Google . . ." (*U.S. v. Google, supra* at 90, at ¶ 303).

The Court ultimately concluded that Apple was a threat to Google:

> "Google perceived the internal search developed by Apple as a threat to its search volume. It believed that Apple's "increasing use of their own variety of suggestions to the user [wa]s pushing the user away from completing the search on" Google. . . This meant that Google could not earn advertising revenue on those queries, which could decrease its overall search revenue on Apple devices." (*U.S. v. Google, supra* at 91, at ¶ 304)."

> "Google has long recognized that, if Apple were to develop and deploy its own search engine as the default GSE in Safari, it would come at great cost to Google. . . For example, *Google projected that without the [Apple] ISA, it would lose around 65% of its revenue,* even assuming that it could retain some users without the Safari default." (*U.S. v. Google, supra* at 90, ¶ 300.) (Emphasis Added.)

And the Court concluded that Apple was required to defer advertising to Google should it seek to serve ads on its own Siri or Spotlight search vehicles:

> "The ISA was therefore meant to address Apple's ability to offer ads. Should Apple wish to serve ads on its Siri or Spotlight search engines it must offer Google the opportunity to supply such ads or paid listings before doing so itself. This provision has been described as the 'Right of First Refusal.'" (*U.S. v. Google, supra* at 92, at ¶ 309).

All triable issues related to Google's liability have therefore have already decided by the Court in the DOJ Case. Judge Mehta has determined that Google violated Section 2 of the Sherman Act. The record "reveals [that] no genuine issue of material fact" exists as to

18

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

Google's liability, so "there are no [liability] issues worthy of trial." *In re Relafen Antitrust Litig.*, 360 F. Supp. 2d at 177.

2.    Google Possessed Monopoly Power

Google admitted that it has held a dominant and durable share of the general search services market for over a decade, with 89.2% of all queries in 2020, and 94.9% on mobile devices. Bing's share is less than 6% overall and 1.3% on mobile (*U.S. v. Google, supra* at 119). Google's market share has been above 80% since at least 2009. (*Id.*) Google's market share is protected by high barriers to entry, including high capital costs, control of key distribution channels, brand recognition, and scale (*Id.,* at 119).

3.    Barriers to Entry and Scale

Building and maintaining a competitive general search engine requires billions of dollars in capital and ongoing investment (*Id.* at 46, 119-124).

Google's exclusive agreements deny rivals the scale (user queries and data) needed to improve search quality and ad monetization, creating a feedback loop that entrenches Google's dominance (*Id.* at 121-122).

New entrants (e.g., Neeva, DuckDuckGo) have been unable to gain meaningful market share due to lack of access to default distribution and scale (*Id.* at 120-121).  *See also* "Barriers to Entry," (*Id.*at 158-159).

4.    The Effect on Competition and Innovation

The exclusive agreements have reduced incentives for rivals to invest and innovate in search, as illustrated by Microsoft's limited investment in Bing due to lack of mobile distribution, and Apple's decision not to enter search due to the value of Google's revenue share payments.  "The agreements have three primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing the incentives of

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

rivals to invest and innovate in general search. Plaintiffs also contend that Google's incentives to invest are diminished, but the evidence of that effect is weaker than the others." (*U.S. v. Google, supra* at 153; 165-67;167-68).

Venture capital and new investment have not flowed into general search, despite high profit margins, because the market is "frozen in place" by Google's exclusive deals (*Id.* at 145).

5.    Supracompetitive Pricing and Degraded Product Quality

Google has profitably raised prices for general search text ads through "pricing knobs" and auction design, without fear of losing advertisers to rivals, resulting in supra-competitive prices and monopoly profits (*Id.* at 177-179).

Google has degraded the quality of its text ads product by reducing transparency (e.g., limiting search query reports, removing keyword match opt-outs), with no competitive constraint (*Id.* at 180).

6.    Lack of Procompetitive Justifications

Google failed to show that the exclusive agreements were necessary to achieve procompetitive benefits, such as improved user experience or increased output, which could be achieved through non-exclusive defaults. "Google advances three categories of pro-competitive benefits. It submits that the challenged agreements (1) enhance the user experience, quality, and output in the market for general search services, (2) incentivize competition in related markets that redounds to the benefit of the search market, and (3) produce consumer benefits within the related markets. The court concludes that the record does not sufficiently support any of these procompetitive justifications. (*Id.* at 171).

7.    Injury to Plaintiffs Who Are Users and Consumers

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

Google's anticompetitive conduct targeted users of general search, such as Plaintiffs. *See* Exhibits C – Y, Papale Decl.  Indeed, both Google and Apple have said as much in their revenue sharing agreements, specifically, their Amendment to the Information Services Agreement dated September 30, 2016:

> *"Agreement Purpose.*  Both parties agree they are entering into this Agreement for the following purposes . . . . (3) to improve the search experience and performance of the Services, the Spotlight Services and the Siri Services for End Users on Apple products." (Exhibit B, Papale Decl.)

In addition, Judge Mehta held that:

> "65. That users overwhelming use Google through preloaded search access points is explained in part by default bias, or the "power of defaults." . . . The consensus in the field is that "defaults have a powerful impact on consumer decisions." *Id.* at 526:22-25 (Rangel)." (*U.S. v. Google, supra* at 45.)

> "(When a consumer encounters their devices for the first time and they start searching, they start searching with the default search engine .... If that search engine that is the default generates adequate experiences, the consumer will get habitized to that.)"  (*Id.*)

> "[T]o be condemned as exclusionary, a monopolist's act must have an `anticompetitive effect.' That is, the monopolist must harm the competitive *process* and **thereby harm consumers.** . . . 'Even though monopolistic conduct requires proof of actual or threatened consumer harm, the proof need not invariably be elaborate.' AREEDA ¶ 651e2." (*Id.* at 152.)

> "The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's

21
*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

monopoly power in the general search services market? The answer is "yes." Google's distribution agreements are exclusionary contracts that violate Section 2 because they ensure that half of all GSE [General Search Engine] users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm. The agreements "clearly have a significant effect in preserving [Google's] monopoly." *Id.* at 71." (*U.S. v. Google, supra* at 153.)

\* \* \*

"The court already has found that preloaded default placements are the most efficient channel for reaching search consumers, and Google has secured all the major ones (except the default on the Edge browser preloaded on Windows devices). FOF ¶¶ 61. Sure, users can access Google's rivals by switching the default search access point or by downloading a rival search app or browser. But the market reality is that users rarely do so." (*Id.* at 156.)

". . . the combination of user habit, Google's brand, and choice friction creates a powerful default effect that drives most consumers to use the default search access points occupied by Google. FOF ¶¶ 65-74." (*Id.* at 160.)

"87. Greater query volume means more user data, or "scale." As the most widely used GSE in the United States, Google receives nine times more queries each day than all of its rivals *combined* across all devices. The disparity is even more pronounced on mobile. There, Google receives *nineteen* times more queries than all of its other rivals put together." (*Id.* at 49-50)

For all these reasons, the Mehta Decision should be given collateral estoppel effect in this case, and partial judgment should be granted in favor of Plaintiffs on the issues of liability and injury under Section 2 of the Sherman Act for the reasons stated by Judge Mehta.

22

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

## V.    PLAINTIFFS ARE ENTITLED TO THE PRESUMPTION OF PRIMA FACIE EVIDENCE  UNDER SECTION 5(A) OF THE CLAYTON ACT

### A.  Section 5(a) of the Clayton Act Makes the Government Judgment Prima Facie Evidence

Congress has provided that a judgment against a defendant in a criminal or civil proceeding brought by the United States under the antitrust laws shall be prima facie evidence against such defendant in any action brought by any other party.

In *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 567-68 (1951), the Supreme Court held that:

> Section 5 of the Clayton Act was adopted in response to a recommendation by President Wilson that Congress "agree in giving private individuals . . . the right to found their [antitrust] suits for redress upon the facts and judgments proved and entered in suits by the Government where the Government has . . . sued the combinations complained of and won its suit . . . ." 51 Cong. Rec. 1964. Congressional reports and debates on the proposal which ultimately became § 5 reflect a purpose to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions. *See* H. R. Rep. No. 627, 63d Cong., 2d Sess. 14; S. Rep. No. 698, 63d Cong., 2d Sess. 45; 51 Cong. Rec. 9270, 9490, 13851.

The statute shifts to Google the burden of coming forward with evidence to rebut the determinations made by the Court on market definition, monopoly power, exclusionary conduct, market foreclosure and its anticompetitive effects, and the lack of procompetitive justifications.

### B.    Judge Mehta's Findings Are Prima Facie Evidence Of The Violation

23

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

Under Section 5(a) of the Clayton Act (15 U.S.C. sec. 16(a)) once a final judgment or decree in a government action is entered, it is prima facie evidence of the facts directly determined in that case in any subsequent proceeding. 15 U.S.C. sec. 16(a). The Supreme Court held that ". . . § 5 makes a prior final judgment or decree in favor of the United States available to a private suitor as prima facie evidence of 'all matters respecting which' the judgment 'would be an estoppel' between the defendants and the United States." *Emich*, *supra* at 567-68.

The Congressional purpose was to "minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions." *Id*. at 568.

And the Court noted that it was Congress' intent "to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit." *Id*. at 568.

In *Emich*, the challenge was to determine what matters had actually been adjudicated in the prior government proceeding. That is not a problem in the present case since we have Judge Mehta's extensive findings of fact that Google unlawfully maintained a monopoly in the general search services market through the use of revenue sharing and exclusive contracts with Apple and others, and that these exclusive agreements raised advertiser costs. These findings are quintessentially within the scope of §16(a) for prima facie use by Plaintiffs in their subsequent litigation.

But even beyond the application of Section 5(a), because Google already fully litigated and lost these issues in *U.S. v. Google*, and because no fairness issue counsels otherwise, the Court should apply full offensive collateral estoppel and grant summary judgment on liability and causation.

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

### C.    Scope Of Preclusion And Remaining Issues

The preclusive effect of the Mehta Decision reaches 1) liability under Section 2 for monopolization of the general search services market; 2) causation flowing from Google's exclusive distribution agreements having caused anticompetitive harm; and 3) the time frame, markets, and conduct adjudicated in the government case.

Damage calculations remain for trial or further proceedings. Since the government action sought only equitable relief, the decision did not adjudicate the extent of users' and Plaintiffs' injuries or the amount of damages. *Emich Motors*, 340 U.S. at 571-72 (prima facie evidence extends to liability issues, not damages calculations).

## VI.    CONCLUSION

Based upon the foregoing, and pursuant to Fed. R. Civ P. 56, Plaintiffs submit that the Court should grant their Motion and enter judgment in Plaintiffs' favor as follows: (1) adjudge and decree that Google's monopolization of the general search services, as orchestrated by Google's executives Pichai and Schmidt, violates Section 2 of the Sherman Act; and (2) adjudge and decree that Google's monopolization of the general search services market, as orchestrated by Google's executives Pichai and Schmidt, has injured consumers and users of Google search including the Plaintiffs in this case.

Dated: May 4, 2026                         Respectfully submitted,

By:    */s/ Joseph M. Alioto*
Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com

25
*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*

ADDITIONAL COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papale.com

Josephine Alioto (SBN 282989)
THE VEEN FIRM
20 Haight Street
San Francisco, CA 94102
Telephone: (415) 673-4800
Email: j.alioto@veenfirm.com

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com


Robert J. Bonsignore, Esq.
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us


Attorneys for Plaintiffs

26

*Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*