# EXHIBIT 23

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARY KATHERINE ARCELL, *et al.*

      *Plaintiffs,*

  v.

GOOGLE LLC,

      *Defendant*.

Case No.: 3:22-cv-02499-RFL

**EXPERT REPORT OF DR. ANDRES V. LERNER**

**March 6, 2026**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

consumers demand at lower prices.  Google promotional agreements have expanded industry output and generated significant benefits for users, partners, and developers.

12.    A central flaw in Plaintiffs' position is the failure to identify an economically sound "but-for" world—one that reflects a competitive market outcome—in which rivals would have achieved materially greater promotion or search volume.  The evidence does not support the claim that competition for defaults and preinstallation have hindered rivals compared to an economically sound but-for world.

13.    Plaintiffs' claims that the challenged conduct restricted competition from "more privacy-protective" or "ad-free" search engines also are economically misguided and inconsistent with the evidence.  The evidence indicates that privacy-focused and ad-free search engines have limited user appeal which, together with their limited ability to monetize, prevent them from being viable competitive alternatives for defaults and preinstallation by partners.  There is no economic or empirical basis for the claim that these search engines would have achieved greater promotion, search volume, or quality in any economically sound "but-for" world.

14.    Ultimately, Plaintiffs propose sacrificing tangible and significant consumer benefits generated by the challenged Google agreements to protect search rivals whose services have been proven unsuccessful with users as well as partners.[9]  Such a proposal is fundamentally antithetical to sound principles of antitrust economics.

## II.    GOOGLE'S BROWSER DEFAULT AGREEMENTS ENHANCE RATHER THAN HARM COMPETITION

### A.  Search defaults reflect a product design by browser providers that benefits users and enhances competition in search

15.    As discussed in this section, the evidence indicates that search defaults reflect design decisions by browser providers that benefit their users and enhance competition in search. Defaults benefit uses by enabling convenient access to a search service recommended by the

---

[9] Throughout this report, I describe and address the terms of the agreements that are challenged in the Complaint.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

browser provider and generate price competition between search providers—a cornerstone of the competitive process.

### 1. Promotional arrangements with intermediaries are common and procompetitive in many industries.

16.     Promotional agreements with intermediaries, such as retailers and distributors, are a ubiquitous and legitimate part of the competitive process across many industries. Their fundamental purpose is to drive incremental sales in exchange for financial incentives—such as lower wholesale prices—provided to intermediaries.[10]  These arrangements expand output by helping consumers find the products or services they desire more efficiently and by incentivizing distributors to pass through promotional payments to customers.  These promotional arrangements can take many forms.  In a traditional retail environment, a supplier might negotiate for "eye-level" shelf space, endcaps, or exclusive billboard displays in exchange for compensation such as wholesale price discounts, slotting fees, or marketing funds.  It is widely acknowledged that these types of promotional arrangements generally enhance competition and benefit consumers because distributors have incentives to pass through these payments in the form of lower product prices, improved services, or higher-quality facilities.[11]

17.     Promotional arrangements in the search industry, including search defaults and preinstallation agreements with partners, are the digital equivalent of these promotional arrangements with distributors in other industries.  As in other industries, search providers compete for this promotional space based on financial incentives offered to partners as well as the quality of the search services to users.  These arrangements are economically analogous to manufacturers competing for promotional space in a retail environment.  Like in other industries, search promotion arrangements enhance competition and benefit users because partners are incentivized to pass these promotional payments through to users in the form of lower device prices or enhanced quality of browsers, devices, and other services.

---

[10] See, *e.g.*, Benjamin Klein and Joshua D. Wright, *The Economics of Slotting Contracts*, 50(3) JOURNAL OF LAW AND ECONOMICS 421 (2007).

[11] *Id.*  See also, Benjamin Klein and Kevin M. Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75(2) ANTITRUST LAW JOURNAL 433 (2008).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

18.     Search defaults and preinstallation not only provide promotional value to a search provider, but also are important inputs for partners, including browser providers, mobile device OEMs, and wireless carriers.  As discussed further below, search defaults and preinstallation provide convenient access out-of-the-box for users of browsers, mobile devices, and computers.  Choosing a high-quality search provider therefore is an important choice for browser providers and other partners.

2.     <u>Search defaults reflect long-standing product design by browser providers.</u>

19.     Designing browsers with a search default has been a standard industry practice since the early days of search (and the Internet).  Google did not invent or initiate the use of search defaults on browsers.  Rather, search defaults on browsers reflect long-standing product design by browser providers.  Browser providers began directly incorporating search functionality in the late 1990s.  Microsoft made MSN Search the default on Internet Explorer in 1999 (specifically with the release of IE 5), later adding an additional access point via the address bar in IE 6 (2001), as shown below.[12]  Other browser providers also implemented search defaults into their browsers around that time, including Netscape making Netscape Search the default on its built-in search button and address bar in 2000.[13]

---

[12] *Internet Explorer 5: Search and Explore,* PC World, Feb. 19, 1999, available at https://web.archive.org/web/20090923171306/http://www.pcworld.com/article/9813/internet_explorer_5_search_an d_explore.html; Danny Sullivan, *Searching & Navigating Via Internet Explorer*, Search Engine Watch, Apr. 1, 2002, available at https://www.searchenginewatch.com/2002/04/01/searching-navigating-via-internet-explorer/.

[13] Alan Cohen, *Netscape 6 Preview Release 1: AOL Is on the Right Track*, PCMag, May 23, 2000, available at https://books.google.com/books?id=FnxFfhjz2-gC&pg=PA45&lpg=PA45.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



20.     Google subsequently entered into arrangements for browser defaults, securing the default position on browsers that were then new entrants and/or small players, such as Opera (2001), Mozilla Firefox (2004), and Safari (2005).[14]  Around the time of these deals, these partners held a very small share of the market:  Opera had less than a 1 percent share of browser usage, Mozilla had around 2 percent share, and Safari had about a 1 percent share.[15]  In contrast, Microsoft's browser—Internet Explorer—had a browser share exceeding 90 percent.[16]



21.     Since that time, all U.S. browsers have had a preset search default, even when Google is not the default search provider.  These browsers include Microsoft's Internet Explorer and Edge browsers (with Bing as the default), Brave (with Brave Search as the default), Mozilla Firefox

---

[14] Amendment One to the Information Services Agreement with Apple, effective Jan. 14, 2005, GOOG-ARCELL-00056275, § 2 adding § 2.3, § 3 adding § 2.4; Matt G. Southern, *After 10 Years Firefox Abandons Google as Default Search Engine, Partners with Yahoo as US Default*, Nov. 19, 2014, available at https://www.searchenginejournal.com/10-years-firefox-abandons-google-default-search-engine-partners-yahoo-us-default/120718/; *Opera Integrates Google's Award-Winning Search Technology*, Opera, May 7, 2001, available at https://press.opera.com/2001/05/07/opera-integrates-googles-award-winning-search-technology/.

[15] OneStat.

[16] OneStat.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(with Yahoo! as the default from December 2014 to October 2017), Silk (with Bing as the default), DuckDuckGo browser (with DuckDuckGo search as the default).[17]

22.    This evidence is at odds with any claim that Google coerced partners to implement these defaults on their browsers.  In fact, as discussed below, there are sound economic reasons why browser providers implemented this product design and why search defaults on browsers became the industry norm—they benefit their users while enhancing competition between search providers.  The fact that search defaults on browsers has been a standard industry practice for over two decades, and across a wide range of providers, is a strong indication of its value and efficiency.  There is no evidence—and Plaintiffs do not provide any evidence—that partners such as Apple or Mozilla preferred an alternative product design (such as a choice screen, as discussed in Section IV.A.4.b) below).  The long-standing use of search defaults and practice of contracting for that default position with search providers support the conclusion that competition for defaults reflects competition on the merits that generates important efficiencies and benefits users.

### 3.    Browser defaults provide convenient access to a recommended search service.

23.    A search engine is a key input or complement to a browser.[18]  Incorporating search functionality directly into the browser interface—via search buttons or address bars—is a key facet of the product design of a browser.  The quality of a search engine significantly impacts the browser experience.  Because the quality of a search engine has a significant impact on how users interact with the web, choosing a high-quality search engine to serve as the default is a critical facet of a browser provider's product design and a key competitive decision.  According

---

[17] *Privacy-preserving Brave Search Replaces Google as the Default Search Engine in the Brave Browser*, Brave, Oct. 19, 2021, available at https://brave.com/blog/search-and-web-discovery/; *Get the DuckDuckGo Browser*, DuckDuckGo, accessed on Feb. 26, 2026, available at https://duckduckgo.com/duckduckgo-help-pages/get-duckduckgo/browser; Thom Craver, *Bing Will Be the Default Search Engine on Kindle Fire*, Search Engine Watch, Sept. 11, 2012, available at https://searchenginewatch.com/2012/09/11/bing-will-be-the-default-search-engine-on-kindle-fire/; Frederic Lardinois, *Mozilla terminates its deal with Yahoo and makes Google the default in Firefox again*, Tech Crunch, Nov. 14, 2017, available at https://techcrunch.com/2017/11/14/mozilla-terminates-its-deal-with-yahoo-and-makes-google-the-default-in-firefox-again/; Parth Shah and Anu Joy, *Microsoft Edge: How to change your default search engine*, Android Police, Mar. 17, 2024, available at https://www.androidpolice.com/microsoft-edge-change-search-engine/.

[18] In economics, two products (say, A and B) are complements if the demand for one (A) increases when the price of the other (B) decreases or its quality increases.  Complementary products exhibit a negative cross-price elasticity of demand.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to Mitchell Baker, former CEO of Mozilla, Mozilla has "found the search experience in the browser to be fundamental to the browser"[19] and that "the quality of the search experience . . . [is] one of the handful of things that are the most critical about a browser."[20]  Similarly, Eddy Cue, Apple's SVP of Services, has testified that "We like our products to come out-of-the-box and work where it feels like magic. And I think the ability of searching in Safari and doing that with Google, it does feel like magic, it works really well."[21]

24.    Browser defaults serve two primary functions for browser users:  (1) they provide convenient access to a search engine "out-of-the-box" and (2) act as a "recommendation" from the browser provider.  Eddy Cue, Apple's SVP of Services, has explained that "one of the benefits . . . that Google gets from Apple is that we are telling the world that Google is the best search engine, because that's what they would expect Apple to pick."[22]

25.    Thus, search default arrangements represent a two-way exchange of essential inputs. From the search provider's perspective, the agreement provides promotional value. Simultaneously, a browser provider receives an essential input from the search provider—a high-quality search service that enhances the value of their own product.  In this sense, default agreements do not just entail a search provider purchasing promotion in the form of the default position; they are also arrangements where the browser provider secures high-quality search services that their users value.

### 4.    Browser defaults enhance search competition.

26.    Browsers play a critical role in enhancing competition in search.  As discussed in this section, competition for browser defaults fundamentally reflects competition for users, with browser providers selecting a high-quality search engine for those who value and follow the provider's recommendation.  Competition for browser defaults also generates price competition, which is a fundamental part of the competitive process.

---

[19] 1/6/2022 Baker Dep. Tr. 34:1-2 (Mozilla) (MOZILLA-ARCELL-00000001).

[20] 1/6/2022 Baker Dep. Tr. 34:8-13 (Mozilla) (MOZILLA-ARCELL-00000001).

[21] 9/26/2023 Trial Tr. 2625:7-10 (Cue) (GOOG-ARCELL-00027172).

[22] 9/26/2023 Trial Tr. 2620:1-4 (Cue) (GOOG-ARCELL-00027172).

9

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

from the improved quality and lower prices of complements.  Because browsers and search engines are strong complements, higher-quality browsers increase demand for search services.  As a result, Google has powerful economic incentives to ensure the availability of high-quality browsers to "grow the pie" of total search usage.

34.    Google's search default arrangements with independent browser providers were driven by the goal of expanding search usage by fostering a competitive, faster, more secure, and more innovative browser ecosystem.  These agreements have supported the development of independent browser providers, such as Mozilla, which rely on revenue share agreements to fund their businesses.  By stimulating browser competition and investment, Google encourages the development of improved browsers that increase overall internet usage, thereby expanding the usage of search services.

35.    During the early 2000s, a lack of browser competition and innovation hindered the functionality and growth of search services.  Internet Explorer held a greater than 90 percent share of browser usage.[27]  The underlying browser technology remained largely stagnant.[28]  This prevented Google and other search engines from delivering the faster, more secure, and interactive experiences that users demanded.  Google's investments—including its support for Firefox and the development of Chrome (discussed below)—were responses to the need to improve browser quality and foster browser competition.

36.    Mozilla was initially funded by donations and had only $5.8 million in total revenue in 2004, putting it at a severe disadvantage against Microsoft's Internet Explorer.[29]  Revenues from search defaults enabled Mozilla to increase software development spending and develop features to compete against Internet Explorer.  For instance, Firefox 2.0, introduced in 2006, provided built-in phishing protection and the ability to resume closed sessions. [30]  Firefox 3.0, introduced

---

[27] OneStat.

[28] Paul Festa, *Developers gripe about IE standards inaction*, CNET, Oct. 9, 2003, available at https://www.cnet.com/tech/services-and-software/developers-gripe-about-ie-standards-inaction/; Raksha Shetty, *Need Another Browser?*, CBSNews.com, July 5, 2004, available at https://www.cbsnews.com/news/need-another-browser/.

[29] *Mozilla Foundation Form 990 Return of Organization Exempt from Income Tax 2004*, Nov. 15, 2005 at 1, available at https://static.mozilla.com/foundation/documents/mf-2004-irs-form-990.pdf.

[30] *Firefox Release Notes*, Mozilla, available at https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/2.0/releasenotes/#whatsnew; *Firefox2*, Mozilla wiki, Oct. 14, 2009, available at https://wiki.mozilla.org/Firefox2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in 2008, added malware protection and significantly increased browsing speed.[31]  Mozilla's software development expenditures grew substantially in response to search revenue share, rising from $6.1 million in 2005 to $103.1 million in 2011, and more than doubled again to $214.2 million by 2015.[32]  Without the search default arrangements, such investment and improvements in quality would not have been feasible.

37.     The incentives for browser innovation during this period differed sharply between Google and Microsoft, which owned the dominant browser at the time.  Microsoft's primary focus was its Windows operating system.  For much of the 2000s, Microsoft lacked the incentive to invest in cross-platform innovation, prioritizing its own Windows ecosystem instead.  This led to the stagnation of improvements in Internet Explorer, which was restricted primarily to Windows.[33]  As mobile usage began to expand, Microsoft initially limited mobile browser development to its own Windows Mobile platform, failing to provide competitive options for iOS or Android until the release of Edge years later.[34]

---

[31] *Firefox 3 Release Notes*, Mozilla, available at https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/3.0/releasenotes/.

[32] *Mozilla Foundation and Subsidiary Independent Auditors' Report and Consolidated Financial Statement December 31, 2006 and 2005*, Dec. 31, 2006 at 3, available at https://static.mozilla.com/foundation/documents/mf-2006-audited-financial-statement.pdf; *Mozilla Foundation and Subsidiary Independent Auditors' Report and Consolidated Financial Statement December 31, 2012 and 2011*, Dec. 31, 2012 at 4, available at https://static.mozilla.com/moco/en-US/pdf/Mozilla_Audited_Financials_2012.pdf; *Mozilla Foundation and Subsidiary Independent Auditors' Report and Consolidated Financial Statement December 31, 2016 and 2015*, Dec. 31, 2016 at 4, available at https://assets.mozilla.net/annualreport/2016/2016_Mozilla_Audited_Financial_Statement.pdf.

[33] 10/2/2023 Trial Tr. 3584:14-3586:12 (Nadella) (GOOG-ARCELL-00027983) ("Q. Now, when you took over, in 2007, the search group, you recognized that Internet Explorer was a poor browser? A…. Maybe I was critical of even our browser, but ultimately, yes, we had to sort of really abandon, effectively trying to build an alternate rendering engine and just join the Google sort or rendering engine, and that's kind of when we started making progress again on the browser."); Don Reisinger, *10 Reasons Why Microsoft's Internet Explorer Dominance is Ending*, eWeek, May 4, 2010, available at https://www.eweek.com/enterprise-apps/10-reasons-why-microsoft-s-internet-explorer-dominance-is-ending/; Gregg Keizer, *How Microsoft lost the web*, Computer World, Dec. 29, 2018, available at https://www.computerworld.com/article/1712765/how-microsoft-lost-the-web.html.

[34] As late as August 2014, Microsoft indicated that it had "no current plans" to develop a mobile browser for Android or iOS.  Microsoft did not release a browser app for Android or iOS until 2017, when it released Edge on those platforms.  See, *e.g.*, Mary Jo Foley, *Internet Explorer on Android or iOS? Not in Microsoft's current plans*, ZDNet, Aug. 15, 2014, available at https://www.zdnet.com/article/internet-explorer-on-android-or-ios-not-in-microsofts-current-plans/; Joe Belfiore, *Announcing Microsoft Edge for iOS and Android*, Microsoft Launcher, Windows Blogs, Oct. 5, 2017, available at https://blogs.windows.com/windows-insider/2017/10/05/announcing-microsoft-edge-for-ios-and-android-microsoft-launcher/.

13

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> *a)    Partners chose Google because it delivers a superior user experience.*

44.    The evidence shows that Google has won competitions for search defaults on browsers, including the Apple Safari and Mozilla Firefox browsers, by offering higher-quality search services that users prefer.  As discussed in Section II.C.2, the Apple agreement has been contested throughout its history, with this competition for this promotional opportunity focusing primarily on the quality of search services provided to users, as well as the payments offered to Apple.  The evidence shows that Apple chose Google as the default for the Safari browser because it delivers the "best search experience" for Apple users.[43]  Similarly, as discussed in Section II.D.1, the agreement with Mozilla for the default on the Firefox browser has been contested by rivals, with Yahoo! winning the competition to be the default between 2014 and 2017.  Google subsequently won the default from Yahoo! in 2017 as a result of Google's superior quality, Yahoo!'s failure to make contractually specified improvements, and the fact that a large share of Firefox users switched to Google when Yahoo! was the default.

45.    This testimony by partners also is consistent with evidence that the vast majority of users prefer Google search services over those of rivals.  For instance, as discussed in Section IV.A.3.a) below, in Europe where a choice screen was implemented in response to the *Android* decision, 95.7 percent of users chose Google over search rivals.  And this estimate understates the extent of user preference for Google because the evidence shows that users subsequently switched to Google after making initial selections for an alternative search engine.  In particular, analysis of usage shares on Android devices following the implementation of the choice screen in Europe shows that rivals' overall share remained essentially unchanged at approximately 1 percent usage.

46.    Consistent with the overwhelming preference by users for Google over Bing and other search rivals, Google has attracted the vast majority of usage even on platforms without significant preinstallation or preinstalled search defaults.  On Windows PCs, where Microsoft Bing is the preinstalled default on virtually all computers, users making up 78 percent of search volume switched to Google (see Section IV.A.3.a)).  The same is true when Mozilla made Yahoo! the default on the Firefox browser in 2014—Mozilla studies consistently found that

---

[43] See Section II.C.2.

17

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Moreover, because DuckDuckGo does not collect user information, the search results it provides can be inaccurate for location-based results like local weather and restaurants.

### C. Google's agreement with Apple reflects the outcome of competition

58.    Plaintiffs challenge Google's agreement with Apple which involves Apple setting Google Search as the default on the Safari browser in exchange for a share of Google's search advertising revenue.  According to Plaintiffs, this arrangement between Google and Apple is an agreement to "suppress, eliminate, and/or foreclose other search providers and/or potential search providers...".[65]  As discussed below, Plaintiffs mischaracterize both the contractual terms and the underlying economic reality of the Google-Apple arrangement. The agreement to make Google the Safari default is not exclusive, nor does it hinder competition between search providers or Apple's own potential entry.  Instead, Google's position is the outcome of competition on the merits, with Google winning by providing a superior user experience at lower prices.

### 1.    Google's agreement with Apple generates mutual benefits

59.    The core component of Google's agreement with Apple is the setting of Google Search as the default provider on the Safari browser.  In exchange, Google pays Apple a share of the search advertising revenue generated by Safari queries (excluding queries where users navigate to Google organically).[66]  The agreement generates substantial mutual benefits.

60.    Google gains promotion on Safari and Apple devices, which yields incremental query volume.  This volume stems not only from users choosing Google over rivals but also from aligning incentives for Apple to encourage overall search activity on its devices.  Additionally,

---

DuckDuckGo Help Pages, available at https://help.duckduckgo.com/duckduckgo-help-pages/results/sources/.  See also, 9/22/2022 Trial Tr. 2352:25-2353:4 (Giannandrea) (GOOG-ARCELL-00037467) ("A. Because DuckDuckGo is, I would describe, a veneer on top of other search engines, specifically Yahoo! and Bing. Q. What do you mean by 'a veneer on top of'? A. Well, in order to be a functional search engine, they have to get most of the results from a much larger search engine.")

[65] Complaint at 18.

[66] Amendment One to the Information Services Agreement with Apple, effective Jan. 14, 2005, GOOG-ARCELL-00056275.

23

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Google benefits from the brand prestige of being featured on Apple products.[67]  These procompetitive incentives—sharing revenue to promote and encourage usage—are economically rational for any search provider, absent any exclusion of rivals.

61.      Apple benefits by providing its users with convenient, "out-of-the-box" access to high-quality search services.  Procuring a high-quality default search service is a critical dimension of Apple's product design.  Much like other components Apple selects on behalf of consumers, choosing the highest-quality provider ensures a superior user experience.[68]  Apple also benefits from the brand prestige of a high-quality search provider such as Google.[69]  Consequently, Plaintiffs' challenge to this agreement is effectively a challenge to Apple's product design decisions—specifically, its choice to implement a search default in order to provide a convenient recommended search engine "out-of-the-box" and its selection of the highest-quality provider for that position.

62.      Apple also receives from Google (as well as from other search providers) a share of search advertising revenue, which as discussed is economically equivalent to a lower price for search services.  This revenue provides Apple with incentives to supply higher-quality or lower-priced devices, as increased device sales leads to greater search usage and thereby search revenue share payments. These payments reflect a return on Apple's extensive investments in the Apple ecosystem and the user loyalty it has cultivated.  Receiving payment for services to access its user base is a fundamental part of Apple's business model (analogous to the revenue shares Apple collects from developers in the App Store).  Ultimately, these revenue share payments reflect the outcome of bilateral bargaining between Google and Apple, conducted against the backdrop of competition from search rivals such as Bing.

---

[67] 9/26/2023 Trial Tr. 2620:1-4 (Cue) (GOOG-ARCELL-00027172) ("I think one of the benefits, for example, that Google gets from Apple is that we are telling the world that Google is the best search engine, because that's what they would expect Apple to pick.")

[68] 9/26/2023 Trial Tr. 2478:20-2479:3 (Cue) (GOOG-ARCELL-00037679) ("We [Apple] want them all [customers] to have the best experience. And so in countries where Google was providing the best experience, we did that.  In the countries where they were not, we did not do that.")

[69] 9/26/2023 Trial Tr. 2619:12-2620:1 (Cue) (GOOG-ARCELL-00027172) ("Q. Does having a first class browsing and internet search capability out-of-the-box make Apple products more competitive? A. It absolutely does…. Q. And has Apple touted that – the fact that Google's search has been integrated into Safari for many years? A. We are, we're proud of that. It's a great product for our customers, and we wanted our customers to know that they're getting the Google search engine….")

24

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

63.　　The fundamental structure of Google's agreement with Apple—making Google the default search provider on Safari in exchange for a revenue share—and the nature of the benefits it generates for both parties, has remained essentially unchanged since the mid-2000s.  Google first entered into a search promotion agreement with Apple in 2002.[70]  This was amended in 2005 to establish Google as the default search provider for the Safari search box, with Apple receiving a share of search advertising revenue.[71]  At that time, Google lacked the market position Plaintiffs now challenge, the iPhone did not exist, the Safari browser was used only on Apple's desktop and laptop computers (accounting for only 4.2 percent of U.S. computer sales in 2005), and Safari represented a mere 1.3 percent of browser usage.[72]  When Apple released the iPhone in 2007, the agreement was extended to the new mobile platform.[73]  Subsequent contract extensions maintained the original fundamental structure of the agreement that Plaintiffs now challenge.[74]  This history of the Apple deal is at odds with Plaintiffs' claims that the Apple agreement is driven by exclusion of search rivals.

---

[70] Information Services Agreement between Google, Inc. and Apple, Inc., effective Dec. 20, 2002, GOOG-ARCELL-00055177.

[71] Amendment One to the Information Services Agreement with Apple, effective Jan. 14, 2005, GOOG-ARCELL-00056275, § 2 adding § 2.3, § 3 adding § 2.4.

[72] Based on Q1 2005 shipments.  IDC Worldwide Personal Computing Device Tracker; OneStat.  See also, Nancy Weil, *IDC, Gartner find Q3 PC shipment increases*, Macworld, Oct. 17, 2005, available at http://www.macworld.com/article/1047514/idc.html.

[73] Amendment Two to Information Services Agreement with Apple, effective Sept. 12, 2007, GOOG-ARCELL-00055242, § 1.

[74] Information Services Agreement between Apple and Google, effective Dec. 20, 2002, GOOG-ARCELL-00055177; Amendment One to the Information Services Agreement with Apple, effective Jan. 14, 2005, GOOG-ARCELL-00056275; Amendment Two to Information Services Agreement with Apple, effective Sept. 12, 2007, GOOG-ARCELL-00055242, § 1; Amendment Three to Information Services Agreement between Google, Inc. and Apple, Inc., effective July 14, 2008, GOOG-ARCELL-00056303; Amendment Four to Information Services Agreement with Apple, effective Jan. 14, 2009, GOOG-ARCELL-00055282; Amendment Five to the Information Services Agreement between Google Inc. and Apple Inc., effective Aug. 1, 2009, GOOG-ARCELL-00056335; Google/Apple Letter, Sept. 7, 2010, GOOG-ARCELL-00056425; Joint Cooperation Agreement with Apple, effective July 31, 2015, GOOG-ARCELL-00056603.  Amendment to the Information Services Agreement between Google Inc. and Apple Inc., effective Sept. 30, 2016, GOOG-ARCELL-00055713, § 1.a., § 4.  See renewal and amendment which extends terms.  Apple Renewal and Extension of Term of the Information Services Agreement for Certain Regions, Sept. 21, 2018, GOOG-ARCELL-00009996 and Ninth Amendment to the Information Services Agreement, effective July 31, 2021, GOOG-ARCELL-00038862.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

73.     First, although a default provides users access to a specific search provider on a particular access point, it does not bar partners from promoting rivals on other access points on the same browser or device.  Google's agreement with Apple does not bar Apple from offering other promotional opportunities to rivals through various channels, including preinstalling rival search engines, featuring rivals on the Safari home page, providing bookmarks to rivals, promoting rival search apps or browsers (with rival search services as the default) in the App Store, and steer users to rival search providers in various other ways.  This flexibility makes defaults economically distinct from an agreement that restricts a retailer from carrying rival products (or what is traditionally thought to be anticompetitive).

74.     In fact, Apple does promote search rivals.  Microsoft Bing, Yahoo!, and DuckDuckGo all have or have had their own agreements with Apple for promotion of their search services on Safari.[96]  For example, search rivals (Bing and Yahoo!) have been prominently featured as default "Favorites" on the Safari homepage across both iOS and macOS.



Safari "Favorites" on iOS

[96] See, e.g., Case COMP/At.40099 – Google Android, Annex I Questionnaire, Apple, APPLE-ARCELL-00000100; Yahoo! Mobile Software and Services Distribution Agreement with Apple, effective Dec. 22, 2006, APPLE-ARCELL-00000260; Agreement between Microsoft Corporation and Apple Inc. Titled "#C56-10-00873", MICROSOFT-ARCELL-00000735 and amendments; Agreement between Apple Inc. and Ecosia GmbH Titled "Software and Services Agreement," APPLE-ARCELL-00000322; 9/26/2023 Trial Tr. 2507:8-10 (Cue) (GOOG-ARCELL-00037679).

30

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

75.     Safari also includes an easily accessible menu that allows users to select Bing, Yahoo!, DuckDuckGo, or Ecosia as their preferred service.[97]  On mobile, this process is straightforward: users simply navigate to the Safari settings, select "Search Engine," and choose a different provider from the list.  Microsoft, Yahoo!, and DuckDuckGo all have arrangements with Apple to appear on this Safari menu.[98]



**Default Search
Options on iOS**

76.     Search access points other than the Safari default drive a significant share of search queries on iOS devices.  As shown in Figure 3 below, other search access points made up over 40 percent of search query volume as of 2024.[99]  And Google's agreement with Apple does not prevent Apple from promoting other access points in a way that would increase the search volume through those channels.

---

[97] See, *e.g.*, Agreement between Apple Inc. and Ecosia GmbH Titled "Software and Services Agreement," APPLE-ARCELL-00000322.

[98] 9/21/2023 Trial Tr. 2169:20-21 (Giannandrea) (GOOG-ARCELL-00026696); 9/26/2023 Trial Tr. 2429:10-12 (Cue) (GOOG-ARCELL-00037679). Eddy Cue also testified it takes a user four steps to change the default search engine on an iOS device and be done in "like a minute." 4/13/2022, Cue Dep. Tr. 244:19-249:11 (Apple) (APLARCELLGOOG_000360).

[99] Based on January through September 2024.  Google Partner data; Google Search Access Point data; Google QueryNav data; Google DisplayNav data.

31

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.    Mozilla chose Google as the Firefox default because it delivers a superior user experience at a lower price

99.    Search default agreements with Mozilla have been contested by search rivals:  Yahoo! competed with Google to obtain the default on Firefox 1.0 in 2004; Microsoft was in negotiations with Mozilla for the Firefox default in 2011, Yahoo! competed (and won) the search default position on the Firefox browser in 2014; and Mozilla tested Bing as the default search engine on Firefox in 2021.[116]

100.    Since before the launch of Firefox 1.0, Mozilla has regularly assessed Google against its rivals, consistently finding that Google provides higher-quality search services that users overwhelmingly prefer.  This superiority has been the primary driver of Mozilla's decisions to set Google as the default search provider on Firefox.

101.    Google successfully competing for the Firefox default is an outcome of the competitive process where success is driven primarily by quality and user preferences.  The evidence shows that Google won the default on the Mozilla Firefox browser from Yahoo! in 2017 by providing superior search services that users prefer.

102.    Before and after Mozilla's switch to Yahoo!, Mozilla conducted several studies of Firefox users.  As discussed in Section IV.A.3.c), these studies showed that users overwhelmingly prefer Google Search over Yahoo! and that Firefox users were likely to change the default search provider from Yahoo! to Google and/or to simply not use the default (*e.g.*, by navigating to Google.com).

103.    Testimony from Mozilla CEO Mitchell Baker corroborates these findings.  Baker has testified there was a "high dropoff of users" of Firefox default search when Yahoo! was the default.[117]  According to Baker, she herself "struggled" using Yahoo! and she would "switch to

---

[116] 1/6/2022 Baker Dep. Tr. 52:20-53:3, 52:8-19 (Mozilla) (MOZILLA-ARCELL-00000001); Matt Rosoff, *Microsoft Let Google Win The Firefox Deal – Maybe It's Finally Ready To Stop Throwing Money At Bing*, Business Insider, Dec. 20, 2011, available at https://www.businessinsider.com/why-did-microsoft-let-google-win-the-firefox-deal-2011-12; *Yahoo and Mozilla Form Strategic Partnership*, Mozilla Press Center, Nov. 19, 2014, available at https://blog.mozilla.org/press/2014/11/yahoo-and-mozilla-form-strategic-partnership/; Barry Schwartz, *Firefox Testing Bing As Default Search Engine*, Search Engine Roundtable, Sept. 21, 2021, available at https://www.seroundtable.com/firefox-test-bing-default-search-engine-32117.html.

[117] 1/6/2022 Baker Dep. Tr. 75:13-14, 76:2-4 (Mozilla) (MOZILLA-ARCELL-00000001).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 2.    The MADA

153.    Plaintiffs also challenged the MADAs.[162]  According to Plaintiffs, the MADAs "ensure that [Google's] entire suite of search-related products is given premium placement on Android devices. Consumers naturally and regularly turn to these prominently placed search access points to conduct searches."[163]  Plaintiffs' claim that the MADAs "are even more pernicious than basic ties because these agreements force distributors to configure the appearance of their phones to Google's specifications" and they "lock[] up another search access point, as it would be impractical for a manufacturer to preinstall two search widgets on the same home screen."[164]

154.    As discussed in this section, Plaintiffs' allegations are incorrect.  The MADA underpins a key procompetitive feature of the Android business model—the royalty-free licensing of Google apps and services, which has enabled the supply of many low-priced mobile devices and played a key role in Android's success.  The MADA also ensures a high-quality and consistent user experience for Android devices "out-of-the-box," which is essential to competing with iOS.[165]  At the same time, the MADA does not exclude search rivals and competitive outcomes in search would not be materially different absent the MADA.  The MADA therefore is procompetitive, generating key efficiencies without any restriction of competition in search.

#### a)    The MADA enables the free licensing of GMS (and the Android OS)

155.    The MADA reflects an "exchange" or "barter":  Google licenses core Google apps and services, including Play, for free to OEMs; in exchange, OEMs promote Google Search through the preinstallation of the Google Search and Chrome apps.  Rather than paying a license fee for these Google apps and services, OEMs agree under the MADA license to preinstall certain Google services, including Play, Google Search, and Chrome.

156.    By enabling the free license of GMS (as well as the Android OS), these preinstallation conditions reduce upfront costs for OEMs, while sustaining Google's significant and continual

---

[162] Complaint at 144-145.

[163] Complaint at 144.

[164] Complaint at 148.

[165] See, *e.g.*, Mobile Application Distribution Agreement (Android) with Samsung Electronics Co., Ltd., effective June 1, 2014, GOOG-ARCELL-00040854; Mobile Application Distribution Agreement (Android) with Samsung Electronics Co., Ltd, effective Mar. 1, 2017, GOOG-ARCELL-00055739.

61

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

investments in the Android platform. The MADA thereby has incentivized the adoption of Android and the provision of an enormous variety of Android devices with a wide range of prices, including many lower-priced devices. This has generated sizable benefits to users (as well as OEMs, carriers, and app developers), while providing critical competition to Apple's iOS platform.

157. The MADA barter has been integral to Android since its inception. This arrangement was instrumental in getting OEMs to adopt the Android platform when Android first launched and continues to be important in encouraging OEM participation in the Android platform today. Setting a license fee for the Google apps and services would have increased upfront costs and diminished OEM incentives to develop devices for the new Android platform. In fact, license fees were a key factor leading to the failure of Symbian according to Symbian's former CEO, Nigel Clifford, who explained that "having to charge a license fee (which we eventually solved)" was one the main aspects of the platform that "really held Symbian back."[166]

158. The MADA generates important pricing efficiencies:

- <u>The MADA barter reflects lower pricing of complementary products:</u> The licensing of the GMS suite at a price of zero reflects efficiency-enhancing pricing of complementary components. It is well recognized in economics that a firm selling complementary products or services will set lower prices because the firm will internalize the benefits that lowering the price of one good has on demand for the other. Google is willing to set lower prices for Play and other GMS apps and services when Google Search and Chrome are preinstalled on the device because those lower prices lead to lower-priced and higher-quality Android devices, thereby expanding search usage. Thus, the MADA barter reflects lower overall pricing to OEMs compared to a scenario where Play and other GMS services are licensed separately from the preinstallation of Search and Chrome.

- <u>The MADA barter is an efficiency-enhancing pricing arrangement:</u> The MADA barter reflects an efficiency-enhancing way for Google to (1) collect for the value of Play and other GMS apps and services (which enables continued development and innovation of

---

[166] Jo Best, *'Android before Android': The long, strange history of Symbian and why it matters for Nokia's future*, ZDNet, Apr. 4, 2013, available at https://www.zdnet.com/article/android-before-android-the-long-strange-history-of-symbian-and-why-it-matters-for-nokias-future/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the Android platform) and (2) pay for the promotion of Google Search on MADA devices.  Absent this barter, Google would implement a license fee for the GMS apps that reflects their economic value to OEMs and users.  But a separate license fee could lead to inefficiencies, including to a reduction in the supply of lower-end devices (for which a license fee may make supply unprofitable).[167]

- ▪ The MADA barter sets a price of zero to OEMs:  the MADA barter also reflects an implicit commitment to OEMs that Google will offer Play and other GMS apps and services at a price of zero.  This implicit commitment protects OEMs by constraining Google's ability to raise license fees after OEMs make specific investments in the platform.  The implicit commitment to offer the MADA bundle at a price of zero therefore helped attract OEMs to the Android platform and continues to support OEMs' ability to offer low-priced Android devices.

159.    Setting a license fee for the Google apps and services, however, would eliminate these key efficiencies of the Android business model.  OEMs would face an upfront license fee for Play and other GMS apps and services.  Although OEMs would receive a payment from Google for the preinstallation of Search and Chrome, they would face uncertainty whether they could recover these higher upfront costs through additional income from the promotion of Google Search (or, hypothetically, other search providers).  Moreover, economics indicates that for some devices (including low-priced Android devices), the license fee for Play would not be offset by the payment for the preinstallation for Google Search, and the increased cost to OEMs would be expected to lead to higher prices and/or restricted supply of Android devices.  For instance, for some lower-end devices, the license fee would be greater than the value of preinstallation of

---

[167] These efficiencies of bundling are recognized in the economics literature.  In particular, the literature shows that bundling different components can be efficient when consumer valuations for the different components are not highly positively correlated and are particularly significant when the valuations are negatively correlated.  See, *e.g.*, William James Adams and Janet L. Yellen, *Commodity Bundling and the Burden of Monopoly*, 90(3) THE QUARTERLY JOURNAL OF ECONOMICS 475 (1976); Yannis Bakos and Erik Brynjolfsson, *Bundling Information Goods: Pricing, Profits, and Efficiency*, 45(12) MANAGEMENT SCIENCE 1613 (1999); Stan J. Liebowitz and Stephen E. Margolis, *Bundles of Joy: The Ubiquity and Efficiency of Bundles in New Technology Markets*, 5(1) JOURNAL OF COMPETITION LAW AND ECONOMICS 1 (2009).  In the MADA context, a positive correlation between the value of GMS to OEMs and the value of search promotion to Google is equivalent to a *negative* correlation in values to Google because licensing GMS to OEMs for free has a negative value to Google.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Search to Google, and thus Google's willingness to pay for preinstallation.[168] Thus, an upfront license fee likely would make the supply of some Android devices unprofitable, especially lower-priced Android devices, which likely would lead to a significant increase in the cost and price of low-priced Android devices.

### b) The MADA ensures consistent out-of-the-box functionality

160.    The MADA also ensures consistent, minimum out-of-the-box functionality on Android devices, which enhances the user experience and thereby the value of Android. Such consistent minimum functionality enhances inter-platform competition by improving Android's ability to compete with Apple's iOS. As discussed, OEMs and wireless carriers have significant discretion to preinstall and promote additional services to users on top of this minimum functionality. Ensuring consistent, minimum functionality also enhances intra-platform competition because a consistent experience facilitates user switching across OEM Android devices by lowering the cost of user switching since users do not need to learn how to use a new mobile device's core services.

161.    Individual OEMs may lack sufficient incentives to ensure that Android devices have adequate, consistent functionality out-of-the box because they do not account for the impact of their actions on the overall platform. OEM incentives to maximize their own profits may be at odds with the interests of the overall platform. For instance, some individual OEMs might benefit from developing devices that do not meet a consistent, minimum functionality out-of-the-box yet fail to take into account the adverse impact on the overall platform due to reduced user demand for Android (especially given that Apple's iOS devices provide high-quality apps and services out-of-the-box).

### c) The MADA does not anticompetitively exclude search rivals

162.    The MADA preinstallation requirements are not exclusive.  The MADA does not restrict the ability of OEMs or wireless carriers to preinstall other apps and services on their Android devices, including those that compete with Google apps.  In fact, the MADA requirements do not

---

[168] Although Google could set differential license fees based on the type of Android device, such differentiated fees require adjustment over time and are unlikely to reflect the value of Play and other GMS apps and services across the wide variety of Android devices compared to the MADA bundle, creating inefficiencies.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prevent OEMs or wireless carriers from offering superior placement and visibility to rival apps, including search rival and browser apps (such as including app icons on the home screen or in the Application Dock).  And the MADA does not require that Google Search or Chrome be the default—OEMs and carriers can make rival apps the default, as Microsoft does with Bing search on Surface Duo devices.

163.    The MADAs also are not effectively exclusive. The MADA requires very limited screen space for Google apps.  In particular, OEMs preinstall on the home screen the Play icon, the Google Search widget, and a folder containing Google apps (including Google Search and Chrome), as shown in the figure below.  GMS apps also take up a trivial amount of storage capacity.[169]  OEMs and wireless carriers do preinstall many other apps, including those that compete with preinstalled Google apps, and display them prominently on the home screen or adjacent screen, as I discuss in my initial report.  This is illustrated not only by popular Samsung devices, which install multiple app stores, browsers, and assistants, but also by Microsoft's Surface Duo, which has Microsoft Edge and Bing preinstalled in addition to Google Search and Chrome.



---

[169] All 11 apps in GMS require about 1.5 GB of total storage, which is about 1.1% of the standard baseline storage space on Android devices in 2024.  The storage estimates are based on app APK sizes available at APKPure and APKCombo.  See APKPure, available at https://apkpure.net/ and APKCombo, available at https://apkcombo.com/, available in backup materials.  See also, Shikhar Mehrota, *It's About Time Flagship Smartphones Bumped the Base Storage to 256GB*, How-To Geek, Nov. 18, 2024, available at https://www.howtogeek.com/its-about-time-flagship-smartphones-bumped-the-base-storage-to-256gb/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

164.    With regards to Chrome, the MADA merely requires that Chrome be preinstalled in a folder, does not require that it be set as the default, and does not require placement in the app dock.  Rival browsers can receive equal or even superior placement than Chrome (such as on the app dock) and can be set as the default.  Indeed, on Surface Duo MADA devices, Edge is on the home screen, on the app dock, and set as the default browser and Chrome is not, as shown below.



165.    Similarly, the Widget requirement in the MADA is not exclusive, and OEMs and/or carriers can preinstall additional widgets on a device.  Moreover, even if OEMs and wireless carriers are unlikely to preinstall a second widget, that does not mean that the widget requirement makes the MADA effectively exclusive.  There are various other search access points in addition to the widget for which search rivals can compete, including premium placement of a browser (with a rival search provider as the default) or of a search app.  In fact, for most of the relevant period (until 2020), browsers (not the widget) were the primary access point for search and remain as important as the widget for Google Search queries on Android devices today.[170]

166.    The evidence also is inconsistent with a claim that, absent the MADA "barter," rivals would receive materially more promotion or search volume.  Absent the MADA preinstallation requirements, Google would nevertheless compete for preinstallation, and the evidence indicates that Google would win on most (if not all) Android devices.  Bidding for the preinstallation and placement of its apps is competition on the merits, and there is no economic basis for prohibiting

---

[170] Google Search Access Point data.

66

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b)    *RSAs reflect competition for incremental promotion of search.*

176.    The RSAs also reflect the outcome of competition between search providers for promotion of their search services (and browsers that have their search engines as the default). Microsoft and Yahoo! had a long history of competing for preinstallation, both on desktop and mobile devices.  Microsoft and Yahoo! competed for and entered into arrangements for the promotion on mobile devices in the late 2000s and early 2010s with various types of partners, including OEMs, wireless carriers, and mobile platform owners.[181]  During this period, Google also competed through the RSAs for search promotional opportunities on Android devices with wireless carriers and OEMs.

177.    Under the RSAs, Google provides a share of search revenues to wireless carriers or OEMs in exchange for incremental promotion of Google Search, including placement conditions and preinstallation exclusivity.[182]

- *Placement requirements:*  Some RSAs had placement requirements for specific search access points, including the Google Search widget and the Google Chrome browser (formerly the Android browser).  To qualify for revenue share, the Google Search widget is required to be placed on the default home screen and set to Google, and the Chrome browser is generally required to be placed in the app dock (*i.e.*, row of apps at the bottom of the default home screen) and set as the default browser (pursuant to wireless carrier RSAs).  Notably, on Samsung devices, Samsung's Internet Browser (rather than Chrome) can be in the application dock and set as the default.

---

[181] Microsoft Mobile Business and Services Framework Agreement between Microsoft and Verizon, effective Dec. 1, 2008, MICROSOFT-ARCELL-00000690 at 690, 693, 728; Email from Matt Dahlin (Microsoft) to Matt Dahlin, "RIM-Bing partnership announcement," Feb. 8, 2011, MICROSOFT-ARCELL-00001274 at 275-276.  See also, 1/26/2022 Ezell Dep. Tr. 103:17-23 (AT&T) (GOOG-ARCELL-00045962); Bing for Mobile Search OEM Distribution Agreement between Microsoft Corp. and Research In Motion Limited, effective Nov. 23, 2010, MICROSOFT-ARCELL-00000510; Amended and Restated Wireless Data Products and Services Agreement between Microsoft Corporation and T-Mobile USA, Inc., effective Apr. 1, 2007, MICROSOFT-ARCELL-00001694.

[182] Search access points which qualify for search ad revenue share payments have changed over time, but the main search access points—Chrome, GSA and the Search widget—have largely remained the same.  See, *e.g*., Google Mobile Revenue Share Agreement with AT&T Mobility LLC, effective June 1, 2021, GOOG-ARCELL-00038682 (AT&T RSA); Google Mobile Revenue Share Agreement with Verizon, effective June 1, 2021, GOOG-ARCELL-00038746 (Verizon RSA); Google Mobile Revenue Share Agreement with Samsung Electronics Co., Ltd., effective July 1, 2020, GOOG-ARCELL-00038568 (Samsung RSA).

71

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

▪ *Preinstallation exclusivity:*  The RSAs historically have included a commitment not to preinstall "Alternative Search Services" on a particular Android device on which Google pays revenue share.[183]  The exclusive preinstallation requirement can be limited to particular devices (device-by-device preinstallation exclusivity) or apply to all of a partner's compatible Android devices (so-called platform-wide exclusivity).  Under device-by-device agreements, the carrier or OEM can elect on which devices it will receive revenue share by meeting specified placement and exclusivity terms on that device.  If the carrier or OEM elects to install an alternative search service, then those devices are not eligible for revenue sharing, but the partner nevertheless can earn revenue shares on other Android devices.

178.    The RSA placement requirements are equivalent to premium promotional space, which is a ubiquitous business practice and is analogous to paying for premium shelf space in a retail environment.  These placement requirements generate incremental usage for Google Search. Even firms lacking market power find it economically rational to compete for incremental sales or usage by paying for promotion.  Notably, the incremental sales generated by a partner's promotional efforts can both shift sales between rivals in a product category and increase total sales in the category—*i.e.*, "grow the pie."

179.    Preinstallation exclusivity generates procompetitive efficiencies, reflecting an efficient means of contracting for incremental promotion of Google Search.  In particular, a commitment not to preinstall an alternative search service guards against partners acting opportunistically by promoting rivals in a way that diminishes the value of that promotion while collecting Google revenue share payments across all paid access points on which Google users search.  This commitment benefits carriers, OEMs, and users by leading to greater revenue share payments

180.    As discussed in the economics literature, exclusive arrangements have several efficiency rationales.[184]  Exclusive arrangements can help to align the incentives of a supplier and a

---

[183] One notable exception is Verizon, which (due to an apparent mistake by Google during an amendment negotiation) had a non-exclusive RSA for most of the lifetime of the partnership.  9/14/2021 Levine Dep. Tr. 233:18-236:10 (Google) (GOOG-ARCELL-00041376).  See also, Verizon-Google Co-Developed Device Strategic Marketing Agreement and Amendments, effective Oct. 1, 2009, GOOG-ARCELL-00056337.

[184] See, *e.g.*, Benjamin Klein and Kevin M. Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75(2) ANTITRUST LAW JOURNAL 433 (2008); Howard P. Marvel, *Exclusive Dealing*, 25 JOURNAL OF LAW AND ECONOMICS 1 (1982).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

distributor.  Exclusive arrangements often entail a commitment by a distributor to exclusively promote one supplier's products, and thereby generate incremental sales for the supplier, in exchange for the supplier making a payment to the distributor (or, equivalently, offering a lower wholesale price).  A distributor's commitment to promote one supplier's product exclusively can provide mutual gains to both the supplier and distributor—distributors desire higher payments and/or lower wholesale prices and suppliers desire to increase sales.  The supplier often would not be willing to offer a higher payment or lower prices to the distributor without some assurance that it will receive some incremental volume.  Exclusivity is often a simple and efficient way of specifying the incremental sales that the supplier will receive.[185]  The potential for both parties to mutually gain from the arrangement indicates that they have an incentive to adopt such agreements even when neither party has market power, and when such agreements do not have the potential to anticompetitively exclude rivals.  These types of arrangements, which are common across a variety of industries and business relationships, can make competition for distribution and promotion more intense and lead to higher payments to distributors.  These higher payments, in turn, are expected to benefit consumers by leading to lower retail prices and/or higher-quality distribution services.

181.    This general economic framework explains the search preinstallation requirements in the RSAs.  Exclusive preinstallation ensures that Google has an opportunity to receive the incremental promotion for which Google is paying wireless carriers and OEMs.  The exclusive preinstallation provision prevents wireless carriers and OEMs from acting opportunistically by collecting revenue share payments from Google while promoting a rival search provider in a way that diminishes or eliminates the value of the promotion of Google Search.  For instance, without this requirement, a carrier or OEM could promote a rival search engine (*e.g.*, by placing a rival search app or search box in a prominent position on the device), while still receiving payment from Google on a particular device model.  Essentially, the partner would be able to collect both from Google and its rival for the same incremental query volume but only deliver it to the rival.  The exclusive preinstallation requirement therefore protects Google's investment by preventing

---

[185] See, *e.g.*, Benjamin Klein and Andres V. Lerner, *The Expanded Economics of Free-Riding: How Exclusive Dealing Prevents Free-Riding and Creates Undivided Loyalty*, 74(2) ANTITRUST LAW JOURNAL 473 (2007).  Volume commitments, volume discounts, premium placement requirements, and other commitments to purchase more can serve similar purposes, although exclusivity can, in some circumstances, be the economically efficient arrangement.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

carriers and OEMs from receiving payment from Google without delivering the incremental query volume for which Google pays.[186]  The exclusive preinstallation provision therefore is a contracting solution that prevents opportunistic behavior by OEMs and wireless carriers that would diminish or Google's incentives to offer revenue share payments to OEMs and wireless carriers.[187]

182.    The fact that users can still easily access rival providers makes the RSA requirements unambiguously efficient because users get the benefits of lower device and/or wireless plan prices and easy access to the most-preferred search service, without the loss in choice and variety (which is a typical cost of exclusivity).[188]  Users that have a preference for an alternative search provider can easily access it from any mobile device by navigating to the website of another search provider using a browser, downloading the apps of alternative search providers through Play (on GMS devices), downloading alternative browsers (with a rival search provider as the default), and changing defaults.  Users get the benefits of lower device and/or wireless plan prices without the loss in choice and variety that accompanies exclusive arrangements in some other industries (such as arrangements in supermarkets or other retail environments).

### c) *RSAs do not anticompetitively exclude search rivals.*

183.    <u>The RSAs do not prevent user access to rival search providers:</u>  The RSAs do not prevent rival search providers from accessing users on Android devices.  The exclusive preinstallation provision only applies to device settings "out of the box," and does not constrain users from accessing rival providers by:

- navigating to the site of a rival search provider using a browser,

---

[186] These economics also highlight that the potential for opportunistic behavior is more significant the larger is the share of users that would use Google Search absent the preinstallation exclusivity, because a larger share of inframarginal users lowers the negotiated revenue share, making such opportunistic behavior more likely to be a profitable strategy for a carrier or OEM.  Put simply, the more attractive Google Search is to users, the greater the need for exclusivity to control opportunism by partners.

[187] Structuring the payments as revenue shares does not eliminate this potential type of opportunistic behavior.  Google shares search ad revenues not only on the incremental search query volume delivered by carriers, but on all queries from certain access points on the device (as specified in the agreements).

[188] See, *e.g.*, Benjamin Klein and Kevin M. Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75(2) ANTITRUST LAW JOURNAL 433 (2008).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- downloading alternative search apps (for free from Play and other app stores),

- downloading alternative browsers with a rival search provider as the default, or

- changing the search default on a browser. [189]

184.    Each RSA device also has Play and Chrome, on which users have unimpeded and easy access to rivals search and browser apps.  Users ubiquitously download apps they want, including apps that are substitutable to preinstalled apps.

185.    <u>The RSAs do not have a material impact on search competition</u>:  There is no evidence of substantial demand by partners for preinstalling search rivals on Android devices.  In fact, the evidence suggests the opposite.  For instance, Verizon did not preinstall a rival search provider despite the fact that its RSA did not include exclusivity terms and therefore could preinstall a rival search provider on any device without forgoing revenue share payments from Google.[190] This lack of evidence is consistent with the fact that Google is more efficient than rivals, both in providing higher-quality search services that are more valued by users and in matching user queries to advertisers, thereby monetizing more effectively.  Moreover, the choice screen evidence indicates that, even if a search rival were preinstalled side-by-side with Google, the additional query volume the rival would receive is limited.[191]

186.    This evidence indicates that search rivals would not receive materially more query volume in any but-for world absent the RSA exclusive preinstallation terms.  The RSAs' exclusive preinstallation provisions nonetheless are procompetitive even absent such demand. Google's assurance that partners would not engage in opportunistic behavior is part of a structure that enabled those partners to most efficiently monetize their devices, including by inducing Google to offer a higher revenue share than it otherwise would.

187.    Neither do the platform-wide RSAs have a material impact on search competition.  As an initial matter, today all U.S. carrier RSAs and major OEM arrangements, are device-by-device

---

[189] For instance, changing defaults in Chrome is straightforward.  The Chrome app enables users to switch the default service from Google to various alternatives in a menu showing a list of search options.

[190] 9/14/2021 Levine Dep. Tr. 233:18-236:10 (Google) (GOOG-ARCELL-00041376).  See also, Verizon-Google Co-Developed Device Strategic Marketing Agreement and Amendments, effective Oct. 1, 2009, GOOG-ARCELL-00056337.

[191] See discussion, Section IV.A.4.b).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

achieve "but for" some claimed anticompetitive aspect of the challenged conduct. As discussed below, the additional volume of queries that search rivals would receive in an economically sound but-for world is very limited. Thus, Google's search promotion arrangements do not foreclose rivals from a share of search volume that could hamper their ability to compete effectively by denying them of scale.

3.    <u>The evidence shows that defaults and preinstallation are neither necessary nor sufficient for competitive success.</u>

205.    Regarding the first question—the evidence shows that although search preinstallation and defaults are valuable because they make a recommended search service readily accessible to users out-of-the-box, and may influence the search engine choice of some users, they are not the only or even the primary way in which users access a particular search service. The evidence indicates that search providers can compete for users without preinstallation and defaults. In fact, Google has competed successfully even on platforms in which it lacks *any* preinstallation or preinstalled defaults. This evidence indicates that competing for users based on supplying higher-quality search services that users value, not preinstallation or defaults, is the primary driver of competitive success.

a)    *Windows PCs*

206.    Google currently does not have *any* preinstallation arrangements for Google Search or Chrome on Windows PCs (and has not had any preinstallation since 2015). In contrast, Bing is the default search engine on the preinstalled browser on nearly *all* Windows PCs—Microsoft's Edge-browser is preinstalled and set as the default browser on nearly all Windows PCs,[209] and Internet Explorer was the preinstalled and default browser for computers on previous versions of Windows.[210] Microsoft sets Bing as the default search engine in its Edge and Internet Explorer

---

[209] See, *e.g.*, *Online platforms and digital advertising Market study final report*, Competition and Markets Authority, July 1, 2020, Appendix H at H4: "Google has no default agreements with Windows PC manufacturers, with Bing being the default on these devices." See also, *id.* at H12: "Microsoft's search default agreements with Windows manufacturers provide for Microsoft Edge to be set as the default browser and for Bing to be set as default within Edge."

[210] 10/2/2023 Trial Tr. 3580:19-3582:9 (Nadella) (GOOG-ARCELL-00027983) ("Q The overwhelming majority of PCs sold in the world are covered by the Jumpstart program, right? A That's correct. [...] Q To the best of your knowledge, Google Search and Chrome are not pre-installed on any Windows PC in the United States, correct? A

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

browsers.  Despite the preinstallation that Microsoft Bing has on all Windows PCs, Google competes successfully for users, achieving a much higher share of search usage than rivals, including Microsoft Bing.  Google's search usage share on Windows PCs was approximately 78 percent through 2021 before declining somewhat due to Microsoft's aggressive user prompting.[211]  In contrast, Bing's share was only approximately 14 percent for the same period, despite being the preinstalled search default on the preinstalled browser on nearly all Windows PCs.[212]  This means that users accounting for roughly 86 percent of search usage switched from the preinstalled search provider (Bing) to a non-preinstalled alternative (Google or another search engine).

207.    Google was the most widely used search engine on Windows PCs, despite a lack of wide preinstallation, when Windows PCs made up the vast majority of search usage.  In particular, Windows PCs made up the largest share of search usage of any platform for much of the relevant period—until 2016—as shown in Figure 10 below.[213]  In 2011, for instance, Windows PCs made up 74 percent of search usage.

---

Yeah, not pre-installed, that's correct. [...] Q Well, you have had the exclusive preloaded browser, which today is Edge, right? A That's correct. Q Edge defaults to Bing, right? A That's correct. Q And you've had the exclusive search engine, Bing, preloaded on all these Windows PCs, right? A That's correct. Q And that has been the case for many years? A That's correct.")

[211] Google's success on Windows is particularly significant given the fact that Microsoft historically has and continues to engage in strategies to prompt users to remain with or switch to Edge and Bing on Windows.  For instance, Microsoft has prompted users to change the default to the Edge browser and pinned the Edge browser to the desktop and taskbar when updating Windows 10.  Microsoft has displayed "pop-up" messages to dissuade users from downloading competing browsers on Windows computers.  Windows 11 users opening hyperlinks in Outlook and Teams will default to Edge even if the user has selected another browser as their overall default.

See Ben Schoon, *Microsoft Edge takes over Windows on first startup, basically ignores your browser choice*, 9to5Google, July 2, 2020, available at https://9to5google.com/2020/07/02/microsoft-edge-windows-startup-takeover/; Matthew Humphries, *Microsoft Tells Edge Users Chrome Is 'So 2008'*, PCMag, Dec. 2, 2021, available at https://www.pcmag.com/news/microsoft-tells-edge-users-chrome-is-so-2008; Andrew Cunningham, *Microsoft Edge will now warn users about the dangers of downloading Google Chrome*, ARS, Dec. 2, 2021, available at https://arstechnica.com/gadgets/2021/12/microsoft-edge-will-now-warn-users-about-the-dangers-of-downloading-google-chrome; Matthew Humphries, *Microsoft Decides Outlook, Teams Will Open Links Using Edge by Default*, PCMag, May 3, 2023, available at https://www.pcmag.com/news/microsoft-decides-outlook-teams-will-only-open-links-using-edge.

[212] Based on 2013 through 2021. Google DisplayNav data.

[213] Google DisplayNav data.

85

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 13**:  **Google's Share of Preinstallation vs. Search Usage on Windows PCs (U.S.)**



211.    This evidence is inconsistent with Plaintiffs' claims that preinstallation is key to competitive success.  The evidence shows that Bing's lack of success has been driven by its inability to *retain* users that purchase a computer with Bing as the preinstalled search provider. That is, Bing's inability to gain share is due to users actively switching away from Bing—either by navigating to Google.com, downloading an alternative browser with Google as the default, or changing the default settings on Internet Explorer/Edge.  This reality also undermines any claim that Google's current success—based on higher quality and monetization—is due to past default and preinstallation agreements.  If historical defaults and preinstallation dictated future success, that advantage would have favored Bing, not Google.

### b)    *Windows Mobile and Blackberry RIM*

212.    There also is no evidence that defaults and/or preinstallation is necessary to compete successfully on mobile devices.  Google also competed successfully on mobile device platforms, including Windows Mobile/Phone and Blackberry RIM mobile devices, despite Bing being the preinstalled default search engine.

90

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the default "reduces consumer surplus … because an important fraction of users are now defaulted into an undesirable search engine."[240]

225.    Moreover, in a but-for world in which Google was restricted from bidding for defaults and preinstallation, revenue share payments (from Microsoft or another search provider) would be much lower since competition would be severely hampered by restricting the most efficient search provider from bidding. These lower revenue share payments, in turn, would lead to higher prices and/or lower quality for Apple devices. The fact that Bing has been the only search rival competing with Google for the Safari search default suggests that the revenue share payments received by Apple likely would be much lower if Google could not compete for that promotion. Thus, a but-for world in which Google could not compete for promotion would lead to lower quality and higher prices for users.

> b)    *Even if one measures foreclosure relative to a choice screen, the impact of the challenged agreements is very limited.*

226.    A choice screen also is not an economically sound but-for world. Economics and empirical evidence indicate that a choice screen is not a rational economic choice for partners and is not a competitive market outcome. A choice screen is at odds with the longstanding industry practice of partners (including browser providers, Android OEMs, and wireless carriers) to preinstall and/or set as a default a search provider, and to have search providers compete for such positions. Partners such as Apple and Mozilla have always had the option of using a choice screen but have chosen not to do so. The "revealed preference" of partners rejects the assumption that a choice screen is a reasonable competitive market outcome. In particular, the history of the search industry shows that choice screens (or other forms of "access point parity") are unattractive to partners. Eddy Cue, Apple's SVP of Services, testified that implementing a search choice screen on Safari is not "something [Apple has] ever wanted."[241] The only examples of a choice screen—such as on Android devices in Europe and in Russia—were

---

loss is only marginally smaller, at $70.81 per user per year. The adjustment due to economies of scale is very small because the paper estimates only "modest economies of scale." Allcott, et al. at 43-44.

[240] Allcott, et al. at 41.

[241] 9/26/2023 Trial Tr. 2476:2-8 (Cue) (GOOG-ARCELL-00037679) ("Q. And the ISA does not permit a choice screen for Apple users to set their default search engine out of box, correct? A. That's correct, and it's not something we've ever wanted. . . We think it's a mistake to ask the customer something like that.")

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

imposed as remedies pursuant to *regulatory proceedings*, not as a result of competitive, market-driven outcomes.[242]  This market evidence shows that it is in partners' interests to offer defaults to a search provider and to have search providers compete for such positions.

227.    The lack of interest by partners in implementing a search choice screen on their devices or browsers reflects the fact that it is inefficient relative to search default.  A choice screen artificially restricts partners' product design decisions and undermines their ability to monetize their valuable promotional space by having search providers compete for such promotion).

- *First*, the evidence indicates that a choice screen is an inferior product design from a user experience perspective.  Several factors make a search choice screen inefficient relative to setting one search provider as the default.  First of all, the vast majority of users prefer Google.  Thus, a choice screen would force that majority to make a selection in a choice screen rather than have their preferred search engine enabled out-of-the-box.  Moreover, any convenience benefits of a choice screen for the small share of users that have a preference for an alternative search service is likely to be small given that those users can access an alternative service in various ways, including changing the default, downloading an alternative search or browser app, or navigating to the website of a search provider.  Additionally, a choice screen deprives those users that rely on a partner's recommendation of a choice screen service, a key attribute of setting a default. The lack of any market-based precedent for a choice screen also is supported by the fact that Google's search rivals, including Microsoft Bing and Yahoo!, also do not contract for a choice screen but have themselves competed for the default position.

- *Second*, a choice screen would lead to lower payments to partners because it hinders competition for promotion between search providers.  A choice screen eliminates or significantly diminishes the incentive for search providers to compete on price (revenue share).  Moreover, in contrast to a default, a choice screen does not lead to outcomes that

---

[242] Julian Chokkattu, *Russian Android users will now be able to choose between Google and Yandex*, Digital Trends, Apr. 18, 2017, available at https://www.digitaltrends.com/phones/russian-anti-competitive-ruling-against-google-upheld/; Paul Gennai, *An update on Android for search providers in Europe*, Google, Aug. 2, 2019, available at https://blog.google/company-news/inside-google/around-the-globe/google-europe/update-android-search-providers-europe/; Oliver Bethell, *Changes to the Android Choice Screen in Europe*, Google, June 8, 2021, available at https://blog.google/company-news/inside-google/around-the-globe/google-europe/changes-android-choice-screen-europe/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

reflect search engines' cost advantages.  Users choose a search engine on a choice screen according to their preferences but will not take into account differential monetization generated by each search engine.  With a default, a partner is able to steer users towards a provider that monetizes better due to higher quality and allows the provider to offer the partner a higher revenue share payment.  With a choice screen, a partner cannot take advantage of a supplier that has better monetization, and a more efficient supplier cannot benefit from superior monetization in competing for promotion, which is economically inefficient and detrimental to partners and users.

228.    Rather, partners have an incentive to set a default or preinstalled search service on their browsers and devices, and to choose as the default a high-quality search service preferred by their users.  By doing so, partners also can secure increased payments that they can pass through to users in the form of higher quality and/or lower prices for their devices or services.

229.    Nevertheless, even if one measures foreclosure relative to a choice screen—as a measure of consumer preferences—the impact of the challenged agreements is very limited.  Recent evidence from the implementation of a choice screen implies that implementing choice screens rather than a Google default, at most, shifted a very small share of search volume.  In Europe where a choice screen was implemented in response to the *Android* decision, 95.7 percent of users across all countries chose Google over search rivals as shown in Figure 16 below.[243]

---

[243] Google Choice Screen data.

below.[244]  Thus, there is no evidence that rivals gained *any* material search usage share after the implementation of the choice screen.

**Figure 17**:  **Rivals' Share of Search Usage on Android (Europe)**



232.    The findings of the lack of a material impact based on the European choice screen on Android devices discussed at trial are confirmed by the Allcott et al. academic study showing that Google Search's share of Chrome declined by only 1.5 percent as a result of implementing a choice screen rather than setting Google as the default search provider.[245]

233.  The evidence indicates that rivals would not have gained a material share of search volume in any economically sound but-for world.  Using a conservative estimate of share shift to rivals of 1.5 percent (the largest of the effects cited above), the incremental search query volume that rivals could have received on third-party browsers is approximately *0.5%* of total U.S. search queries in 2024.  On Android, the evidence shows that the incremental query volume that rival search providers could have received absent the Android agreements based on the choice screen

---

[244] Google DisplayNav data.

[245] See Allcott, et al., Table 10.  The 1.5% represents the decrease in the share of Google on Chrome (column 3 of the table) when moving from the "status quo" with Google as default (Google share at 98.8%) to the "choice screen" scenario (Google share at 97.3%).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

evidence would be approximately *0.3%* of total US search in 2024. All in all, the available evidence indicates that the impact of Google's browser defaults and Android agreements relative to a choice screen would have been less than *1 percent* of total industry search volume in 2024.[246]

### B. The challenged agreements do not impair rivals' ability to compete by depriving them of scale

234. Plaintiffs' claim that Google's default and preinstallation agreements have "denied its rivals access to the scale that would allow rivals to increase quality. By depriving them of scale, Google also hinders its rivals' ability to secure distribution going forward, insulating Google from competition."[247] But the evidence does not support Plaintiffs' claim that the very limited incremental search volume that rivals could have received in any economically sensible but-for world—even based on the highly-conservative assumptions described above—would have enabled rival search providers to offer higher-quality search services or otherwise compete more effectively. There also is no evidence that, given a marginal improvement in search quality, search rivals would receive materially more users or search volume. And there is no evidence that a small share shift would yield substantially stronger rivals over time.

## V. PLAINTIFFS' CLAIMS THAT THE CHALLENGED AGREEMENTS HARMED USERS IS ECONOMICALLY FLAWED AND INCONSISTENT WITH THE EVIDENCE

235. Plaintiffs assert that Google's conduct has harmed users because they have been deprived of alternative high-quality search engines that may be "more responsive to Plaintiffs' demands for privacy" and/or show no or fewer advertisements.[248] In particular, Plaintiffs claim that "By restricting competition in general search services, Google's conduct has also harmed users by reducing the quality of general search services related to privacy, data protection, and the use of consumer data…"[249] According to Plaintiffs, but-for the challenged conduct, "Plaintiffs and

---

[246] Google AdEvents Logs data; Google Partner data; Google Search Access Point data; Statcounter.

[247] Complaint at 132.

[248] Complaint at 210.

[249] Complaint at 40.

103

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

others would be free to choose competitive search engines that may be more user-friendly, more solicitous of Plaintiffs' privacy, more careful about the sale of Plaintiffs' personal information, even more up-to-date and innovative…."[250]  I understand the Court concluded that Plaintiffs "adequately allege[d] antitrust injury based on their theory that Google's allegedly anticompetitive use of default contracts have precluded competitors from providing consumers high-quality search products that are more privacy protective and ad-free."[251]

236.    As I discuss in this section, Plaintiffs' claims that the challenged agreements restricted competition from search engines that are "more privacy protective" and/or "ad-free" are flawed and inconsistent with the evidence.  There is no basis that any such search engines would have offered higher quality search services, achieved additional distribution or promotion, or attracted more users or search volume in an economically sound but-for world.

### 1.    The economics of privacy

#### a)    *The collection and utilization of user data enhance the provision of high-quality search services at low prices.*

237.    In the digital era, the collection and utilization of data, including data from users, is fundamental to the underlying functionality and quality of products and services.[252]  Across the economy, firms ranging from supermarkets to digital retailers and mobile applications collect and utilize various types of data to improve and expand their offerings to consumers.  Like many other digital firms, Google utilizes user data to improve the relevance of its search results and improve matches between user queries and advertisements, providing benefits to both users and advertisers.[253]  This practices is not unique to Google—rivals such as Bing, Yahoo!, ChatGPT,

---

[250] Complaint at 213.

[251] *Arcell, et al. v. Google LLC, et al.*, In the United States District Court for the Northern District of California, Case No. 3:22-cv-02499-RFL, Order Granting in Part and Denying in Part Motion to Dismiss Third Amended Complaint, Jan. 16, 2025 at 2.  I understand that in this same Order, the Court concluded that "Plaintiffs still fail to plausibly allege antitrust injury based on their theory that Google's default contracts have stifled the development of search engines that compensate users for their search data."

[252] See, *e.g.*, Matthew Quint and David Rogers, *What is the Future of Data Sharing?*, Columbia Business School, Oct. 2015 at 21.

[253] See *Automatically generating and ranking results*, Google Search, accessed on Mar. 5, 2026, available at https://www.google.com/intl/en_us/search/howsearchworks/how-search-works/ranking-results/; *Advertising*, Google Privacy & Terms, accessed on Mar. 5, 2026, available at https://policies.google.com/technologies/partner-sites?hl=en-US.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Yelp, and Amazon, along with many other online and offline entities, rely on user information to refine their services and compete effectively.

238.    Claims that users would benefit from a limitation in the collection of user data ignore the significant quality improvements and other benefits generated by that data.  The collection and utilization of user data in search involves an inherent economic tradeoff between user privacy and the provision of high-quality, low-priced search services.  To accurately assess the impact of data usage on search demand, one must not only account for user preferences regarding collection and use of that data, but also how use of that data benefits users.  The collection and utilization of user data provides both direct and indirect benefits to users.

239.    Direct benefits to users:  Information such as query history and location is frequently used alongside a user query to improve the relevance of search and the matching of queries to advertisements.  For example, Google can utilize a user's location and recent search history to ascertain whether a search for "Giants" refers to the New York football team rather than the San Francisco baseball team or a mythical character.[254]  Users also benefit from data-driven features such as autocomplete, which predicts intended searches based on past queries, location, and regional trends.[255]  Google also uses typical search behavior within the same region to suggest related products or topics, further improving the utility of the service.[256]

240.    The experience of rivals like DuckDuckGo illustrates how limitations on the use of some types of data, such as precise location data, can undermine search quality.[257]  DuckDuckGo admits on its website that its "anonymous localized results" can be inaccurate for queries like

---

[254] See *Automatically generating and ranking results*, Google Search, accessed on Mar. 5, 2026, available at https://www.google.com/intl/en_us/search/howsearchworks/how-search-works/ranking-results/; *How Search works with your activity*, Google Search Help, accessed on Mar. 5, 2026, available at https://support.google.com/websearch/answer/10909618?hl=en.

[255] Danny Sullivan, *How Google autocomplete works in Search*, Google, Apr. 20, 2018, available at https://blog.google/products/search/how-google-autocomplete-works-search/.  See also, 10/28/2021 Nayak Dep. Tr.. 142:9-143:1 (Google) (GOOG-ARCELL-00043916).

[256] Arooj Ahmed, *Google Is Making Changes To Related Search Area Present At The Bottom Of Result Pages*, Digital Information World, Apr. 22, 2020, available at https://www.digitalinformationworld.com/2020/04/google-is-making-changes-to-related-search-area-present-at-the-bottom-of-result-pages.html.

[257] See, *e.g.*, Danny Sullivan, *How Location Helps Provide More Relevant Search Results*, Google, Dec. 16, 2020, https://blog.google/products/search/location-relevant-search-results/:  "Location is another important factor to provide relevant Search results. It helps you find the nearest coffee shop when you need a pick-me-up, traffic predictions along your route, and even important emergency information for your area."

105

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that provides lower-quality search results and that cannot adequately generate revenue share payments, is significantly less valuable for users and partners.  Moreover, as discussed further below, consumer preferences toward privacy are highly heterogeneous.  To understand the impact that the utilization of user data may have on users' search engine preferences, one must also understand how this impact may vary across users.

b)    *Users have heterogeneous preferences for "privacy."*

244.    Even among users who prioritize "privacy" to some extent, preferences are not uniform. "Privacy" means different things to different people.  The economics literature finds that user attitudes toward privacy are highly heterogeneous, with significant variation among individuals, over time, and across different contexts and types of data.[261]

245.    Consumer preferences with regards to "privacy" are inherently context specific.  User preferences towards the sharing of data depend on how they expect the data will be used.  Most people tend to view certain categories of data as more personally sensitive than others and are less willing to share more sensitive data.[262]  But users are more likely to do so if they believe it generates value for them.[263]  Many consumers express a willingness to share their data in exchange for better or more personalized services.[264]  Users who find certain forms of online advertising annoying or invasive generally are not referring specifically to search ads, which are often viewed as more relevant or useful (see discussion below).

246.    Users also have heterogenous preferences regarding the fundamental tradeoff between "privacy" and service quality and functionality.  While some individuals prioritize limitations on

---

[261] See, *e.g.*, Matthew Quint and David Rogers, *What is the Future of Data Sharing?*, Columbia Business School, Oct. 2015 at 56; Jason I. Pallant, et al., *When and How Consumers are Willing to Exchange Data with Retailers: An Exploratory Segmentation*, 64 JOURNAL OF RETAILING AND CONSUMER SERVICES 1 (2022) at 7.

[262] See, *e.g.*, Kirsten Martin and Helen Nissenbaum, *Measuring Privacy: An Empirical Test Using Context to Expose Confounding Variables*, 18 THE COLUMBIA SCIENCE & TECHNOLOGY LAW REVIEW 176 (2016) at 177:  "Our study has called privacy concepts into question by showing that 'sensitivity' of information and 'concern' about privacy are not stable in the face of confounding variables:  privacy categories and sensitivity labels prove to be highly influenced by the context and use of the situation."

[263] Matthew Quint and David Rogers, *What is the Future of Data Sharing?*, Columbia Business School, Oct. 2015 at 21; Avi Goldfarb and Catherine Tucker, *Shifts in Privacy Concerns*, 102(3) AMERICAN ECONOMIC REVIEW 349 (2012) at 349.

[264] See, *e.g.*, Timothy Morey, et al., *Customer Data: Designing for Transparency and Trust*, 93(5) HARVARD BUSINESS REVIEW 96 (2015) at 7-8.

107

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the use of their data and are willing to accept lower quality or functional services, others actively prefer the enhanced quality, convenience, and relevance enabled by the utilization of user data. As discussed below, the evidence shows that in the context of search, most users do not prioritize more "privacy" over search quality.

247.    Offering users choice in the form of data privacy controls helps resolve these heterogenous user preferences regarding the trade-off, allowing individuals to balance their individual preferences for privacy with their demand for service high-quality and functionality. Because user preferences for privacy are highly diverse, privacy settings that offer users choices—such as those offered by Google—have proved more valuable to a broader set of users than the specific, rigid notion of privacy advanced by "privacy-focused" search engines like DuckDuckGo.  Data privacy controls allow users to balance their individual preferences for privacy and relevance and functionality.  This flexibility allows users to choose the functionality they demand while managing their data according to their individual preferences.

248.    Google competes for a broad user base by offering superior search quality and functionality while offering users privacy controls.  In contrast, DuckDuckGo offers a specific trade-off between functionality and "privacy" that is attractive to a much smaller subset of users. As discussed, the attributes that purportedly make a search engine like DuckDuckGo more "private" (such as the limitations on the use of precise location information) also inherently diminish search quality and monetization.

249.    Google provides many data privacy controls that enable users to manage how their data is collected and used.  Examples include opt-in/opt-out options regarding the use of information in search and search ads, data collection reminders and privacy/security checkups, options regarding the duration of data retention, and both manual and auto-deletion features for certain forms of data.[265]  For example, "[w]hen your Web & App Activity is turned on" in a Google account, "you get Google Search results tailored for you based on things like your activity and

---

[265] *Privacy tools that put you in control*, Google Safety Center, accessed on Mar. 3, 2026, available at https://safety.google/intl/en_sg/settings/privacy-settings/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

are seeking.[272]  This inherent utility reinforces the broad user preference for an ad-supported model.  Additionally, search ads are typically non-intrusive, as users can easily ignore or bypass them.

256.    The limited success of providers like Neeva and Kagi underscores this reality.  While these firms offer(ed) an ad-free experience in exchange for a subscription fee, they have attracted only a trivial audience.  Sridhar Ramaswamy, co-founder and former CEO of Neeva, testified that Neeva is no longer a consumer search engine because Neeva struggled with user growth as well as other challenges.[273]  He further testified that Neeva was in a "modest place when it came to subscription revenue" of less than a million dollars before he sold Neeva to Snowflake in 2023 for approximately $185 million.[274]  The experience of these services confirms that when faced with a direct tradeoff between viewing ads and paying a subscription fee, the vast majority of users choose the former. The failure of these ad-free search engines to gain significant traction demonstrates that a subscription-based search engine is a less desirable offering for users.  Consequently, as discussed below, these search engines lack the broad user appeal (and monetization) necessary to compete successfully for default and preinstallation arrangements with partners who seek to maximize the value of their products to a broad user base.

      3.    <u>There is no basis for Plaintiffs' claim that search engines that offer "more privacy" would have competed more effectively in the but-for world.</u>

          *a)*    *There is no evidence that search engines that offer "more privacy" would have obtained greater promotion or search volume in the but-for world.*

257.    There is no evidence for the claim that privacy-focused search engines would have obtained greater scale, search volume, or promotion in a but-for world.  In a but-for world absent the challenged agreements, browser developers, OEMs, and wireless carriers would have continued the long-standing and ubiquitous practice of preinstalling search engines on their

---

[272] According to a recent study by Verve, 76% of participants responded they "more likely to pay attention to ads that felt relevant to them," 72% reported "they would be less likely to pay to remove ads if they were targeted and interesting," and 48% said they were "most likely" to engage with relevant ads.  Marisa Jones, *Consumers respond better to relevant ads but feel negatively toward personalization, per Verve*, eMarketer, Oct. 17, 2025, available at https://www.emarketer.com/content/consumers-respond-better-relevant-ads-feel-negatively-toward-personalization--per-verve.

[273] 10/2/2023 Trial Tr. 3674:17-3675:6 (Ramaswamy) (GOOG-ARCELL-00028144).

[274] 10/2/2023 Trial Tr. 3677:4-6, 3791:14-3792:23 (Ramaswamy) (GOOG-ARCELL-00028144).

111

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

devices and setting search defaults on their browsers. As discussed, there is no evidence that any of these partners prefer a different product design such as a search engine choice screen.

258.    Moreover, in the but-for world, as in the actual world, browser developers, OEMs, and wireless carriers would continue to make decisions regarding defaults and preinstallation based on search quality and monetization. As Apple executive Eddy Cue explained in testimony regarding default promotion in September 2023: "You have to remember, … the revenue doesn't just come in…. That would be easy if it were true. The way that it works is customers have to go and search on Google or search on Bing … and then they have to provide great results so the customers keep doing it and customers want to keep doing it and using it, otherwise, it's very easy to switch…. And, secondarily, you have to know how to do advertising."[275] Cue further explained that in the particular negotiation cycle in 2015 to 2016, Apple decided to select Google rather than Bing as the default on Safari because Google has "the best search engine, they know how to advertiser, and they're monetizing really well."[276]

259.    In a but-for world without the challenged conduct, these same considerations of quality and monetization would have continued to drive partners' choice of search engine. There is no evidence that any browser developer, OEM, or carrier would have placed greater emphasis on privacy in the but-for world. Moreover, as discussed, search engines that prioritize privacy as their main selling point often do so by implementing features that inherently degrade search quality and diminish monetization capacity. Consequently, these search engines are less desirable to partners who focus on overall quality and broad user appeal when setting defaults or preinstalling search services.

260.    Consistent with these economic realities, the evidence shows that no browser provider, OEM, or wireless carrier refrained from setting a different search engine as a default due to the terms of the challenged Google agreements. For example, John Giannandrea of Apple testified in September 2023 that he was not aware of Apple having considered using DuckDuckGo as the default search engine in the Safari browser because DuckDuckGo "is a veneer on top of other

---

[275] 9/26/2023 Trial Tr. 2527:17-2528:21 (Cue) (GOOG-ARCELL-00037679).

[276] 9/26/2023 Trial Tr. 2527:17-2528:21 (Cue) (GOOG-ARCELL-00037679).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

itself based on prioritizing privacy or less (or no) ads.  These examples highlight that even when partners choose a non-Google search engine as the default or preinstalled search provider, they do not select search engines that prioritize privacy as their main selling point due to their limited user demand and inferior performance.

262.    Monetization also would have been an important factor driving default and preinstallation decisions for browser developers, OEMs, and wireless carriers in the but-for world.  As previously discussed, higher revenue share payments are economically equivalent to lower wholesale prices, and these lower prices are essential for partners since they enable partners to compete more effectively by offering higher-quality products at lower prices.  As discussed, because the limitations of privacy-focused search engines typically reduce the ability to match user queries to advertisers and thereby generate ad revenue, these rivals are unable to offer competitive revenue share payments to browser developers, OEMs, and wireless carriers.  This reality would also have been true in the but-for world.

263.    Ultimately, Plaintiffs provide no economic basis for why search rivals that offer "more privacy" would win more promotion or otherwise receive more search volume in the but-for world.  In any economically valid but-for world, browser developers, OEMs, and wireless carriers would continue to make decisions about search defaults and preinstallation based on the superior search quality and high revenue share payments that Google offers and not based on the privacy attributes of a search engine such as DuckDuckGo.  Thus, there is no evidence that the challenged agreements caused those search rivals to be less readily available or denied them the scale necessary to improve their services.

> b)    *There is no basis or evidence that search engines that offer "more privacy" would have offered higher quality in the but-for world.*

264.    Consequently, there is no economic evidence to suggest that "more privacy protective" search services would have offered higher quality in a but-for world.  Because there is no economic or empirical basis for the claim that these search engines would have had more defaults, preinstallation, or other promotion by partners in the but-for world, there is also no basis for the claim that they would have achieved greater scale.  And, thus, there is no basis for Plaintiffs' claim that these privacy-focused search engines would have achieved greater quality in the but-for world.

114

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

265.    The claim that DuckDuckGo's quality would have improved in a but-for world also is at odds with the fact that it has not developed its own technology for operating a standalone general search engine, instead adopting a strategy of syndicating the vast majority of its organic and paid search results from Microsoft.[281]  Accordingly, there is no basis to assume that any additional search volume DuckDuckGo hypothetically would have received in the but-for world would have transformed its technical capabilities or allowed it to significantly improve its search quality.

266.    In sum, there is no evidence that "more privacy protective" search engines would have been more numerous, more readily available, or of higher quality in the but-for world.

> 4.    There is no basis that ad-free, subscription-based search engines would have competed more effectively in the but-for world.

267.    For similar reasons, there is no economic or empirical evidence for the claim that ad-free, subscription-based search engines would have competed more effectively or obtained greater promotion in the but-for world.  Search engines that offer ad-free services lack broad consumer appeal.  As demonstrated by the experience of subscription-based search services like Neeva, there is limited demand for ad-free, subscription-based search services.  Neeva's CEO, Sridhar Ramaswamy testified in October 2023 (after he sold the company to Snowflake) that Neeva's unsuccessful business model of offering ad-free, subscription based search services depended on overcoming the "power of zero," meaning the concept that people like free products and services.[282]  Although Neeva attracted several million unique users per month, its ad-free business model did not succeed because users did not want to pay to search and Neeva's revenues from subscriptions "was less than a million dollars."[283]

268.    Subscription-based search engines are particularly poor alternatives for a default position because they conflict with the primary benefit of a default—a convenient and seamless "out-of-the-box" experience.  Eddy Cue of Apple has testified that "the beauty in why" Safari's integrated search box has "worked so well is that it just works," and "the whole concept" is that

---

[281] 9/21/2023 Trial Tr. 2146:15-2147:25 (Weinberg) (GOOG-ARCELL-00026696).

[282] 10/3/2023 Trial Tr. 3735:11-17 (Ramaswamy) (GOOG-ARCELL-00028144).

[283] 10/3/2023 Trial Tr. 3734:12-3735:10, 3676:1-3677:10 (Ramaswamy) (GOOG-ARCELL-00028144).

115

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"when a customer uses it, it just works."[284]  Similarly, Mitchell Baker of Mozilla has testified that "[y]ou want the browser to work when it starts, and so … the default in the search box … is what happens if the user makes no choice."[285]  Contrary to this primary purpose of a search default, a subscription service requires that users sign up, provide payment information, or switch to another provider if they are unwilling to pay, thereby breaking the seamless experience that partners prioritize.  Thus, an ad-free, subscription-based search engine would not have been an attractive alternative for defaults.

269.    Consistent with this, there is no evidence that any partner wanted to set as a default a search engine that required users to pay a subscription fee to access its full functionality, such as Neeva.  And there is no evidence that Neeva ever proposed to be the default search engine on any browser or a preinstalled application on any device.  Neeva's CEO has described discussions with Apple to be listed in the pull-down menu in Safari with other search engines such as DuckDuckGo, Bing, and Ecosia, but those discussions "just didn't go anywhere."[286]  And those discussions were not for the default on Safari.

270.    Ultimately, there is no evidence that ad-free, subscription-based search engines would have been more numerous, more readily available, or of higher quality but-for the challenged conduct.  Their limited success is a function of a business model that fails to align with the demands of both partners and the vast majority of users.

## VI.  CONCLUSIONS

271.    The conduct challenged by Plaintiffs has enhanced rather than hindered competition in search.  Far from harming competition and consumers, the conduct challenged by Plaintiffs have enhanced search competition, expanded search output, and generated significant benefits for users, developers, browser providers, OEMs, and wireless carriers.  Plaintiffs' claims that this conduct restricted competition from "more privacy protective" or "ad-free" search engines are economically misguided and inconsistent with the evidence. There is no basis to conclude that

---

[284] 4/13/2022 Cue Dep. Tr. 25:20-26:8, 124:7-125:2 (Apple) (APLARCELLGOOG_000360).

[285] 1/6/2022 Baker Dep. Tr. 46:23-47:23 (Mozilla) (MOZILLA-ARCELL-00000001).

[286] 10/3/2023 Trial Tr. 3789:9-14 (Ramaswamy) (GOOG-ARCELL-00028144).

116

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

such services would have achieved greater promotion, volume, or quality in an economically sound but-for world.  Ultimately, Plaintiffs propose sacrificing tangible and significant consumer benefits to protect rivals whose services have been consistently rejected by users and partners in favor of Google's superior offerings.  Such a proposal is fundamentally antithetical to the principles of antitrust economics.

Andres V. Lerner

March 6, 2026

117