Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, Floor 14
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Last Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| Mary Katherine Arcell, *et al.*,<br><br>                    Plaintiffs,<br>vs.<br><br>Google LLC, Alphabet, Inc., XXVI Holdings, Inc., Apple, Inc., Tim Cook, Sundar Pichai, and Eric Schmidt,<br><br>                    Defendants. | Case No:  3:22-cv-02499-RFL |

**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE
RE: SUBJECT-MATTER JURISDICTION**

**I. PRELIMINARY STATEMENT**

Pursuant to the Court's Order (ECF 256), Plaintiffs respond to the Court' OSC with respect to Article III standing. Fed. R. Civ. P. 56(e).  Plaintiffs further submit that under Rule 56(d) Plaintiffs are entitled to the testimony of the witnesses that Google has withheld to date, each of whom bears directly on issues of the causation and damages raised by the Court; Plaintiffs cannot fully respond to the OSC without it.

**II. THE COURT HAS TWICE HELD THAT PLAINTIFFS' CAUSATION AND INJURY THEORIES ARE LEGALLY SUFFICIENT**

Antitrust injury requires (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type of the antitrust laws were intended to prevent.  In its January 16, 2025 Order (ECF 138), the Court held that Plaintiffs had adequately alleged antitrust injury on the theory that Google's default contracts precluded competitors from offering high-quality search products that are more privacy protective and ad-free. (*See* Appendix A).  In its January 21, 2026 Order in *Attridge v. Google LLC*, 816 F. Supp. 3d 1059 (N.D. Cal. 2026), the Court went further, sustaining *both* theories of consumer antitrust injury in a but-for world: (a) access to more privacy-protective and less ad-laden alternatives, and (b) compensation to users for their searches, data, and attention.  (Appendix A).

**III. THE RECORD EVIDENCE SUPPORTS EACH LINK IN THE CAUSAL CHAIN THAT THE COURT HAS ALREADY SUSTAINED**

**1. INJURY IN FACT**

All Plaintiffs used Google for search, and each named Plaintiff testified under oath, from personal experience to two concrete and particularized injuries: Google collected and monetized their search queries, their data, their time, and their attention without compensating

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION

them; and they were deprived of access to search alternatives offering them compensation, stronger privacy protections, or fewer ads.

In point of fact, set out here and in the attached Appendix, Plaintiffs suffered direct antitrust injury from Google's exclusionary conduct in the general search market. Plaintiffs' injury is both monetary and quality-based: Plaintiffs lost the benefits of competition that would have included potential compensation for searches and search data; more privacy-protective search options; fewer or no advertisements; and broader choice among competing general search engines ("GSEs"). Google's anticompetitive conduct has precipitated tangible and measurable harms to Plaintiffs.

Google, an adjudicated monopolist, failed to compensate users for: (i) using Google search; (ii) for the time and attention spent viewing search ads; (iii) for advertising revenue generated from Plaintiffs' user activity; and (iv) for the extraction, collection, use, and monetization of search data, including advertising, product development, and AI training. These injuries are not speculative. Search competitors have historically attempted to attract users through compensation, and real-world examples demonstrate that users such as Plaintiffs could have been compensated for search activity, attention, or data absent Google's exclusionary conduct. Absent the proven monopoly, compensation to attract and retain search users would have become a major - and eventually standard - competitive feature.

A. **Uncompensated taking and monetization of Plaintiffs' data, time, and attention**

| Talewsky Dep. 66:8–14 | "They are taking my information. I'm not getting compensated. . . . if I go on Google 20 times a day and they are getting paid for each click . . . after 20 years or so, that adds up." *See also* 70:4–11; 97:1–7. (App. B-4, 8; C-1.) |
| Faust Dep. 112:3–23 | "I believe I've lost income from not being compensated." *See also* 103:16–23; 122:12–16. (App. B-4, 8; C-2.) |
| D'Augusta Dep. | Google "monetizes my data; monetizes my query, can get very high |

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION

| 51:18–52:3, 91:9–16 | prices for it from an advertiser," and "doesn't pay me or compensate me in any way." (App. B-4, 8; C-3.) |
|---|---|
| Rubinsohn Dep. 82:14–25, 88:17–89:5 | "if my personal data is being given to somebody else, that's harm"; damages include "compensation for the economic value of the information Google collected." (App. B-4, 8; C-4.) |
| Freeland Decl. ¶¶ 4–5, 8 (adopted by all Plaintiffs) | "My search history, browsing activity, and personal data has both economic and exchange value"; "Google received value from my searches and data without paying me." (App. B-4, 8; C-5.) |

## B.  Deprivation of privacy-protective, ad-free, and compensating alternatives

| Talewsky Dep. 31:8–10, 32:1–8 | uses DuckDuckGo because "they don't have the tracking," but returns to Google because of its quality advantage. (App. B-3,4,7,8; C-1.) |
|---|---|
| Faust Dep. 62:9–21, 69:1–13, 117:1–7 | would prefer a non-tracking alternative; "consumer has fewer choices" because of pre-installation relationships with device manufacturers. (App. B-3,4,7,8; C-2.) |
| D'Augusta Dep. 87:8–88:5 | "were there other competitors . . . I might have an opportunity to be offered better service . . . to be shown less ads . . . better . . . information protection . . . to be rewarded." (App. B B-3,4,7,8; C-3.) |
| Rubinsohn Dep. 56:5–22 | resorts to DuckDuckGo, Edge, Firefox, and Bing because Google sells his data. (App. B-3,4,7,8; C-4.) |
| Freeland Decl. ¶¶ 3, 7 | "deprived of high-quality search alternatives that could have offered stronger privacy, less tracking, fewer ads, better innovation, and compensation." (App. B-3,4,7,8; C-5.) |

## C.  Privacy invasion and targeted advertising

| Faust Dep. 69:14–25, 117:10–20 | Google targets her searches with advertising — "not a coincidence" — and its tracking, storing, and selling is "a violation of my privacy." (App. B-3,4, 8; C-2.) |
|---|---|
| Talewsky Dep. 32:12–18 | after searches, ads appear "on any feed," plus unsolicited emails and calls: "someone's doing something with my information." (App. B-3,4, 8; C-1.) |
| D'Augusta Dep. 49:1–7, 50:19–51:15 | "ads follow me" after every keyword search; Google stores her search history for 18 months. (App. B-3,4, 8; C-3.) |

## 2. TRACEABILITY: THE EVIDENCE CONNECTING THESE INJURIES TO THE DEFAULT AGREEMENTS

The record traces these injuries to the challenged agreements through three factual links, each independently documented:

## A.  Google's own documents show the default agreements — not consumer preference — drive search volume

| Google's 2020 | Estimated that default placements drove 54% of its overall search |
|---|---|

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION

| internal modeling | revenue and projected that losing the Apple default would cost 60–80% of iOS query volume and $28.2–$32.7 billion in net revenue. Mehta Decision (Aug. 4, 2024). (App. B-2.) |
|---|---|
| Field-experiment evidence | Quantifies the same effect: changing the default search engine moves market share by roughly 40 percentage points, and one-third of Google users who tried an alternative for two weeks chose to keep using it. NBER, Sources of Market Power in Web Search. Roughly 70% of U.S. search queries occur where Google is the default. (App. B-6.) |

### B.  The foreclosure suppressed the very alternatives Plaintiffs testified they wanted

| Only two notable entrants in 15 years | DuckDuckGo (privacy) and Neeva (ad-free subscription) — and each was stunted or exited. Mehta Op. (App. B-1.) |
|---|---|
| DuckDuckGo's CEO testified under oath | DuckDuckGo "hit an obstacle with Google's contracts" when it sought default placements. *United States v. Google* trial testimony (Sept. 21, 2023). (App. B-1.) |
| Neeva's shutdown announcement (June 2023) | Ultimately, Neeva's inability to retain and attract users—and thus acquire scale—was a primary reason for its withdrawal from the market. (App. B-1,5.) |
| Microsoft CEO testified under oath | (a) if Bing had succeeded in getting the Safari traffic from Apple, "that would have made us more competitive as a search product that end users would have liked and advertisers and publishers would have benefited from as well." (App. B-5.) (ECF 106.5, Exhibit E to Alioto Decl., Tr. 3508:15-18 (Nadella).) <br> (b) Microsoft, the largest company in the world, which was willing to spend billions of dollars to enter the market, could not break into the general search services market against Google, because of the exclusionary effect of Google's pre-set default. (App. B-5.) (ECF 106.5, Exhibit E to Alioto Decl., Tr. 3500:9-3505:23; Tr. 3510:16-23 (Nadella).) |

### C.  Compensation for search was and is a real market practice, foreclosed here

| Operating compensation models | Microsoft Rewards has paid Bing users per search since 2010 (approx. half a cent per search); Presearch pays per search; Scour paid approx. $0.004 per point until 2009; Brave pays users 70% of ad revenue; Permission pays for ad engagement; Nielsen pays up to $60/year for passive browsing data. (App. B-3.) |
|---|---|
| Google's own conduct | internal emails discussed "cut[ting] users in on the deal," and by 2000 Google's Affiliate Program paid partner sites $0.03 per completed search — while Google instead paid gatekeepers billions for default placement. (App. B-3.) |

4

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION

| Consumer demand for paid and ad-free search persists | Kagi charges $5–$10/month for ad-free, no-tracking search with approximately 50,000 paying subscribers; Brave Search Premium offers ad-free search at $3/month. (App. B-3,4.) |
|---|---|

### 3. REDRESSABILITY: DAMAGES ARE CALCULABLE FROM RECORD BENCHMARKS

A damages award redresses both injuries, and the record supplies concrete valuation inputs: Google's internal 54% and 60–80% estimates (App. B-2); per-search market prices ($0.005 Bing; $0.0038 Scour; and $0.03 Google Affiliate Program payments (App. B-3,4).

## IV. CONCLUSION

The foregoing record evidence establishes injury in fact, traceability, and redressability under Rule 56(e).  Because this Court has twice sustained the precise causation and damages theories at issue in this case under the "more demanding" antitrust-standing framework, *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), the same evidence necessarily satisfies Article III.  The appended record evidence, including Plaintiffs' sworn testimony, Google's internal estimates, and real-world market benchmarks, support every link in the causal chain the Court described.   Should the Court nonetheless perceive any evidentiary gap, the relevant materials — Google's complete internal analyses of its default-placement value — remain in Google's exclusive possession. Plaintiffs would respectfully request relief under Rule 56(d) for access to that information before any dismissal.

Dated: June 15, 2026

Respectfully submitted,

By: */s/ Joseph M. Alioto*
ALIOTO LAW FIRM
Joseph M. Alioto
Tatiana V. Wallace
Attorneys for Plaintiffs

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION

**ADDITIONAL COUNSEL:**

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papale.com

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

Josephine Alioto (SBN 282989)
THE VEEN FIRM
20 Haight Street
San Francisco, CA 94102
Telephone: (415) 673-4800
Email: j.alioto@veenfirm.com

Robert J. Bonsignore, Esq.
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Attorneys for Plaintiffs

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT-MATTER JURISDICTION